**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | **NON-CONFIDENTIAL** Proprietary Information Contained in Pages 38, 39, and 50. |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | Ct. No. 22-00029 |
| SSAB ENTERPRISES LLC, | |
| and | |
| NUCOR CORPORATION, | |
| Defendant-Intervenors. | |
| DONGKUK STEEL MILL CO., LTD., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | Ct. No. 22-00032 |
| and | |
| NUCOR CORPORATION, | |
| Defendant-Intervenor. | |

**PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF
ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

14013807–1

August 5, 2022

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

## TABLE OF CONTENTS

I.    Introduction ................................................................. 2

II.   Statement Pursuant To Rule 56.2 ................................. 2

III.  Issues Of Law Presented And Reasons For Contesting The
      Administrative Determination ...................................... 3

IV.   Statement Of Facts ...................................................... 3

V.    Summary Of Argument ................................................ 10

VI.   Standard Of Review .................................................... 12

VII.  Argument .................................................................. 13

      A.   Commerce's Determination That The GOK's Provision Of
           Carbon Emission Permits To Hyundai Steel Constitutes A
           Countervailable Subsidy Is Unsupported By Substantial
           Evidence And Is Otherwise Contrary To Law ..................... 14

           1.   The KETS Does Not Provide A Financial Contribution
                Because There Is No Revenue Foregone That Is
                Otherwise Due. .......................................... 15

                a.  Commerce Misinterprets Unambiguous Language
                    Of The Tariff Act ................................... 16

                b.  Commerce's Interpretation Of "Otherwise Due" Is
                    Unreasonable. ....................................... 27

                c.  Commerce's Determination That Revenue Was
                    Foregone Is Unsupported By Substantial
                    Evidence. ........................................... 29

           2.   The KETS Program Does Not Provide A Benefit to
                Hyundai Steel. ........................................... 34

                a.  The KETS Program Imposes Burdens On Hyundai
                    Steel. .............................................. 37

                b.  Commerce May Not Disregard The Burdens That
                    The KETS Imposes. ................................... 42

           3.   The KETS Program Is Not Specific. .......................... 47

                a.  The KETS Is Not Specific Pursuant To Section
                    771(5A)(D)(i). ...................................... 47

i

*b. The KETS Meets The Requirements Of Section 771(5A)(D)(ii).* ..........................................................54

*VIII. Conclusion And Relief Requested* ................................................58

*Certificate Of Compliance* ........................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Asociacion de Exportadores e Industiales de Aceitunas de*
   *Mesa v. United States*,
   523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ............................. *passim*

*Asociacion de Exportadores e Industriales de Aceitunas de*
   *Mesa v. United States*,
   429 F. Supp. 1325 (Ct. Int'l Trade 2020) ..........................................53

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837, 104 S. Ct. 2778 (1984) ........................................ *passim*

*Coalition of American Flange Producers v. United States*,
   448 F. Supp. 3d. 1340 (Ct. Int'l Trade 2020) .....................................53

*CS Wind Vietnam Co. v. United States*,
   832 F.3d 1367 (Fed. Cir. 2016) ........................................................... 40

*Delverde, Srl. v. United States*,
   202 F. 3d 1360 (Fed. Cir. 2000) ......................................................... 26

*Gerald Metals, Inc. v. United States*,
   132 F. 3d 716 (Fed. Cir. 1997) ........................................................... 40

*Gov't Sri Lanka v. United States*,
   308 F. Supp.3d 1373 (CIT 2018) .............................................. 26, 40, 43

*Histeel Co. Ltd. v. United States*,
   547 F. Supp. 3d 1233 (Ct. Int'l Trade 2021) .......................................28

*Hyundai Steel Company v. United States*,
   19 F.4th 1346 (Fed. Cir. 2021) ...........................................................17

*La. Pub. Service Comm'n v. F.C.C.*,
   476 U.S. 355, 106 S. Ct. 1890 (1986) ..................................................22

*MCI Telecomms. Corp. v. AT&T Co.,*
   512 U.S. 218, 114 S. Ct. 2223 (1994) ................................................. 18

*SAS Inst., Inc. v. Iancu,*
   138 S. Ct. 1348 (2018) ..................................................................... 17

*SeAH Steel VINA Corp. v. United States,*
   950 F.3d 833 (Fed. Cir. 2020) ......................................................... 56

*Timex V.I., Inc. v. United States,*
   157 F.3d 879 (Fed. Cir. 1998) ......................................................... 17

*Timken Co. v. United States,*
   894 F.2d 385 (Fed. Cir. 1990) ......................................................... 57

*United States v. Menasche,*
   348 U.S. 528, 75 S. Ct. 513 (1955) ................................................. 22

*Williams v. Taylor,*
   529 U.S. 362, 120 S. Ct. 1495 (2000) ............................................. 22

*Zenith Radio Corp. v. United States,*
   437 U.S. 443, 98 S. Ct. 2441 (1978) ............................................... 42

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................. 13

19 U.S.C. § 1677(5) ............................................................... *passim*

19 U.S.C. § 1677(5A)(D) ....................................................... *passim*

19 U.S.C. § 1677(6) .................................................................. 45, 46

**Regulations**

19 C.F.R. § 351.106(c) ........................................................................ 10

19 C.F.R. § 351.503(b) ..................................................... 35, 36, 45, 46

**Other Authorities**

Black's Law Dictionary ..................................................................... 18

*Certain Cut-To-Length Carbon Quality Steel Plate from the*
  *Republic of Korea: Final Results of Countervailing Duty*
  *Administrative Review; 2019*, 87 Fed. Reg. 79 (Dep't
  Commerce January 3, 2022) ..................................................... *passim*

*Circular Welded Carbon-Quality Steel Pipe From the*
  *Socialist Republic of Vietnam: Final Negative*
  *Countervailing Duty Determination*, 77 Fed. Reg. 64,471
  (Dep't Commerce Oct. 12, 2012) .......................................... 30

*Countervailing Duties*, 63 Fed. Reg. 65,348, (Dep't
  Commerce Nov. 25 1998) ................................................ 43, 44, 45, 46

*Final Negative Countervailing Duty Determination: Certain*
  *Cold-Rolled Carbon Steel Flat Products From Argentina*,
  67 Fed. Reg. 62,106 (Dep't Commerce Oct. 3, 2002) .......................... 29

*Initiation of Antidumping and Countervailing Duty*
  *Administrative Reviews,*
  85 Fed. Reg. 19,730 (Dep't Commerce April 8, 2020) ......................... 3

Merriam-Webster Dictionary, ............................................... 18

Uruguay Round Agreements Act, Statement of
  Administrative Action, H.R. Doc. No. 103–316, vol.1,
  (1994) ..................................................................... 43

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

1.  Act on the Allocation and Trading of Greenhouse-Gas Emissions ("AAGEP")

2.  Cold-Rolled ("CR")

3.  Corrosion Resistant ("CORE")

4.  Countervailing Duty ("CVD")

5.  Cut-To-Length ("CTL")

6.  Emission Trading System ("ETS")

7.  Government of Korea ("GOK")

8.  Greenhouse Gas ("GHG")

9.  Hot-Rolled ("HR")

10. Korean Allowance Units ("KAUs" or "permits")

11. Korean Emission Trading System ("KETS")

12. Korean Won ("KRW")

13. Less Than Adequate Remuneration ("LTAR")

14. Period of Review ("POR")

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>SSAB ENTERPRISES LLC,<br><br>    and<br><br>NUCOR CORPORATION,<br><br>    Defendant-Intervenors. | **CONFIDENTIAL**<br>Proprietary<br>Information<br>Contained in<br>Pages 38, 39, and<br>50.<br><br>Ct. No. 22-00029 |
| DONGKUK STEEL MILL CO., LTD.,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>    and<br><br>NUCOR CORPORATION,<br><br>    Defendant-Intervenor. | Ct. No. 22-00032 |

## PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

I.    *Introduction*

In accordance with Rule 56.2 of the Rules of this Court, and the

June 7, 2022, Scheduling Order, ECF No. 36, Plaintiff Hyundai Steel

Company ("Hyundai Steel" or "Plaintiff") files this brief in support of its

Rule 56.2 motion for judgment upon the agency record.  Scheduling

Order, *Hyundai Steel Company v. United States*, No. 22-00029 (Ct. Int'l

Trade June 7, 2022), ECF No. 36.  As discussed below, the U.S.

Department of Commerce's ("Commerce") *Final Results* are

unsupported by substantial evidence and otherwise not in accordance

with law.

II.   *Statement Pursuant To Rule 56.2*

The administrative determination under review is Commerce's

*Final Results* in the administrative review of the countervailing duty

("CVD") order on cut-to-length carbon-quality steel plate ("CTL plate")

from the Republic of Korea, Case No. C-580-837, issued by Commerce,

which covered entries of subject merchandise into the United States

during the January 1, 2019 and December 31, 2019 period of review

("POR").  *See Certain Cut-to-Length Carbon-Quality Steel Plate From*

*the Republic of Korea: Final Results of Countervailing Duty*

2

*Administrative Review; 2019*, 87 Fed. Reg. 79 (Dep't Commerce

January 3, 2022) ("*Final Results*"), Appx1076–1077, and accompanying

Issues and Decision Memorandum, Appx1037–1075.

III.   *Issues Of Law Presented And Reasons For Contesting The*
       *Administrative Determination*

      1.     Whether Commerce's determination that the GOK's

provision of carbon emissions permits to Hyundai Steel constitutes a

countervailable subsidy is unsupported by substantial evidence and is

otherwise not in accordance with law.

IV.   *Statement Of Facts*

      On April 8, 2020, Commerce initiated an administrative review of

the CVD order on CTL plate from Korea. *Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 19,730

(Dep't Commerce April 8, 2020).

      On May 6, 2020, Commerce selected Hyundai Steel as the sole

mandatory respondent in this administrative review and issued initial

questionnaires to Hyundai Steel and the Government of Korea ("GOK")

the following day. *See* Appx14598-14602. Hyundai Steel filed its

response to Commerce's initial questionnaire on May 28, 2020. *See*

Appx1196.

On August 17, 2020, the petitioner, Nucor Corporation, filed a new subsidy allegation alleging, *inter alia*, that the GOK provides carbon emission permits for less than adequate remuneration ("LTAR"). *See* Appx9230. On April 26, 2021, Commerce initiated an investigation into the alleged provision of carbon emissions permits for LTAR, and issued questionnaires to Hyundai Steel and GOK regarding the alleged program. *See* Appx15438-15450.  Hyundai Steel and the GOK responded to the carbon emissions questionnaires on May 17, 2021. *See* Appx11902; Appx10110.

In its response, the GOK explained that it pledged to reduce its greenhouse gas emissions ("GHG") by 37 percent by 2030 pursuant to the Paris Agreement.  Appx10155.  To implement the reduction in GHG, the GOK established the Korea Emission Trading Scheme ("KETS") via the Act on the Allocation and Trading of Greenhouse-Gas Emission Permits ("AAGEP") and its Enforcement Decree.  Appx11573-11759; Appx11918-11925.  Pursuant to the AAGEP companies that emit a certain volume of carbon dioxide or equivalents (collectively, "carbon equivalents") are subjected to the KETS.  *Id.*  Specifically, entities that emit 125,000 tons of carbon equivalents or that have a place of business

that emits 25,000 tons or more carbon equivalents are subject to the KETS ("subject entities").  Appx10161; Appx11583.  Entities that do not emit 125,000 tons of carbon equivalents or have no single place of business that emits 25,000 tons or more worth of carbon equivalents are not subject to the KETS.  Appx10161; Appx10165; Appx11583; Appx11919.

To achieve its overall emissions reduction goals, the GOK implemented emission reduction targets in phases.  Phase One was from 2015 to 2017.  Appx.10155 n.4; Appx15496.  Phase Two covers 2018 to 2020 and thus applied to the underlying review.  Appx.10155 n.4; Appx15496.  Through the KETS, the GOK calculates and allocates Korean Allowance Units ("KAUs" or "permits") to subject entities based on the phase of the program, the number of permits available, and the number of participants.  Appx14330.  The permit system is the means by which the GOK sets carbon emissions caps because it requires subject entities to surrender the number of permits equivalent to their actual emissions levels at the end of each compliance year or else face substantial fines.  Appx10142.  Over time, the GOK reduces the amount of permits available.  Appx14330.  As a part of the mandatory

5

application for permits, companies must develop and report plans regarding fuel consumption and reducing greenhouse gas emissions. Appx11920. After reviewing applications, the GOK assigned an amount of permits to companies in Phase Two, based on their carbon emissions from 2014 to 2016, which is referred to as the "base period." Appx10141.

The GOK "unconditionally" allocates 100 percent of permits to entities that meet certain "trade intensity" or "production cost" criteria. Appx10143. Those criteria provide that a subsector may receive 100 percent of its assigned permits if (i) it has a "trade intensity" of thirty percent; (ii) its production costs are at least thirty percent; or (iii) it has a "trade intensity" of at least ten percent and production costs that are at least five percent.[1] Appx1052; Appx10139-10140; Appx11638. If an entity does not meet the "trade intensity" or "production cost" criteria, the GOK deducts 3 percent of its permit allocation to be set aside in

---

[1] Trade intensity is equal to average annual exports plus average annual imports divided by average annual sales plus average annual imports. Appx10139. Production costs are equal to the annual average emission quantity multiplied by the market price for permits divided by the value-added during the base period. Appx10140.

6

reserve, *i.e.*, they are allocated 97 percent.  Appx10139; Appx10142;

Appx10156; Appx11638.

If a subject entity does not have sufficient permits to cover its

annual emissions by the end of each compliance year, it must acquire

additional permits to surrender or be subject penalties.  Appx10144;

Appx11598.  Entities may carry-forward unused permits from prior

years, borrow its own permits from future years, and may earn credits

by reducing greenhouse gas emissions.  Appx10142; Appx11911;

Appx14331.  Entities may purchase permits on the open market from

non-governmental third parties, but also have the option of purchasing

permits from a government auction.  Appx10142; Appx10144;

Appx12537; Appx14153; Appx14155.  The vast majority of exchanged

permits, approximately eighty percent, are traded privately rather than

being purchased from the GOK-run auctions.  Appx14430-14431; *see

also* Appx10144; Appx14154.  Entities do not need to purchase permits

if their annual emissions do not exceed the amount of their allocated

permits.  Appx12537.

During the POR, Hyundai Steel was allocated 100 percent of its

assigned permits because it met the trade intensity and production cost

criteria.  Appx11919-11920.  Additionally, Hyundai Steel's actual emissions exceeded its allocated permits and thus Hyundai Steel purchased additional permits from private parties at significant expense.  Appx10158.  Hyundai Steel did not purchase any permits from the GOK.  Appx10144.

On October 19, 2021, Commerce issued its Post-Preliminary Analysis Memorandum.  *See* Appx14328-14359.  In its Post-Preliminary Analysis Memorandum, Commerce preliminarily determined that the GOK relieved companies who received the additional 3 percent allocation from the financial burden of purchasing the additional permits.  Appx14332. Additionally, Commerce found that the GOK provides "something of value on which it could collect . . . revenue" because companies could purchase the additional permits from a GOK-run auction.  *Id.*  Commerce also determined that the program was *de jure* specific because companies that meet the trade intensity or production cost criteria automatically qualify for the additional 3 percent allocation. *Id.*

On November 4, 2021, Hyundai Steel filed its case brief. *See* Appx14411.  Hyundai Steel argued that the KETS places a significant

8

burden and costs on those subject to it and thus did not provide a
benefit to Hyundai Steel. Appx14421-14427. Specifically, Hyundai Steel
explained that it had to purchase additional credits to meet its actual
level of emissions at a significant financial burden. Appx14424-14425.
Hyundai Steel also argued that the GOK's provision of the additional 3
percent allocation to Hyundai Steel did not constitute a financial
contribution because no revenue would have been "otherwise due" to the
GOK. Appx14427-14433. Finally, Hyundai Steel argued that the
additional 3 percent allocation of emissions permits is not *de jure*
specific because it merely allocates the additional permits based on
production and trade criteria but does not limit access to the permits.
Appx14433-14436. Any industry or enterprise may purchase the
additional permits. Appx14434.

In the *Final Results*, Commerce found that the provision of the
additional 3 percent of carbon emissions permits was countervailable.
Appx1047. Specifically, Commerce found that a financial contribution
existed because the GOK was forgoing revenue otherwise due for the
additional 3 percent allocation. Appx1050. Commerce also found that
the provision of carbon emission credits was *de jure* specific because the

criteria establish that some industries may receive the additional 3 percent credits while others do not. Appx1052. The benefit was calculated as the difference between Hyundai Steel's receipt of 100 percent of its emissions permit allocation, and the standard 97 percent allocation. Appx1051.

Commerce calculated a 0.10 percent *ad valorem* subsidy for the carbon emissions program and, in total, calculated a subsidy rate of 0.56 percent for Hyundai Steel.  Appx1076-1077.  This was over the *de minimis* threshold.  The issue raised in this appeal is of the utmost importance to Hyundai Steel given that this program is the difference between receiving a *de minimis* subsidy rate or one that is just above *de minimis*.  *De minimis* means Hyundai Steel receives refunds of all the CVD cash deposits it paid in calendar year 2019; over *de minimis* means it does not.  *See* 19 C.F.R. § 351.106(c).

## V.    Summary Of Argument

In its *Final Results*, Commerce fails to establish any of the elements for the KETS to be a countervailable subsidy.

First, the KETS program does not provide a financial contribution because the GOK did not forego any revenue it was "otherwise due."

The permits were provided to set a cap on Hyundai Steel's emissions, and not to provide revenue to the GOK. At the time the GOK allocated the emissions permits to Hyundai Steel there was no definite expectation that the government was foregoing any revenue that was otherwise due. The additional 3 percent provided to Hyundai Steel was not destined for sale at the GOK auction, nor was it even certain that they would generate any revenue for the GOK. The statute governing financial contributions requires that the revenue foregone must be "otherwise due" to the GOK. Commerce has unlawfully interpreted the plain language of the applicable statute by expanding its meaning to cover the situation here where there was never any revenue actually due to the GOK.

Second, this program did not provide a "benefit" to Hyundai Steel. Instead, mandatory participation in this program imposed burdens on Hyundai Steel in the form of increased costs and competitive disadvantage against foreign companies, including those in the United States, that are not subject to a nationwide carbon reduction regime. The KETS mandates that Hyundai Steel submit permits to the GOK to cover its carbon emissions during each compliance year. If Hyundai

Steel needs more permits than it was allocated then it must purchase additional permits to cover the shortfall, or pay a penalty.  In this way, the KETS operates as a restriction on companies' carbon emissions and creates a costly and burdensome system for compliance.  As a company subject to this program, Hyundai Steel had to expend significant funds during the POR in order to remain compliant.  This is not a countervailable benefit.

Finally, the KETS program is not *de jure* specific under the statute, as its implementing legislation does not explicitly restrict or limit the allocation of additional permits to a specific industry or enterprise.

Accordingly, and for the reasons described below, Commerce's determination that the provision of KETS permits constitutes a countervailable subsidy is unsupported by substantial evidence and not in accordance with law.

## VI.   *Standard Of Review*

In reviewing a challenge to Commerce's determination in a CVD administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by

substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## VII.  Argument

In an effort to fight climate change, certain countries like Korea have established cap and trade regulatory systems to reduce carbon emissions.  Although created to comply with the GOK's commitments under the Paris Agreement, this cap and trade system imposes significant costs on the companies required to participate, as they must adjust their operations to lower their carbon footprint.  Korean companies like Hyundai Steel that are subject to these restrictions must compete with, among others, U.S. companies that are not subject to a nationwide cap and trade or other regulatory system that forces them to lower their carbon emissions.  In treating Korea's cap and trade system as countervailable, Commerce is discouraging and penalizing countries like Korea that are trying to lower global carbon emissions in the fight against climate change.

While this Court is not a policy maker, it is important to consider this context when reviewing whether Commerce's decision to countervail Korea's carbon emissions programs is unlawful.  Hyundai

Steel submits that Commerce's decision runs contrary to the very purpose of the CVD law, which is to level the playing field between U.S. companies and foreign competitors.  Commerce's decision to impose countervailing duties for participation in Korea's cap and trade system puts Korean companies such as Hyundai Steel at an even further competitive disadvantage vis-à-vis U.S. companies and thus unfairly tilts the competitive landscape in favor of U.S. companies.

Hyundai Steel thus respectfully requests that the Court carefully analyze Commerce's decision within this context to determine whether it is unsupported by substantial evidence and is otherwise not in accordance with the CVD law.  Hyundai Steel submits that it is.

A. *Commerce's Determination That The GOK's Provision Of Carbon Emission Permits To Hyundai Steel Constitutes A Countervailable Subsidy Is Unsupported By Substantial Evidence And Is Otherwise Contrary To Law.*

A countervailable subsidy exists when (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries.  *See* 19 U.S.C. § 1677(5)(B) & (5A).  In the *Final Results*, Commerce found that the provision of carbon

14

emission permits to Hyundai Steel constituted a countervailable subsidy.  Commerce determined that the 100 percent allocation of Hyundai Steel's assigned permits, instead of 97 percent, constitutes a financial contribution from the GOK in the form of revenue foregone that was otherwise due, a benefit was conferred to Hyundai Steel based on the 3 percent differential, and the program is *de jure* specific.  As demonstrated below, Commerce's decision errs on all three counts.

          *1.*     *The KETS Does Not Provide A Financial Contribution Because There Is No Revenue Foregone That Is Otherwise Due.*

In the *Final Results*, Commerce determined that the GOK's 100 percent allocation of emissions permits to Hyundai Steel constitutes a financial contribution.  Appx1050-1051; Appx14332.  Specifically, Commerce determined that the additional 3 percent of the permits allocated to Hyundai Steel that was not allocated to other subject entities was a financial contribution because it constituted revenue foregone by the GOK pursuant to section 771(5)(D)(ii) of the Tariff Act of 1930, *as amended*, ("Tariff Act"), 19 U.S.C. § 1677(5)(D)(ii).  Appx1050-1051.  However, in so concluding Commerce misinterpreted the rest of this subpart of the statute, which specifically limits Section

15

771(5)(D)(ii) financial contributions to situations where the GOK is "foregoing or not collecting revenue *that is otherwise due*, such as granting tax credits or deductions from taxable income." 19 U.S.C. § 1677(5)(D)(ii) (emphasis added). Commerce failed to interpret this statutory language as requiring that the alleged revenue be "otherwise due" to the GOK from the additional 3 percent of emissions permits allocated to Hyundai Steel.

        *a. Commerce Misinterprets Unambiguous Language Of The Tariff Act.*

When evaluating an agency's interpretation of a statute, this Court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984). Here, "Congress has directly spoken to the precise question at issue" by limiting Section 771(5)(D)(ii) of the Tariff Act to "revenue that is *otherwise due.*" 19 U.S.C. § 1677(5)(D)(ii). Hyundai Steel submits that this statutory language is clear and that this Court must give effect to that unambiguous plain language. *See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393, 1403 (Ct. Int'l Trade 2021) ("*ASEMESA*") (citing *Timex V.I., Inc.*

16

*v. United States*, 157 F.3d 879 (Fed. Cir. 1998)) ("*Chevron* requires that the court begin with the plain meaning of the statute.").

For a statute to be considered silent or ambiguous, "there must be a 'gap left, implicitly or explicitly, by Congress' that Commerce is entitled to fill." *Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1354 (Fed. Cir. 2021); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) ("Even under *Chevron*, we owe an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' we find ourselves unable to discern Congress's meaning.") (emphasis in original).  Subsection (ii) of Section 771(5)(D) is not silent and leaves no gap for Commerce to fill regarding whether revenue must be "otherwise due" for a financial contribution to be found.  The relevant text of Section 771(5)(D)(ii) provides:

> The term "financial contribution" means—
>
>> (ii) Foregoing or not collecting revenues that is *otherwise due*, such as granting tax credits or deductions from taxable income.

19 U.S.C. § 1677(5)(D) (emphasis added).  The statute thus plainly requires that, for a financial contribution to exist, the foregone revenue must be "otherwise" "due" to the government.

Dictionary definitions are a traditional tool of statutory interpretation employed by courts to determine the plain meaning of statutory terms. *See, e.g., MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 227-29, 114 S. Ct. 2223, 2229-2231 (1994); *ASEMESA*, 523 F. Supp. 3d at 1403. Merriam-Webster defines "due" as "owed or owing as a debt," "owed or owing as a natural or moral right," and "satisfying or capable of satisfying a need, obligation, or duty." *Due*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/due (last visited on July 22, 2022) (attached as Exhibit A).[2] Black's Law Dictionary defines "due" as "owing or payable; constituting a debt." *Due*, BLACK'S LAW DICTIONARY (8th ed. 2004). Merriam-Webster defines "otherwise" as "in different circumstances," and "to suggest an indefinite alternative." *Otherwise*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/otherwise (last visited July 22, 2022) (attached as Exhibit B). The plain meaning of the statute thus requires that a financial contribution pursuant to Section 771(5)(D)(ii) exists only if the GOK had a "right" to collect revenue from

---

[2] Pursuant to the practice comment in Rule 81 of the Rules of the U.S. Court of International Trade, Plaintiff attaches hereto printouts of the cited internet-based definitions.

Hyundai Steel and Hyundai Steel would have "owed" revenue to the GOK as a result of an "obligation or duty" absent the allocation of permits that it actually received.

The statutory examples of foregone revenue otherwise due, "tax credits" or "deductions from taxable income," confirm this interpretation.  19 U.S.C. § 1677(5)(D)(ii).  These statutory examples represent government actions that reduce or relieve a taxpayer of taxes that they are otherwise legally required to pay to the government.  That is, "but for" the provision of the tax credit or tax deduction, the government would be legally entitled to receive the additional tax revenue.  The taxpayer legally owes the government the taxes and, by reducing that tax burden, the government is foregoing revenue that is otherwise payable or owed.

By contrast, under the KETS program there is no expected revenue otherwise due to the GOK.  Rather, it is unknown at the time the permits are issued whether the recipient will need all of the permits to cover their emission reduction obligations, or whether they will need to purchase additional permits from private parties or through the GOK auction.  The purpose of issuing the emissions permits is to set a cap on

the recipient's carbon emissions and to provide an incentive for their reduction.  So the expectation, if there is one, is that the recipient will reduce its carbon emissions below the amount of permits issued and thereby accomplish the goals of the KETS program.  Unlike tax revenue, which is required for the government to exist and function, the emission permits are not for government revenue generation.  In providing an additional 3 percent of emissions permits to Hyundai Steel, the GOK is not foregoing any revenue that it expects or is legally entitled to receive.

Hyundai Steel did not owe revenue to the GOK before its emissions permit allocation or after its allocation.  Rather, the GOK capped Hyundai Steel's carbon emission output with the permit allocation it deemed applicable through criteria unrelated to any revenue collectable from Hyundai Steel.  Appx11583; Appx11638. Whether the GOK applied the same carbon emissions cap on other companies is irrelevant to the issue of whether the GOK had a right to collect revenue from Hyundai Steel.  Through the emissions trading system, the GOK sets the amount of carbon emissions under which entities are capped by "unconditionally" allocating permits at different

levels to entities that meet certain criteria.  Appx11583; Appx11638;

Appx10143.  An entity who exceeds its allocated cap can borrow permits

from itself, and has the option to purchase additional permits from

private parties in the market or the GOK.  Appx10142; Appx10144;

Appx12538; Appx14155.  No revenue "due" to the GOK results from the

allocation.  At most, the difference between the 100 percent and 97

percent allocations demonstrates that the AAGEP sets different

emissions limits and associated costs for different companies who are

required to participate, but the difference does not represent "revenue

otherwise due" to the GOK as required by statute.

    If the GOK had allocated Hyundai Steel 97 percent of its assigned

permits, and not 100 percent, Hyundai Steel would not automatically

owe the GOK revenue.  Hyundai Steel would not have been obligated to

purchase any permits beyond the 97 percent amount allocated.  It could

have emitted 97 percent, or less than the 97 percent allocation.

Appx12537.  If it needed to acquire more permits, it would have had the

choice whether to acquire additional permits from the market or borrow

permits from future compliance years rather than the GOK.

Appx10142; Appx10144; Appx12538; Appx14155.  Thus, Hyundai Steel

would have had no obligation or duty to pay revenue to the GOK due to the permit allocation. Indeed, Commerce admitted that parties who receive the 97 percent allocation are "not obligated" to purchase permits from the GOK. Appx14331; Appx14155.

Commerce's interpretation of the statute to permit an affirmative finding of financial contribution in such a situation is contrary to the unambiguous language in the statute and the express intent of Congress. It is "a cardinal principle of statutory construction . . . {to} 'give effect, if possible, to every clause and word of a statute.'" *Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 1519 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39, 75 S. Ct. 513, 520 (1955)). Since the agency can only act in such a manner as its authorizing statute allows it, a statutory limitation confers a limitation on the agency's authority to act. *See e.g.*, *La. Pub. Service Comm'n v. F.C.C.*, 476 U.S. 355, 374, 106 S. Ct. 1890, 1901 (1986) ("{A}n agency literally has no power to act . . . unless and until Congress confers power upon it."). For an agency to act otherwise would be "to expand its power in the face of a congressional limitation on its jurisdiction" and to override Congress, which the agency cannot do. *La. Pub. Service*

22

*Comm'n*, 476 U.S. at 375.  Congress placed a limitation on Commerce's ability to act by adding the words "otherwise due" after "foregoing or not collecting revenue."  19 U.S.C. § 1677(5)(D)(ii).

In response to this argument, Commerce explained why the additional 3 percent allocation constitutes revenue foregone that is otherwise due to the GOK.  Specifically, Commerce explained:

> Commerce notes that when evaluating revenue foregone that would have been otherwise {due}, it is not a matter of what the GOK would have done with the KAUs had they not given them to qualifying entities like Hyundai Steel.  Rather, the key consideration is that, in lieu of giving these entities the additional KAUs for free, the GOK would have received revenue from said entities, which are treated differently from all other entities that receive the standard 97 percent allocation, and who would otherwise be required to purchase the additional KAUs.

Appx1051.  This explanation exposes the error in Commerce's analysis and statutory interpretation of foregone revenue that is otherwise due.

According to Commerce, the key consideration is that if the GOK had not given Hyundai Steel and other qualifying entities the additional 3 percent, the GOK would have received revenue from those entities, *i.e.,* they would have been required to purchase that 3 percent from the GOK.  This underlying assumption is entirely speculative.  There is nothing in the AAGEP or its Enforcement Decree that supports

23

the conclusion that the GOK would have received additional revenue from Hyundai Steel if the GOK had not provided Hyundai Steel with the additional 3 percent.  Hyundai Steel was not legally required to purchase additional permits from the GOK auction.  And when the GOK allocated the additional 3 percent permits there was no basis to know whether Hyundai Steel would reduce its emissions during the relevant period to 97 percent or lower, or whether it would exceed that baseline emissions allocation.  There is thus no basis to assume that the GOK would have received revenue from Hyundai Steel had it not provided it with an additional 3 percent emissions permit allocation.

As characterized by Commerce in the *Final Results*, revenue was otherwise due to the GOK because, allegedly, "the GOK is able to collect revenue on additional {permits}" that "entities *may* need to purchase" and therefore the GOK provides "something of value on which it *could* collect revenue." *Id.* (emphasis added).  The *Final Results* then conclude, without explanation that "the GOK *would* have received revenue from said entities." Appx1051 (emphasis added).  Again, this explanation fails to demonstrate that Hyundai Steel owed the GOK revenue for its allocation of permits had it been allocated 97 percent

24

rather than 100 percent.  The allocation results in no revenue due to the GOK regardless of the amount allocated to Hyundai Steel.  Moreover, the *Final Results* unreasonably leap from the *possibility* that the GOK could collect revenue to the alleged *certainty* that revenue was owed.

While Commerce attempts to explain that "it is not a matter of what the GOK would have done" with the permits "had they not given them to {Hyundai Steel}," such explanation fails to establish that revenue was owed to or foregone by the GOK as unambiguously required by the statute.  *Id.*  "{W}hat the GOK {and Hyundai Steel} *would have done*" is precisely what Congress requires Commerce to consider by requiring it to find that revenue would have been "*otherwise* due."  *Id.* (emphasis added); 19 U.S.C. § 1677(5)(D)(ii) (emphasis added).  Commerce must find substantial evidence that, *had circumstances been otherwise,* the GOK would have in fact collected revenue from Hyundai Steel that was otherwise due.  Commerce did not do so in the *Final Results*.

Commerce also claims that Hyundai Steel failed to refute the fact that "certain enterprises are placed in an advantageous position in relation to others" due to the 3 percent allocation difference.  Appx1050.

25

However, this "basic fact" proffered by Commerce relates to the *benefit*
element of a countervailable subsidy, 19 U.S.C. § 1677(5)(E), not
whether revenue is foregone by the government for *financial*
*contribution* purposes under 19 U.S.C. § 1677(5)(D)(ii).  Section
771(5)(D) and (E) contemplate that financial contribution and benefit
are distinct concepts.  *Gov't Sri Lanka v. United States*, 308 F. Supp.3d
1373, 1381 (Ct. Int'l Trade 2018) ("*GOSL*"); *see also Delverde, Srl. v.*
*United States*, 202 F. 3d 1360, 1366 (Fed. Cir. 2000) ("{T}he statute
clearly requires that in order to find that a person received a subsidy,
Commerce determine that that person received . . . both a financial
contribution and benefit, either directly or indirectly, by means of one of
the acts enumerated.").  Hyundai Steel's relative permit allocation vis-
à-vis other companies subject to the AAGEP thus does not support the
existence of a financial contribution from revenue foregone that is
otherwise due.

Pursuant to *Chevron* step one that is the end of the matter.
*Chevron*, 467 U.S. at 842-43 ("If the intent of Congress is clear, . . . the
court, as well as the agency, must give effect to the unambiguously
expressed intent of Congress.").  The plain language of the statute

requires that the allegedly foregone revenue otherwise be "due" to the government, *i.e.*, that the revenue was actually or certainly owed the government.  Commerce was thus required to give effect to this unambiguous statutory language, but failed to do so in the *Final Results*.  Instead, Commerce misinterpreted and misapplied this plain statutory definition and instead interpreted the "otherwise due" language to capture revenue that was not actually or certain to be due to the government.  This was legal error.  19 U.S.C. § 1677(5)(D) unambiguously requires that, in order for a financial contribution to be found pursuant to subsection (ii), Commerce must find by substantial evidence that, but for the varying levels of allocation, Hyundai Steel affirmatively owed a debt to the GOK and the GOK had a right to collect thereon.  Commerce erroneously interprets the statute to permit its finding of a financial contribution where there is no evidence that revenue was otherwise due to the GOK.  The *Final Results* are thus not in accordance with law.

        b.  *Commerce's Interpretation Of "Otherwise Due" Is Unreasonable.*

As demonstrated, 19 U.S.C. § 1677(5)(D)(ii) unambiguously provides that Commerce may only find a financial contribution in the

form of revenue foregone if revenue was in fact otherwise due.

However, if the Court finds that the statute is ambiguous regarding the

revenue otherwise due, the Court should nonetheless find that

Commerce's interpretation is unreasonable.  Pursuant to step two of

*Chevron*, "if a statute does not 'directly speak' to the issue at hand, the

court must determine whether the agency's interpretation of the statute

was 'reasonable,' meaning that the interpretation is not 'arbitrary,

capricious, or manifestly contrary to the statute.'" *Histeel Co., Ltd. v.*

*United States*, 547 F. Supp. 3d 1233, 1244 (Ct. Int'l Trade 2021); *see*

*also Chevron*, 467 U.S. at 843.

The GOK regulates carbon emissions by setting levels of carbon

emission caps through the varying allocations of permits depending on

whether entities meet certain trade intensity or production cost criteria.

Appx11583; Appx11638.  As explained, the GOK unconditionally

allocated 100 percent of the permits assigned to Hyundai Steel.

Appx10143.  No revenue is otherwise due based on the number of

permits allocated.  Nor is there any expectation that the GOK could

collect revenue from parties that receive the 97 percent allocations

because there is no guarantee that an entity's emissions will exceed its

allocated cap so that purchase of permits is necessary, and parties who

exceed their allocated amounts have the option to borrow or purchase

from non-governmental third parties.  Appx10142; Appx10144;

Appx12537.  An interpretation of the statute that permits the finding of

a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(ii) where

revenue is not otherwise obligatory is arbitrary, capricious, and

manifestly contrary to the statute contrary to the requirements of

*Chevron*.  *See Chevron*, 467 U.S. at 845.

> c. *Commerce's Determination That Revenue Was*
>    *Foregone Is Unsupported By Substantial Evidence.*

In order to give meaning to the "otherwise due" language of the

statute, Commerce must point to substantial evidence that shows that

the alleged revenue foregone was actually "due" to the government.  *See*

19 U.S.C. § 1677(5)(D)(ii); *see also Final Negative Countervailing Duty*

*Determination: Certain Cold-Rolled Carbon Steel Flat Products From*

*Argentina*, 67 Fed. Reg. 62,106 (Dep't Commerce Oct. 3, 2002) and

accompanying Issues and Decision Memorandum at Comment 5

(finding no financial contribution where "there is no evidence that the

{Government of Argentina} failed to receive any revenue it would

otherwise receive."); *Circular Welded Carbon-Quality Steel Pipe From*

*the Socialist Republic of Vietnam: Final Negative Countervailing Duty Determination*, 77 Fed. Reg. 64,471 (Dep't Commerce Oct. 22, 2012) and accompanying Issues and Decision Memorandum at Comment 3 ("Imports of raw materials, spare parts and accessories, and fixed assets by {the respondent} are not subject to duties in Vietnam and, therefore, the {Government of Vietnam} has not foregone revenue."). No such evidence exists on this record.

The *Final Results* err by assuming that any of the permits allocated to Hyundai Steel above 97 percent of its allowance constitutes revenue that the GOK would have otherwise been due, *i.e.,* Commerce assumes that Hyundai Steel would have purchased the additional 3 percent from the GOK. Appx1051. In doing so, Commerce misconstrues the consequences of the permit allocation. The GOK assigns the full amount (100 percent) of permits to every entity subject to the KETS program. Appx14330. Only after assigning 100 percent to every subject entity will the GOK set aside in "reserve" 3 percent when it allocates permits to entities that are not "trade intensive." Appx10142; Appx14333. However, setting aside in "reserve" does not

30

mean that every permit set aside will be purchased at auction, or even designated for such purpose.

The GOK explained that its "reserve" permits are "used for several purposes, including to provide permits to new entrants and to participants that {have} constructed or expanded {their} facilities." Appx10141.  The "reserve" in Phase Two also includes an additional 14,000,000 permits to stabilize the emission permit market and 5,000,000 permits for market operations.  Appx10141; Appx15501 (describing the "{t}ypes and operation methods of spare portions").  Each permit allocated above 97 percent would have been part of this larger pool of permits used for multiple purposes, in addition to auctions, and thus would not have necessarily been auctioned by the GOK.  These permits therefore do *not* represent revenue "otherwise due" to the GOK as they could have been used in a variety of ways that would not have generated any revenue for the GOK.

In addition, as Commerce describes, there are five ways that companies can acquire additional permits to cover shortfalls between their allocated permits and their actual emissions levels without any involvement by the GOK, if they even exceed their allocated emission

31

permits.  Appx14331.  For those only receiving 97 percent of their allowances, they *may* participate in government auctions, but they are not required to do so and instead may turn to the private market to cover their shortfall.  Appx10144.  As Commerce admits, parties are "not obligated to purchase from the GOK-run auction" additional permits.  Appx14155; Appx14331.  Furthermore, some of those companies may have sufficiently reduced their emissions such that they do not need additional permits beyond the 97 percent and may have spare permits that they can transfer to the next compliance year or sell to other entities in the market.  Appx10142; Appx12537; Appx14332.

The record shows that Hyundai Steel's emissions exceeded the 100 percent emissions permit amount and thus it was required to either acquire additional permits or pay a penalty.  Appx11921.  Hyundai Steel purchased all of its additional permits from private parties in the marketplace.  Appx12056; Appx13882-13883.[3]  This fact undercuts the assumption that, but for the additional 3 percent allocation, Hyundai

---

[3] Private sales of permits are conducted through the ETS Market Exchange or "over-the-counter" transactions.  Appx14153.

32

Steel would have purchased permits from the GOK auction and thus that the GOK was foregoing revenue otherwise due.

The *Final Results* thus fail to support the determination that the GOK has in fact foregone revenue due from Hyundai Steel. At best, Commerce can show that Hyundai Steel would have had the *option* to purchase additional permits from the GOK just as it could purchase permits from any other third party. Appx1051 ("The GOK is providing something of value on which it *could* collect revenue.") (emphasis added); Appx10144. But the fact that it would have had the *option* to purchase permits from the GOK does not evidence that Hyundai Steel was obligated to pay the GOK revenue as a result of the 97 percent allocation. Commerce's determination assumes, without evidence, that had Hyundai Steel been allocated 97 percent of its assigned permits instead of 100 percent, Hyundai Steel *must* have purchased permits from the GOK. Appx1050-1051. The record cannot support such a finding, and only shows that the revenue that the GOK *could* have collected from Hyundai Steel was *otherwise due*.

2.    *The KETS Program Does Not Provide A Benefit to Hyundai Steel.*

Commerce determined that the 100 percent allocation to Hyundai Steel confers a countervailable benefit, Appx1047-1049, and calculated the countervailable subsidy rate applicable to the KETS based on the additional 3 percent allocation, Appx1053; Appx14353.  In doing so, however, Commerce failed to recognize the KETS program for what it really is—a burden imposed on Hyundai Steel and other Korean companies to curb their carbon emissions.  By selectively reviewing the program based on the relative allocation among only those subjected to the program, Commerce ignores the immense burden this program places on companies like Hyundai Steel and the fact that Hyundai Steel is subject to the program whereas other companies are not.  This program provides no "benefit."

Section 771(5)(E) states:

A benefit shall normally be treated as conferred where there is a benefit to the recipient, including—

> (i) in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made,

34

(ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market,

(iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and

(iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

19 U.S.C. § 1677(5)(E).

Nowhere in the *Final Results* does Commerce explain which provision of Section 771(5)(E) considers the 100 percent allocation of permits to be a benefit conferred because none of them are applicable. Appx1048-1049; Appx1053.  However, in its Post-Preliminary Results Commerce found that a benefit exists under 19 C.F.R. § 351.503(b)(2), which is the "catch-all" regulation that defines "other subsidies" since the examples specifically outlined in section 771(5)(E) are not meant to be exhaustive.  19 C.F.R. § 351.503(b)(2) provides:

For other government programs, the Secretary normally will consider a benefit to be conferred where a firm pays less for

its inputs (e.g., money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn.

In its Post-Preliminary Results, Commerce found that subsection 503(b)(2) applied to the permit allocation because Hyundai Steel "is relieved of the obligation to purchase additional allowances."[4] Appx14333. The carbon emission permits do not meet the catch-all definition of benefit and Commerce fails to sufficiently explain with substantial evidence how the definition is met. Appx1048-1053. Permits are not inputs, goods or services for which Hyundai Steel is paying less than it otherwise would. Nor is Hyundai Steel receiving more revenue than it would otherwise earn. To the contrary, the carbon emission caps impose emission reduction obligations that increase costs. Appx10142; Appx11920; Appx11922; Appx13715; *see also* Appx1302; Appx1314. Hyundai Steel received *less* revenue than it would otherwise earn because of the increased costs it was forced to incur due to the KETS program. Appx13712-13713; Appx11913-11914; Appx11921.

---

[4] Commerce did not find that any provision other than the catch-all definition applied to the KETS in the *Final Results*. Appx 1048-1053.

36

a. *The KETS Program Imposes Burdens On Hyundai
   Steel.*

As discussed, the KETS was established in order to reduce Korea's

national greenhouse gas emissions levels and to comply with the Paris

Agreement.  Appx10155.  The permit system is the means by which the

GOK sets carbon emissions caps because it requires subject entities to

surrender the number of permits that is equivalent to their actual

emissions levels at the end of each compliance year or else face

substantial fines.  Appx10142.  To the extent certain sectors that are

subject to the emissions reduction requirements are allocated slightly

more emissions permits, this just means they are burdened slightly less

than companies with lower emissions permit allocations.  Neither sector

are receiving benefits, let alone countervailable benefits.

Korean entities that emit over a certain volume of carbon dioxide

or equivalents over a three-year period are "*mandatorily* subject to the

K-ETS."  Appx10165; Appx14329; Appx11583; Appx14329.  These

companies are required to participate because they would not otherwise

subject themselves to a program that increases their costs.  Appx10142.

All companies subject to this program are allocated emissions permits

by the GOK, the level of which are representative of the emissions

37

NON-CONFIDENTIAL

limits the GOK imposes on each company.  Appx10140-10142.  In addition to the cost of compliance and tracking allocated permits, the allocation of emissions permits acts as an effective cap on the emissions volumes of the subject companies and therefore acts as a restriction on those forced to participate.  Appx10156.  Commerce acknowledged the burden that the permits impose.  Specifically, Commerce explained that "fewer KAUs {are} issued in later phases in order to place *a greater burden* on participants to limit their greenhouse gas emissions over time."  Appx14330 (emphasis added).

For Hyundai Steel specifically, it had to purchase [          ] permits at a cost of [          ] KRW—a significant financial burden.  Appx13712-13713; Appx13881-13883.  Hyundai Steel had to purchase these additional emissions permits from private entities because its actual emissions exceeded the cap placed on it by the KETS program.  Appx13712-13713; Appx11922.  In addition, Hyundai Steel made significant investments in a cogeneration project that will ultimately reduce its carbon emissions in the future.  Appx13715. Hyundai Steel expended these tremendous sums to avoid the costly fines the GOK imposes on those who do not surrender enough emissions

NON-CONFIDENTIAL

permits to cover all of their actual emissions during a compliance year. Appx10164; Appx11602.  Thus, it is evident that even with the allocation of emissions permits, Hyundai Steel suffered a significant financial burden to comply with this program, and it in no way provided Hyundai Steel with a benefit.  Notably, Hyundai Steel was not alone in this shortfall.  The GOK reported that during compliance year 2019, private parties traded [

].  Appx14154.  When the program is examined as a whole, it is clear that no benefit can possibly exist from the KETS, and instead the program places a significant financial burden on those subject to it.

In the *Final Results*, Commerce selectively focuses on the fact that some subject companies are allocated 100 percent of their assigned permits whereas others are allocated 97 percent.  Appx1049.  Commerce claims that the additional 3 percent "means" that certain industries are given "a benefit not available" to industries who receive 97 percent, and are "thus favored with respect to the granting of emissions permits."  *Id*. The fact that Hyundai Steel received a 100 percent of its assigned permits rather than 97 percent does not mean that it benefited from a

39

program that imposes burdens that fundamentally limit and alter its operations and force it to internalize costs that it would not incur but for the program. In reviewing whether an alleged program provides a benefit, Commerce must review the program as a whole and cannot selectively analyze the benefit in isolation from the overall program. *GOSL*, 308 F. Supp. 3d at 1380. Commerce's determination is arbitrary because it fails to provide rationale or any legal authority to selectively view one aspect of the KETS, and thus misconstrues the program out of context and without rationally dismissing evidence that detracts from its determination. *E.g.*, *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) ("{T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

Commerce claims that whether the KETS "covers all entities within {Korea} and whether the program results in a burden" is "not the focus of {its} analysis." Appx1048. In doing so, Commerce refuses to "compare the burden placed on all companies subject to the overarching K-ETS program to companies not subject to the K-ETS program."

Appx1048.  The issue is not just whether all "Korean companies are subject to the K-ETS program," but whether a benefit is conferred by the KETS pursuant to 19 U.S.C. § 1677(5)(E).  Appx1048.

Commerce selectively compares Hyundai Steel to companies who receive 97 percent of their assigned permits while disregarding all other companies.  But such a narrow comparison disregards, without reason, that both Hyundai Steel and companies who receive 97 percent of their assigned permits are disadvantaged vis-à-vis companies that are not subject to the KETS.  Importantly, the latter category includes not only companies in Korea who are not subject to the KETS but also all foreign companies anywhere against which Hyundai Steel competes, including companies in the United States, whose emissions are not capped based on emissions levels from 2014 to 2016.  Appx14330 ("{P}articipants were required to submit emissions data for the years 2014 to 2016, with the GOK relying on this data to calculate a benchmark allowance of KAUs for each entity.").[5]  It cannot be said that Hyundai Steel received a benefit from the KETS that unfairly advantages it over U.S.

_____

[5] At most, the record supports that the only U.S. companies subject to similar burdens are those in California.  Appx10163 n.6.

competitors such that a countervailing duty is necessary to level the

playing field for the domestic industry.[6]  *See Zenith Radio Corp. v.*

*United States*, 437 U.S. 443, 455-56, 98 S. Ct. 2441, 2448 (1978) ("The

countervailing duty was intended to offset the unfair competitive

advantage that foreign producers would otherwise enjoy from export

subsidies paid by their governments.").

> ### b. *Commerce May Not Disregard The Burdens That The KETS Imposes.*

Instead of rationally reconciling the evidence that the KETS

program burdens Hyundai Steel such that a benefit has not been

conferred, Commerce in the *Final Results* merely claims that it does not

have to consider such evidence because it is not required to take into

account the "effects" of the KETS program pursuant to Section

771(5)(C).  Appx1047; Appx1049.  Commerce states that whether the

program "affects the recipient's behavior is not material to Commerce's

determination as to whether a countervailable benefit {has been}

---

[6] In fact, the GOK calibrated the 100 percent allocation to Hyundai Steel precisely because Hyundai Steel, unlike other Korean companies who receive the 97 percent allocation, is exposed to competition with foreign companies that are not subject to emission caps.  Appx10139-10140; Appx10142; Appx10156.

conferred." Appx1047.  It is true that section 771(5)(C) provides that Commerce is "not required to consider the effect of the subsidy in determining whether a subsidy exists."  19 U.S.C. § 1677(5)(C).[7] However, the court has clarified that it is "not in accordance with Section 1677(5)(C)" for Commerce to "selectively analyze" purported benefit payments "in isolation" from the overall program.  *GOSL*, 308 F. Supp. 3d at 1380.  Accordingly, in the *Final Results*, Commerce may not disregard record evidence that the program at issue burdens Hyundai Steel.

Commerce relies on the "*CVD Preamble*" as authority to selectively analyze the allocation of permits within the KETS. Appx1047; *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,361 (Dep't Commerce Nov. 25 1998) ("*CVD Preamble*").  Commerce claims that the *CVD Preamble* provides an example that allegedly "speaks directly to

---

[7] Section 771(5)(C) was added to the statute to clarify that "the new definition of subsidy does not require Commerce to consider or analyze the effect . . . of a government action on the *price or output* of the class or kind of merchandise under investigation or review."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol.1, at 159 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4240 (emphasis added) ("SAA").  The effect of the KETS allocations on the price or output of the merchandise is not at issue.

the circumstances in this case," Appx1047, but is actually inapposite to the allocation of permits.  The referenced example from the *CVD Preamble* assumes that a government establishes new environmental regulations that require a firm to purchase new equipment and provides a subsidy to purchase the new equipment, but the "net effect" of the subsidy does not "fully offset" the total cost increase as a result of the environmental restrictions.  *CVD Preamble*, 63 Fed. Reg. at 65,361. Ultimately, the example in the *CVD Preamble* concludes that the subsidization of the equipment purchase provides a benefit "because this action represents an input cost reduction," and the requirement to install the equipment "cannot be construed as an *offset* to the subsidy." *CVD Preamble*, 63 Fed. Reg. at 65,361 (emphasis added).  Commerce exaggerates the relevance of the example in the *CVD Preamble*.

The example in the *CVD Preamble* is inapposite because Hyundai Steel is not purchasing an input, is not arguing for an offset to the benefit calculation, and the burdens that result from the KETS are directly relevant to the issue of whether a benefit has been conferred. The key point in the *CVD Preamble* example is the fact that the subsidy reduces the cost for an input, the equipment.  *CVD Preamble*, 63 Fed.

Reg. at 65,361.  The relative allocation of permits to Hyundai Steel does

not reduce its cost for inputs.  Rather the imposition of carbon caps

implemented via the allocation of permits increases costs regardless of

the relative allocation amount that Hyundai Steel receives.  Appx10142;

Appx10155-10156; Appx11920; Appx11922-11924; Appx13715.  The

*CVD Preamble* assumes that the "subsidy" described in the example

would take the form of situations similar to those outlined in Section

771(5)(E) and 19 C.F.R.§ 351.503(b), *i.e.*, input cost reductions or

revenue enhancement, which are not at issue in the allocation of

emissions cap amounts.  The provision of 100 percent emissions permits

is not a reduction in costs like the equipment subsidy in the *CVD*

*Preamble*.

Additionally, the example in the *CVD Preamble* finds that the

"requirement to install the equipment cannot be construed *as an offset*

to the subsidy provided to reduce the costs of installing the equipment."

*CVD Preamble*, 63 Fed. Reg. at 65,361 (emphasis added).  Despite

Commerce's insinuations, Appx1048, Hyundai Steel has not claimed

that the alleged benefit should be "offset" pursuant to Section 771(6), 19

45

U.S.C. § 1677(6), but argued that the KETS program does not confer a

benefit and instead imposes burdens, Appx14421-14427.

Therefore, neither the *CVD Preamble* nor Section 771(5)(C)

support Commerce's determination to find that the relative allocation to

Hyundai Steel within the KETS program provides a benefit despite the

resulting costs that burden and disadvantage Hyundai Steel.  Instead,

the *CVD Preamble* contemplates a countervailable benefit as an input

cost reduction or revenue enhancement like the statute and regulation.

19 U.S.C. § 1677(5)(E); 19 C.F.R. § 351.503(b).  As the *CVD Preamble*

states, the catch-all definition of benefit captures the "underlying theme

behind the definition of benefit contained in section 771(5)(E)" and

"reflects the fundamental principles" in Commerce precedent:  whether

the recipient "enjoys a reduction in *input costs or revenue enhancement*

that it would not otherwise have enjoyed."  *CVD Preamble*, 63 Fed. Reg.

at 65,359-60 (emphasis added).  The relative allocation of permits to

Hyundai Steel, which represents the cap on its emissions, does not

benefit Hyundai Steel.  Hyundai Steel has not paid less for inputs or

earned more revenues than it would have otherwise as required

pursuant to 19 C.F.R. § 351.503(b), and Commerce failed to explain how

46

those regulatory elements are met in the *Final Results*.  Appx1047-

1049; Appx1053.

  3.  *The KETS Program Is Not Specific.*

  a. *The KETS Is Not Specific Pursuant To Section 771(5A)(D)(i).*

In the Post-Preliminary Results, Commerce determined that the

carbon emissions permit program was *de jure* specific under 19 U.S.C.

§ 1677(5A)(D).  Appx14332.  As support, Commerce found that Article

12(4) of the Act on the Allocation and Trading of Greenhouse Gas

Emissions Permits ("AAGEP") and Article 14 of its Enforcement Decree

"delineate{} the criteria for determining which sectors and sub-sectors

qualify for the additional KAU allotment" and companies that fall

within the "sectors and sub-sectors that the GOK determined as trade

intensive and/or high production cost sectors automatically qualify for

the additional free three precent {sic} KAU allocation from the GOK."

Appx14332.  In the *Final Results*, Commerce continued to determine

that the 3 percent permit allocation is *de jure* specific because the

AAGEP and its Enforcement Decree allegedly "establish explicit

limitations" regarding "which industries qualify for the additional

allocation" of permits, and the trade intensity and production cost

47

criteria "are not objective criteria or conditions."  Appx1052.  However, the criteria in Article 12(4) of the AAGEP and Article 14 of the Enforcement Decree do not "explicitly limit" such treatment "to a specific enterprise or industry" as required to be *de jure* specific. Commerce's *de jure* specificity determination is thus not supported by substantial evidence and is otherwise not in accordance with law.

Pursuant to Section 771(5A) of the Tariff Act, a subsidy may be specific "in law or in fact."  19 U.S.C. § 1677(5A)(D).  In its *Final Results*, Commerce found the KETS to be specific as a matter of law under Section 771(5A)(D), Appx1052, which provides as follows:

> (i) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law.

19 U.S.C. § 1677(5A)(D).  The court recently addressed the plain meaning of Section 771(5A)(D)(i) in *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States.  ASEMESA*, 523 F. Supp. 3d at 1393.

In *ASEMESA*, the court held that the "plain meaning of the statute is that a subsidy is *de jure* specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly

assigns limits to or restricts the bounds of a particular subsidy to a

given enterprise or industry." *ASEMESA*, 523 F. Supp. 3d at 1403.  In

applying this unambiguous reading, the court rejected Commerce's

interpretation that the statute permitted a *de jure* specificity finding

when, by law, "there {was} no uniform treatment across the {relevant}

sector in the provision of benefits." *ASEMESA*, 523 F. Supp. 3d at

1403.  The lack of uniform treatment of the agricultural sector, which

was the relevant sector in that case, was "not equivalent to its *explicit*

*restriction* of those benefits to a specific enterprise or industry."

*ASEMESA*, 523 F. Supp. 3d at 1403.  Accepting such a reading, the

court said, "reduces the *de jure* specificity test to a general finding of

non-uniform treatment, without any determination that the subsidy in

question be explicitly limited to a specific enterprise or industry by the

administering authority or its implementing legislation." *ASEMESA*,

523 F. Supp. 3d at 1403.  Instead, what is required by the plain

meaning of the statute is that "the authority providing the current

subsidy, or its operating legislation, directly and explicitly prescribes

limitations on the distribution of subsidies *to an enterprise or industry*."

49

NON-CONFIDENTIAL

*ASEMESA*, 523 F. Supp. 3d at 1404.  The record here does not demonstrate that AAGEP meets the requirements to be *de jure* specific.

The trade intensity and production cost criteria do not "explicitly limit" the 100 percent allocation "to a specific enterprise or industry" as required to be *de jure* specific.  The AAGEP and Article 14 of the Enforcement Decree do not "express" that a certain enterprise or industry is ineligible for the 100 percent allocation.  Appx11586-11587; Appx11638.  *Any* subsector may meet the trade intensity or production cost thresholds regardless of enterprise or industry.  As more entities become subject to the KETS over time, more subsectors will either qualify or not qualify based on the criteria in the AAGEP.  Appx10168 (showing that [

                                        ]). As Commerce itself admits, the program does "not name specific industries."  Appx1052.  These facts alone establish that the KETS does not meet the statutory requirements pursuant to Section 771(5A)(D)(i).

Nonetheless, application of the trade intensity and production cost criteria demonstrate that the KETS lacks an express limitation.  The criteria set standards that required collection and analysis of data from

50

2013 to 2016 regarding each subsector's imports, exports, sales, production, and emissions. Appx10139-10140; Appx15500. Those factors were chosen to determine (a) whether subsectors were exposed to competition from markets that were not subject to similar emissions caps and (b) the impact that the KETS emission cap may have on each potentially affected subsector. Appx10139-10140. Notably, the GOK set the criteria with the Enforcement Decree on December 29, 2017, Appx11615; Appx11638, *and then* determined which subsectors received the 100 percent allocation using the criteria, which were not proposed until July 9, 2018. Appx15496; Appx15504. In order to implement Phase Two of the KETS, the GOK had to further divide the 26 subsectors from phase one into 63 subsectors for Phase Two such that it could determine which subsectors met the criteria of the AAGEP. Appx10140; Appx15500. The GOK could not have "expressly limited" the KETS allocations to an enterprise or industry because it did not yet know which subsectors met the criteria.

In the *Final Results*, Commerce finds that the trade intensity and production cost criteria are express statutory limitations because they set "thresholds that industries must meet in order to qualify."

51

Appx1052.  Thus, Commerce determined that the program was specific because the AAGEP and the Enforcement Decree allegedly "establish that some industries may benefit from the additional assistance, . . . while others do not."  *Id.*  However, pursuant to the holding in *ASEMESA*, such non-uniform treatment under the AAGEP is not sufficient to find this program is *de jure* specific because the alleged failure to treat all enterprises or industries uniformly does not equate to an "explicit restriction" to specific enterprises or industries.  *ASEMESA*, 523 F. Supp. 3d at 1403.  Section 771(5A)(D)(i) unambiguously dictates that, to be *de jure* specific, the program must "*directly, firmly, or explicitly assign limits* to or restricts the bounds of a particular subsidy to *a given enterprise or industry*."  *ASEMESA*, 523 F. Supp. 3d at 1403. As explained, the AAGEP and Article 14 of the Enforcement Decree do not *expressly* delineate enterprises or industries to which the 100 percent allocations would be limited.  Appx11586-11587; Appx11638. Moreover, the program could not have expressly limited the allocations to specific enterprises or industries because, at the time of the establishing the trade intensity and production cost criteria, the GOK itself was unaware of the precise entities or subsectors to which the

52

permit allocations would ultimately apply.  Appx15496; Appx15504;

Appx11615; Appx11638.

The *Final Results* also recite the trade intensity and production

cost criteria and then, without explanation, find that "as such," the

AAGEP and its Enforcement Decree "establish explicit limitations."

Appx1052.  However, this is a mere recitation of the criteria at issue

and then a conclusory statement without any reasonable explanation

tying the applicable law to the facts found.  *Id.*  Conclusory statements

without more are insufficient to support Commerce's determination.

*ASEMESA*, 523 F. Supp. 3d at 1403 n.1; *see also Asociación de*

*Exportadores e Industriales de Aceitunas de Mesa v. United States*, 429

F. Supp. 3d 1325, 1340 (Ct. Int'l Trade 2020).  Commerce must provide

an adequate explanation that demonstrates a rational connection

between the facts found and the determination made, and is required to

respond to Hyundai Steel's arguments that highlight material evidence

that detracts from its determination.  *See Coalition of American Flange*

*Producers v. United States*, 448 F. Supp. 3d. 1340, 1350, 1357-58 (Ct.

Int'l Trade 2020) (remanding Commerce's determination where its

explanation "does not permit" the court "to discern the path of the agency's reasoning and fails to address detracting evidence.").

The requirements of subsection (i) of Section 771(5A)(D) have not been met and Commerce's *de jure* specificity determination is unsupported by record evidence and contrary to law.

> b. *The KETS Meets The Requirements Of Section 771(5A)(D)(ii).*

In the *Final Results*, Commerce also found that the AAGEP and the implementing rules "are not objective criteria or conditions as defined by Section 771(5A)(D)(ii)." Appx1052.  In other words, Commerce found that the KETS program did not meet the requirements of the specificity safe harbor in Section 771(5A)(D)(ii), which provides as follows:

> (ii) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, *the subsidy is not specific as a matter of law*, if—
>
> (I)   Eligibility is automatic,
> (II)  The criteria or conditions for eligibility are strictly followed, and
> (III) The criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.

> For purposes of this clause, the term "objective criteria or
> conditions" means criteria or conditions that are neutral and
> that do not favor one enterprise or industry over another.

19 U.S.C. § 1677(5A)(D)(ii) (emphasis added).  Although Commerce fails

to explain how those three criteria are not met in the *Final Results* a

review of these criteria shows that the AAGEP and its Enforcement

Decree do meet the requirements of Section 771(5A)(D)(ii).  The

program is thus not *de jure* specific.

First, eligibility is automatic.  As noted, the program allocates 100

percent of an entity's assigned permits if (i) it has a "trade intensity" of

thirty percent; (ii) its production costs are at least thirty percent; or (iii)

it has a "trade intensity" of at least ten percent and production costs

that are at least five percent.  Appx1052; Appx10139-10140;

Appx11638.  Once any one of those criteria are met, any entity

regardless of enterprise or industry is automatically eligible for the 100

percent allocation.  As the GOK explained, the full amount of the

assigned permits "shall be allocated unconditionally" to entities that

"meet the criteria."  Appx10143.  Second, the criteria for eligibility are

strictly followed.  The permits are "allocated strictly" pursuant to the

AAGEP and Article 14 of the Enforcement Decree.  Appx10166.  As the

GOK reported, it "does not have any discretion that goes beyond the criteria laid out." Appx10166. Third, the criteria and conditions are capable of verification because the GOK requires that companies submit a report for each compliance year. Appx14157. Companies must have that report "verified by an independent expert," and after receipt, the GOK conducts an additional "evaluation" of submitted reports. Appx14157-14158. Finally, as Hyundai Steel has detailed herein, the trade intensity and production cost criteria do not "favor one enterprise or industry over another." *Any* subsector may meet the trade intensity or production cost thresholds regardless of enterprise or industry. Appx11586-11587; Appx11638. The criteria are thus neutral and do not favor one enterprise or industry over another.

Accordingly, each requirement pursuant to Section 771(5A)(D)(ii) has been met. Yet, in the *Final Results*, Commerce claims that the trade intensity and production cost criteria are "not objective criteria or conditions" without any explanation. Appx1052. This failure to explain the basis for its decision further renders the *Final Results* unsupported by substantial evidence. *See SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 847-48 (Fed. Cir. 2020) (citing *CS Wind Vietnam Co., Ltd.*

56

*v. United States*, 971 F.Supp.2d 1271, 1295 (Ct. Int'l Trade 2014))
(finding Commerce's allocation of brokerage and handling expenses by
weight unsupported where Commerce failed to explain away evidence
that demonstrated that the weight-based allocation was inapplicable to
the shipments in question); *Timken Co. v. United States*, 894 F.2d 385,
389 (Fed. Cir. 1990) (sustaining the trial court's holding that Commerce
failed to explain an inconsistency in applied surrogate value data
because Commerce failed to justify its determination).  The AAGEP and
the Enforcement Decree meet the requirements established pursuant to
Section 771(5A)(D)(ii).  Commerce's determination that the trade
intensity and production cost criteria are not objective criteria is thus
unsupported by substantial evidence.

## VIII. Conclusion And Relief Requested

Based on the foregoing, Hyundai Steel respectfully requests that this Court (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 10,801 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  August 5, 2022

Exhibit A

 SINCE 1828

# **due** adjective

📑 Save Word

\ ˈdü 🔊, ˈdyü \

## Definition of *due* (Entry 1 of 3)

**1**   **:** owed or owing as a debt
// is *due* a full week's pay

**2**   **a**   **:** owed or owing as a natural or moral right
// finally got the recognition she was *due*
// give credit where credit is *due*
// everyone's right to dissent … is *due* the full protection of the Constitution
— Nat Hentoff

   **b**   **:** according to accepted notions or procedures **:** APPROPRIATE
// with all *due* respect

**3**   **a**   **:** satisfying or capable of satisfying a need, obligation, or duty **:** ADEQUATE
// giving the matter *due* attention

   **b**   **:** REGULAR, LAWFUL
// *due* proof of loss

**4**   **:** capable of being attributed **:** ASCRIBABLE —used with *to*
// this advance is partly *due* to a few men of genius
— A. N. Whitehead

**5**   **:** having reached the date at which payment is required **:** PAYABLE
// the rent is *due*

**6**   **:** required or expected in the prescribed, normal, or logical course of events **:** SCHEDULED
// The train is *due* at noon.
// When is the baby *due*?
*also* **:** expected to give birth
// has a friend who is *due* in April

# **due** noun

## Definition of *due* (Entry 2 of 3)

**:** something due (see DUE entry 1) or owed: such as

**a**   **:** something that rightfully belongs to one
// give him his *due*

**b**   **:** a payment or obligation required by law or custom **:** DEBT

**c**   **dues** *plural* **:** FEES, CHARGES
// membership *dues*

# **due** adverb

## Definition of *due* (Entry 3 of 3)

Exhibit B

 SINCE 1828

# otherwise  *pronoun*

▪ <u>Save Word</u>

oth·er·wise  |  \ ˈə-thər-ˌwīz 🔊 \

**Definition of *otherwise* (Entry 1 of 3)**

**:** something or anything else **:** something to the contrary
**//** was ordered to testify and could not do *otherwise*

# otherwise  *adverb*

**Definition of *otherwise* (Entry 2 of 3)**

**1**   **:** in a different way or manner
   **//** glossed over or *otherwise* handled
    *— Playboy*
   **//** All shows begin at 8:00 unless *otherwise* noted.

**2**   **:** in different circumstances
   **//** might *otherwise* have left
   **//** The test helps identify problems that might have *otherwise* gone unnoticed.

**3**   **:** in <u>other</u> respects
   **//** an *otherwise* flimsy farce
    *— Current Biography*
   **//** I didn't like the ending, but *otherwise* it was a very good book.
   **//** The patient had a foot problem, but she was *otherwise* healthy.

**4**   **:** if not
   **//** do what I tell you, *otherwise* you'll be sorry
   **//** Tickets can be bought in advance at a discount; *otherwise* they can be purchased at the door for full price.

**5**   **:** <u>NOT</u> —paired with an adjective, adverb, noun, or verb to indicate its contrary or to suggest an indefinite alternative
   **//** people whose deeds, admirable or *otherwise*
    *— John Fischer*
   **//** almost thirty thousand women, Irish and *otherwise*
    *— J. M. Burns*
   **//** his opinion as to the success or *otherwise* of it
    *— Australian Dictionary of Biography*

# otherwise  *adjective*

**Definition of *otherwise* (Entry 3 of 3)**

**:** <u>DIFFERENT</u>
**//** if conditions were *otherwise*

ⓧ