# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>SSAB ENTERPRISES LLC,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenors. | NON-CONFIDENTIAL VERSION<br>Proprietary Information Removed from Pages 18 and 27<br><br>Ct. No. 22-00029 |
| DONGKUK STEEL MILL CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | Ct. No. 22-00032 |

## PLAINTIFF HYUNDAI STEEL COMPANY'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

MORRIS, MANNING & MARTIN, LLP
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

December 13, 2022

14013807–1

## <u>TABLE OF CONTENTS</u>

I.   Argument ........................................................................... 5

   A.   The KETS Program Does Not Provide A Financial Contribution Pursuant To 19 U.S.C. § 1677(5)(D)(ii) ........... 6

   B.   When Viewed In Its Entirety, The KETS Program Does Not Provide A Countervailable Benefit ...................................... 16

   C.   Commerce's Finding That The KETS Is Specific Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law. ........................................................ 24

      1.   The KETS Program Is Not De Jure Specific Pursuant To 19 U.S.C. §1677(5A)(D)(i) ...................................... 24

      2.   The Safe Harbor Criteria Have Been Met ................... 30

II.   Conclusion ...................................................................... 35

Certificate Of Compliance ...................................................... 36

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Asociacion de Exportadores e Industriales de Aceitunas de
 Mesa v. United States,*
 523 F. Supp. 3d 1393  (Ct. Int'l Trade 2021)................................ 24, 25

*BGH Edelstahl Siegen GMBH v. United States,*
 No. 21-00080, 2022 WL 11544421 (Ct. Int'l Trade Oct. 12,
 2022)......................................................................................... *passim*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
 467 U.S. 837, 104 S. Ct. 2778 (1984) ............................................ 7, 14

*Government of Sri Lanka v. United States,*
 308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018)............................. *passim*

**Statutes**

19 U.S.C. § 1677(5)(C) ........................................................... 19, 20, 21

19 U.S.C. § 1677(5)(D)................................................................. 6, 14

19 U.S.C. § 1677(5)(E) ....................................................................... 23

19 U.S.C. § 1677(5A)(D) ............................................................ 24, 25, 33

**Other Authorities**

19 C.F.R.§ 351.503(b)(2)..................................................................... 23

*Circular Welded Carbon Quality Steel Pipe from the
 Socialist Republic of Vietnam: Final Negative
 Countervailing Duty Determination*, 77 Fed. Reg. 64,471
 (Dep't Commerce Oct. 22, 2012) .................................................... 12

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,361 (Dep't
 Commerce Nov. 25, 1998 ................................................................ 22

*Due*, BLACK'S LAW DICTIONARY (8th ed. 2004) ........................................8

*Final Negative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,106 (Dep't Commerce Oct. 3, 2002) .......................... 12

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) ....................... 33

*Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (March 8, 2018) .................................................................. 31

# GLOSSARY OF ACRONYMS

1.  Act on the Allocation and Trading of Greenhouse Gas Emissions Permits ("AAGEP")

2.  Asociacion de Exportadores e Industriales de Aceitunas de Mesa ("ASEMESA")

3.  BGH Edelstahl Siegen GMBH ("BGH")

4.  Circular Welded Carbon Quality Steel Pipe ("CWP")

5.  Countervailing Duty ("CVD")

6.  European Union ("EU")

7.  Government of Germany ("GOG")

8.  Government of Korea ("GOK")

9.  Government of Sri Lanka ("GOSL")

10. Greenhouse Gas ("GHG")

11. Guaranteed Pricing Scheme ("GPS")

12. Kilowatt Hours ("kWh")

13. Konzessionsabgabenverordung (the "KAV Program")

14. Korean Allowance Units ("KAUs" or "permits")

15. Korean Emission Trading System ("KETS")

16. Korean Won ("KRW")

17. Statement of Administrative Action ("SAA")

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>SSAB ENTERPRISES LLC,<br><br>    and<br><br>NUCOR CORPORATION,<br><br>    Defendant-Intervenors. | **NON-CONFIDENTIAL VERSION**<br>Proprietary Information Removed from Pages 18 and 27<br><br>Ct. No. 22-00029 |
| DONGKUK STEEL MILL CO., LTD.,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>    and<br><br>NUCOR CORPORATION,<br><br>    Defendant-Intervenor. | Ct. No. 22-00032 |

## PLAINTIFF HYUNDAI STEEL COMPANY'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of

International Trade, and the October 25, 2022, Order Granting

Defendant's Motion for Extension of Time, ECF No. 44, Plaintiff

Hyundai Steel Company ("Hyundai Steel" or "Plaintiff") hereby replies

to the response briefs filed by Defendant, the United States, and
Defendant-Intervenor, Nucor Corporation.  *See* Defendant's Response to
Plaintiff's Motion for Judgment on the Agency Record, *Hyundai Steel
Co. v. United States*, No. 22-00029 (Ct. Int'l Trade Nov. 1, 2022), ECF
No. 45; Defendant-Intervenor's Response to Plaintiff's Motion for
Judgment on the Agency Record, *Hyundai Steel Co., v. United States*,
No. 22-00029 (Ct. Int'l Trade Nov. 15, 2022), ECF No. 48.  As discussed
more fully below, Defendant's and Defendant-Intervenor's arguments
are without merit and should be rejected.

This case involves a unique program that does not seamlessly fit
into the standard financial contribution, benefit, and specificity
provisions of the countervailing duty ("CVD") law.  The Government of
Korea ("GOK") has decided to take its obligation to fight climate change
seriously and has imposed a strict cap and trade system on a small
subset of companies in Korea.  The vast majority of companies in Korea
are not subject at all to this costly cap and trade system.  The way the
program works is that the GOK looks at historical emissions outputs
and then uses this level of emissions to set a "baseline" amount.  The
GOK then allocates emissions permits using this baseline and then

gradually lowers the allocations in phases to incentivize the reduction of carbon emissions below this baseline.  For certain participants that do *not* compete in the international market against companies who are not subject to cap and trade costs, or whose production costs meet a certain threshold, the GOK deducted 3 percent of the emissions permits from the baseline amount in the phase at issue in this case and set them aside in reserve.  For participants like Hyundai Steel that do compete in the international market or whose production costs are high, the GOK did not deduct 3 percent.

In allocating emissions permits to mandatory participants like Hyundai Steel, the GOK is merely setting a cap on the participants' carbon emissions during a particular phase of the KETS program.  The GOK is not seeking to generate revenue but is instead trying to lower carbon emissions to comply with its international commitments.  To the extent that a mandatory participant does not meet its carbon reduction goals, it has many options to generate its required level of emissions permits to surrender to the GOK.  This includes buying permits from private parties in the market, carrying forward unused permits from earlier years, or borrowing from future years.  There is no requirement

3

or even expectation that any permit shortfall will be purchased from the GOK.  By not having 3 percent deducted from its emissions permit allocation, companies like Hyundai Steel do not take on a debt to the GOK or owe the GOK revenue for these permits.  Thus, no revenue is foregone that is otherwise due or owed to the GOK and there is no financial contribution.

Nor is there any benefit. Being subjected to the KETS system is onerous and imposes costs on participants as they have to make changes to their business operations to lower their carbon footprint. Far from being a benefit to mandatory participants like Hyundai Steel, this program operates to their detriment as they incur costs that most other companies in Korea, and most foreign competitors, do not.  To the extent there is a beneficiary, it is the GOK who is making progress towards its international commitments to lower carbon emissions through the KETS program.  Instead of viewing this program in its entirety and reaching the obvious conclusion that the KETS program imposes burdens on Hyundai Steel, Commerce has myopically focused on the fact that trade intensive and high production cost companies do not have 3 percent of their emissions permit allocation deducted and

thus allegedly receive a countervailable benefit.  In Hyundai Steel's view, this is a perversion of the CVD law and ignores the totality of the program that is established to benefit the GOK and that operates to Hyundai Steel's detriment.  Only by looking at this program narrowly can Commerce come to the conclusion that Hyundai Steel has received a countervailable subsidy.

Finally, the KETS program is not *de jure* specific because it does not expressly limit the receipt of 100 percent emissions permit allocations to specific enterprises or industries.  Instead, the law sets eligibility criteria related to trade intensity and production costs that could be met by any enterprise or industry.  It is only after applying these eligibility criteria that certain sectors and subsectors are found to qualify for not having the 100 percent allocation reduced by 3 percent. Commerce's *de jure* specificity determination is thus unlawful because the law does not by its terms expressly limit alleged benefits to particular enterprises or industries.

I.    *Argument*

As discussed in Hyundai Steel's Rule 56.2 brief, Commerce's determination that the KETS program provided a financial

contribution, benefit, and was specific is unsupported by substantial evidence and is otherwise not in accordance with law. None of the arguments made by Defendant and Defendant-Intervenor alter that conclusion.

A.   *The KETS Program Does Not Provide A Financial Contribution Pursuant To 19 U.S.C. § 1677(5)(D)(ii)*

In the *Final Results*, Commerce determined that the 3 percent of permits that the GOK did not deduct from Hyundai Steel's permit allocation[1] was a financial contribution under 19 U.S.C. § 1677(5)(D)(ii) because it constituted revenue foregone by the GOK that was otherwise due. Appx1050-1051. Hyundai Steel argued that this determination is contrary to the plain language of the statute because under the KETS program the GOK was not foregoing any revenue that was otherwise due to it or otherwise owed by Hyundai Steel. The issue presented is whether the plain language of § 1677(5)(D)(ii) mandates that the government be foregoing revenue that it is otherwise legally obligated to collect or owed, or whether the mere possibility that the government

---

[1] The GOK first limits companies subject to the KETS to 100 percent of their applicable carbon emissions permits *and then* takes away 3 percent from subject companies that do not meet trade intensity and production cost criteria. Appx10142; Appx14330.

could collect such revenue suffices.  Hyundai Steel submits that the

plain language is clear and Commerce's statutory interpretation is

unlawful under *Chevron* step one.    *Chevron, U.S.A., Inc. v. Nat. Res.*

*Def. Council, Inc.* 467 U.S. 837, 104 S. Ct. 2778 (1984).

In response, Defendant argues that Commerce's financial

contribution determination is sound because it found that "the GOK

relieves companies in certain business sectors, such as Hyundai and

Dongkuk, of the financial burden of purchasing the additional credits."

Def. Br. at 21-22.  In Hyundai Steel's view, relieving companies of the

financial burden of purchasing emissions permits *may* be relevant to a

benefit determination, but it does not demonstrate that the GOK was

foregoing revenue it was otherwise due.[2]  The missing link is showing

that Hyundai Steel was otherwise legally obligated to purchase permits

from the GOK.  In other words, "but for" the fact that the GOK did not

---

[2] As discussed in Hyundai Steel's Rule 56.2 brief, the benefit and
financial contribution determinations are separate.  See Plaintiff's
Motion for Judgment on the Agency Record at 26, *Hyundai Steel Co., v.*
*United States*, No. 22-00029 (Ct. Int'l Trade Aug. 5, 2022), ECF No. 37
("Hyundai Br.").  Defendant argues that even if benefit and financial
contribution are separate, "it does not follow that the two cannot be
intertwined."  Def. Br. at 27.  This may be true, but each determination
must still be legally supported on its own; the intertwining cannot
relieve Commerce of its legal obligation to explain them both.

deduct 3 percent of Hyundai Steel's permits like it did from other subject companies, Hyundai Steel would have been obligated to purchase that 3 percent from the GOK or otherwise pay revenue to the GOK in the form of a penalty.

This interpretation flows naturally from the plain language of the terms "otherwise" and "due" in the statute as defined by dictionaries. Merriam-Webster defines "due" as "owed or owing as a debt," "owed or owing as a natural or moral right."  Hyundai Br. at Exhibit A.  Black's Law Dictionary defines "due" as "owing or payable; constituting a debt." *Due*, BLACK'S LAW DICTIONARY (8th ed. 2004).  Merriam-Webster defines "otherwise" as "in different circumstances," and "to suggest an indefinite alternative."  Hyundai Br. at Exhibit B.  The plain meaning of the statute thus requires that a financial contribution pursuant to Section 771(5)(D)(ii) exists only if the GOK had a "right" to collect revenue from Hyundai Steel and Hyundai Steel would have "owed" revenue to the GOK as a result of an "obligation or duty" had the GOK deducted 3 percent of its emissions permits as was done for other subject companies.

Defendant attempts to cure this infirmity by arguing that "{b}ecause companies receive a baseline of 97 percent of the calculated allotment, the GOK is legally entitled to collect revenue on any additional credits that these entities may need to purchase from the GOK-run trading exchange; the GOK is thus providing something of value on which it could otherwise potentially collect revenue." Def. Br. at 22. There are at least two problems with this argument.

First, companies subject to the KETS are not "required" to purchase permits from the GOK-run auction. Appx14155; Appx14331. Instead, if subject companies like Hyundai Steel need more permits, they have the choice whether to acquire permits from the private market, carry forward unused permits from prior years, or borrow its own permits from future compliance years rather than purchase from the GOK. Appx10142; Appx10144; Appx12538; Appx14155.

Second, the concession that the GOK is providing something of value "that it *could* otherwise *potentially* collect revenue" exposes the fundamental problem with Commerce's financial contribution determination. Having the "potential" ability to collect revenue is the not the same as revenue being "otherwise due." The revenue needs to

be "owing or payable" or "constituting a debt" to be "due."  Here, it is not.

Defendant's further responses to Hyundai Steel's statutory argument do not establish that, "but for" the fact that the GOK did not deduct 3 percent from Hyundai Steel's emissions permits, the GOK was owed revenue from Hyundai Steel.  For example, Defendant argues that "Hyundai automatically received an additional three percent allocation of KAUs, and it is inherently placed into an advantageous position, where it will need to purchase fewer permits than necessary, because of the GOK's involvement."  Def. Br. at 24.  But Hyundai Steel's position vis-à-vis other companies subject to the burdensome KETS program is not relevant to whether the GOK is foregoing revenue otherwise due.  Rather, to the extent it is relevant, it is relevant to the separate determination of benefit.  Although Defendant claims that Commerce did not conflate financial contribution and benefit but instead "simply sought to explain why it found a countervailable subsidy with reference to the treatment of other Korean entities," Def. Br. at 27, this explanation is in defense of its financial contribution determination and thus is conflating the two statutory elements.

10

Defendant also argues that "{h}ad the GOK treated Hyundai and Dongkuk like any other company, then both plaintiffs would have been eligible to participate in the government run auction where the GOK could have recovered the remaining three percent of permits that Hyundai and Dongkuk needed to purchase to comply with their KETS obligations." Def. Br. at 24. This is again speculative, and does not establish that Hyundai Steel owed a debt to the GOK or was otherwise obligated to purchase permits from the GOK had it been eligible to do so. The mere fact that Hyundai Steel "might" have purchased permits from the government auction, or that the GOK "could have" recovered the 3 percent does not establish that revenue was "otherwise due" to the GOK. Hyundai Steel had options for obtaining additional permits that did not involve purchasing them from the GOK, including buying from private parties, borrowing from future years, or carrying forward unused permits from prior years. Appx10142; Appx10144; Appx12538; Appx14155.

Hyundai Steel cited *Cold Rolled from Argentina* and *CWP from Vietnam* to support the general proposition that in order to give meaning to the "otherwise due" language, Commerce must point to

11

evidence that shows that the alleged revenue foregone was actually "due" to the government. *See* Hyundai Brief at 29-30 (citing *Final Negative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,106 (Dep't Commerce Oct. 3, 2002) and accompanying Issues and Decision Memorandum at Comment 5 ("*Cold Rolled from Argentina*"); *Circular Welded Carbon Quality Steel Pipe From the Socialist Republic of Vietnam: Final Negative Countervailing Duty Determination*, 77 Fed. Reg. 64,471 (Dep't Commerce Oct. 22, 2012) and accompanying Issues and Decision Memorandum at Comment 3 ("*CWP from Vietnam*"). Defendant spills pages of ink trying to distinguish these cases on the facts. Def. Br. at 27-30. However, Hyundai Steel did not rely on the specific facts of those cases as being directly on point to the situation with the KETS program. Rather, Hyundai Steel cited to them for the general proposition that in order to find that a financial contribution is provided by means of foregone revenue otherwise due, Commerce must point to substantial evidence that the revenue was in fact otherwise due. *See* Hyundai Br. at 29-30. That point remains undisputed, and Hyundai Steel submits that Commerce has no evidence that the 3

12

percent permit deduction from other subject companies and not from Hyundai Steel resulted in revenue foregone by the GOK that was otherwise due from Hyundai Steel.

For its part, Defendant-Intervenor largely echoes the arguments made by Defendant but also seeks to support Commerce's financial contribution determination by relying on this court's recent decision in *BGH Edelstahl Siegen GMBH v. United States*, No. 21-00080, 2022 WL 11544421 (Ct. Int'l Trade Oct. 12, 2022).  Def.-Intervenor Br. at 19.  To be sure, the carbon emissions program at issue in the *BGH* case has similarities to the KETS program in Korea, and the court did affirm Commerce's determination that the provision of additional carbon credits to companies on the carbon leakage list provided a financial contribution in the form of revenue foregone.  *See id.* at *11-12. However, Hyundai Steel respectfully submits that the court's discussion of this issue was cursory and the court was not presented with the precise question of whether the "otherwise due" requirement of the statute was violated.  The case is thus not on point to the issue presented in this appeal.

13

As characterized by the *BGH* court, the argument presented by the plaintiff in that case was that since "neither the EU nor any member state may collect revenues on the free allowances generally," there is no revenue foregone. *Id.* at *12. The court characterized this argument as a "strawman" and summarily dismissed it in one sentence: "The issue is not whether the GOG can sell the free allowances to companies, rather the issue is whether the GOG foregoes revenue when it gives additional free allowances to companies on the carbon leakage list like BGH, reducing the number of allowances BGH must purchase at the state-run auction or the secondary market." *Id.* The plaintiff did not argue, as here, that pursuant to *Chevron*, Commerce's interpretation of the "otherwise due" language of 19 U.S.C. § 1677(5)(D)(ii) is unlawful because it treats the mere possibility of collecting revenue as tantamount to revenue that was otherwise due or owed to the government by Hyundai Steel.[3] Thus, while the *BGH*

---

[3] Although not a model of clarity, the argument made by BGH appears to hinge on the factual distinction between the normal allocation of 43% of free allowances and the 57% of allowances that are additionally allocated to companies on the carbon leakage list. Specifically, Plaintiff argued that:

> The 43% of free allowances cannot be actioned (sic) by the European Union or its Member States and the 57% auctioned

decision deals with a similar program, Hyundai Steel respectfully submits that the holding is not directly relevant to the arguments presented in this appeal.

Finally, Defendant-Intervenor argues that the GOK is foregoing revenue it is otherwise due because "if Hyundai Steel does not surrender a sufficient amount of KAUs to cover its obligation to the GOK through the KETS program, the GOK is entitled to additional revenue through 'an administrative penalty in a monetary form of less than three times of the average market price of the carbon dioxide emission permits up to KRW 100,000 per 1 ton of carbon dioxide.'"  Def.-Intervenor Br. at 25.  Again, this does not demonstrate that revenue

---

allowances cannot be allocated for free… Therefore, Commerce is incorrect in claiming that the allocation of free allowances constitutes a financial contribution in the form of revenue foregone that is otherwise due.  By law, neither the European Union nor any Member State may collect revenues on the 43% of free allowances and none of the 57% auctioned allowances can be allocated for free.  Accordingly, the ETS never provides for the allocation of allowances where a government is foregoing revenue that is otherwise due."
Rule 56.2 Memorandum In Support Of Motion For Judgment Upon The Agency Record at 33, *BGH Edelstahl Siegen GMBH v. United States*, No. 21-00080 (Ct. Int'l Trade Oct. 26, 2021), ECF No. 22 ("BGH Br.").

was "otherwise due" to the GOK.  At best, this means that there is a
*possibility* that the GOK could collect revenue in the form of penalties if
Hyundai Steel does not meet its emissions reduction targets and does
not otherwise surrender the required number of permits.  This does not
satisfy the statute's plain language requirement that the GOK was
definitively owed something from Hyundai Steel and forfeited it by
deducting 3 percent from companies who did not meet the trade
intensive or production cost criteria but not from Hyundai Steel.

> **B.**    ***When Viewed In Its Entirety, The KETS Program Does Not
> Provide A Countervailable Benefit***

In the *Post-Preliminary Results*, Commerce determined that "the
benefit under this program exists in accordance with 19 C.F.R.
§ 351.503(b)(2) to the extent that the recipient is relieved of the
obligation to purchase additional allowances."  Appx14333.  In other
words, Commerce found that, despite the emissions cap to which the
KETS subjects Hyundai Steel, the GOK granted Hyundai Steel a
benefit by deducting 3 percent of the permits from other subject
companies who did not meet the trade intensity or production cost
criteria but not making a similar deduction from Hyundai Steel.
Appx01048-49; Appx10142; Appx14330.  Hyundai Steel challenged this

benefit determination by arguing that when the KETS program is viewed in its entirety, it is plain that the KETS imposes burdens and does not provide a countervailable benefit.

In response, Defendant argues that Hyundai Steel received a benefit "*compared to other Korean industries* with a lower volume of international trade or production costs" and that the benefit received is "not otherwise available to entities receiving the standard 97 percent allocation." Def. Br. at 33 (emphasis in original). Defendant claims that, if Hyundai Steel received the 97 percent allocation, it would incur a cost to acquire additional permits, and, if Hyundai Steel reduced its emissions, it would allegedly dispose of the permits for a profit. Def. Br. at 33-34. Similarly, Defendant-Intervenor argues that Hyundai Steel "received 100 percent of its allocated permits for free, whereas other Korean companies were only provided with the standard allocation," and thus "receive{d} relief from incurring the full costs of the environmental program incurred by other non-trade exposed companies." Def.-Intervenor Br. at 15-16.

Yet, Defendant and Defendant Intervenor conveniently ignore the bigger picture that the KETS program by its nature is established so

17

the GOK can meet its climate reduction goals.  Appx10155.  This is done by singling out a small subset of Korean sectors for mandatory participation and requiring that these companies incur costs and reduce their carbon emissions.[4]  Appx10161; Appx11583.  The vast majority of companies in Korea are *not* subject to the KETS program and, unlike Hyundai Steel, do not have to alter operations and incur costs to reduce emissions.  Appx10168 (showing that only [      ] companies in Korea are subject to the KETS program as of 2019).  Hyundai Steel also has to compete with foreign companies who do not have to similarly operate

---

[4] The amount of permits allocated to a company represents the amount of carbon emissions, or equivalents, that it may emit during a given year.  Appx10142-44.  The amount of permits issued is based on Korea's emissions during the 2014-2016 "base period," but the amount of permits issued decreases over time to limit greenhouse gas emissions.  Appx10140-41; Appx10155; Appx14330-31.  Both companies that receive 100 percent of the applicable permit allocations and those that receive 97 percent allocations have their annual emissions capped equal to an amount of permits that it receives.  Appx10142-44.  Companies whose emissions exceed the amount of permits received must acquire additional permits to cover the shortfall or face fines.  Appx10142-44; Appx13882-83.  Additionally, because the amount of permits allocated over time decreases, those subject to the KETS (regardless of relative allocation amounts) have to reduce operations or invest in ways to reduce annual carbon emissions.  Appx13715; Appx11920.  Companies that are not subject to the KETS in Korea and abroad are not subject to these burdens.

under allocated emissions caps.[5]  Appx10142; Appx10156.  To the extent

that high trade intensity or production cost companies like Hyundai

Steel do not have 3 percent deducted from their 100 percent permit

allocation, this just means that they are burdened slightly less than

some other companies that are subject to the KETS.

Neither Defendant nor Defendant-Intervenor dispute that the

KETS burdens and increases costs for the companies subject to it.  Def.

Br. at 35, 37, 38-39; Def.-Intervenor Br. at 16, 21.  Instead, they

myopically focus on the narrow fact that the GOK deducts 3 percent

from some companies subject to the KETS, but not Hyundai Steel.  Def.

Br. at 33-34; Def.-Intervenor Br. at 15-16.  The closest Defendant comes

to confronting this point is to argue that Commerce allegedly does not

need to consider the "effects" of the KETS, or the burden that the

allocated carbon emission caps impose per 19 U.S.C. § 1677(5)(C).[6]  Def.

---

[5]  In fact, the GOK calibrated the 100 percent allocation to mitigate
Hyundai Steel's exposure to competition with foreign companies that
are not subject to similar emissions caps.  *Compare* Appx10142,
Appx10156; *with* Def. Br. at 34-35.

[6]  Similarly, Defendant-Intervenor contends that Commerce does not
permit "offsets" for "negative benefits."  Def.-Intervenor Br. at 21-23.
However, as Hyundai Steel explained in its opening brief, it is not
arguing for an offset to the benefit calculation.  Hyundai Br. at 45-46.

Br. at 35-38. However, it "is not in accordance with Section 1677(5)(C)" for Commerce to "selectively analyze" benefit payments "in isolation" from the "overall program" as the court held in *Government of Sri Lanka v. United States*. 308 F. Supp. 3d 1373, 1380 (Ct. Int'l Trade 2018) ("*GOSL*"). Although the facts are different, the *GOSL* case provides a useful framework for analyzing whether the KETS program provides a countervailable benefit to Hyundai Steel.

In *GOSL*, the court found that Commerce's assessment of certain government payments made to the respondent as reimbursement for above-market guaranteed prices that the respondent paid to small producers for rubber inputs was unlawful because Commerce analyzed the payments without regard to the program as a whole. *GOSL*, 308 F. Supp. 3d at 1379. The court found that 19 U.S.C. § 1677(5)(C) "does not authorize Commerce" to "ignore" record evidence that contextualized the payments at issue. *GOSL*, 308 F. Supp. 3d at 1381. The court also rejected Commerce's "attempts to dilute the requirement that countervailable subsidies benefit a recipient by reference to Section 1677(5)(C)." *GOSL*, 308 F. Supp. 3d at 1382. The court reasoned that Commerce need not consider the pricing effect of the reimbursements

20

"to recognize that the series of debts and repayments . . . yielded no benefit." *GOSL*, 308 F. Supp. 3d at 1382. Rather, the program, taken as a whole, operated to the respondent's detriment because the respondent was actually serving as a "payment vehicle" for the program. *GOSL*, 308 F. Supp. 3d at 1382. Therefore, pursuant to *GOSL*, Commerce must review the KETS program holistically when determining whether it benefits Hyundai Steel and, despite 19 U.S.C. § 1677(5)(C), Commerce cannot selectively view relative aspects of the KETS to conveniently find alleged benefits from a program that, as a whole, operates to Hyundai Steel's detriment.

Defendant and Defendant-Intervenor claim that, pursuant to examples from the *CVD Preamble*, Commerce can still countervail alleged subsidization even though the overall effect of environmental regulations and the subsidization leave the firm with higher costs. Def. Br. at 36; Def.-Intervenor Br. at 20. The court in *GOSL* rejected a similar line of argument. According to *GOSL*, both hypotheticals from the *CVD Preamble* (*i.e.*, subsidization that reduces the costs of environmentally-friendly equipment and installation of seatbelts) "required 'improvements' to the product" or "enhance{d} the product in

21

some way and the government covered some of the cost of the enhancement." *GOSL*, 308 F. Supp. 3d at 1383 (citing *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,361 (Dep't Commerce Nov. 25, 1998)). The court found that the program "is not separable" like those "acts described in the regulatory preamble" and that reimbursement payments did not provide the respondent with any additional "value" because "reimbursements bear no resemblance" to input cost reductions or situations where the company receives more revenue than it otherwise would have earned. *GOSL,* 308 F. Supp. 3d at 1383-84.

Similarly, Hyundai Steel receives no enhancement, improvement, overpayment or additional value by having its emissions capped at 100 percent of its allocated permits, regardless of the emissions caps allocated to some other Korean entities. Instead, the record demonstrates, uncontrovertibly, that the KETS program restricts Hyundai Steel's operations by capping its emissions and forcing it to internalize the costs of Korea's carbon emissions reductions pursuant to the Paris Agreement. Appx01314; Appx10155; Appx13715; Appx11920; Appx13882-83. Just because the KETS restricts some other subject companies to slightly more onerous emissions caps, does not mean that

22

Hyundai Steel benefits pursuant to 19 U.S.C. § 1677(5)(E).[7]  Like the Guaranteed Pricing Scheme ("GPS") at issue in *GOSL*, the KETS program does not benefit Hyundai Steel and instead operates to its detriment.

Neither Defendant nor Defendant-Intervenor rebut these fundamental facts regarding the KETS program.  Instead, Defendant and Defendant-Intervenor would have the Court selectively limit the benefit analysis to the relative difference between Hyundai Steel's 100 percent allocation and other companies subject to the KETS who receive 97 percent of their applicable carbon permits and who, importantly, are not exposed to competition in markets that lack emissions caps like Hyundai Steel is.  Pursuant to the court's holding in *GOSL*, such a selectively narrow view of the circumstances is not lawfully permitted.

---

[7] Defendant-Intervenor seeks to further support Commerce's benefit determination by arguing that "by awarding the credits with value to Hyundai Steel for free, the GOK is conferring a benefit by providing goods and services for less than adequate remuneration."  Def.-Intervenor Br. at 16.  This is nothing more than a *post-hoc* argument that should not be considered since Commerce did not make its benefit determination under the less than adequate remuneration provision of the statute.  *See* Appx01048-49; Appx01053.  Instead, Commerce relied on 19 C.F.R.§ 351.503(b)(2) or the catch-all provision because Hyundai Steel "is relieved of the obligation to purchase additional allowances." Appx14333.

C.   *Commerce's Finding That The KETS Is Specific Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law*

1.   *The KETS Program Is Not De Jure Specific Pursuant To 19 U.S.C. §1677(5A)(D)(i)*

In the *Post-Preliminary Results*, Commerce determined that the carbon emissions permit program was *de jure* specific under 19 U.S.C. § 1677(5A)(D). Appx14332. In the *Final Results*, Commerce continued to determine that the KETS program was *de jure* specific because the Act on the Allocation and Trading of Greenhouse Gas Emissions Permits ("AAGEP") and its Enforcement Decree allegedly "establish explicit limitations" regarding "which industries qualify for the additional allocation" of permits, and the trade intensity and production cost criteria "are not objective criteria or conditions." Appx1052. Hyundai Steel argued that the criteria in Article 12(4) of the AAGEP and Article 14 of the Enforcement Decree do not "explicitly limit" such treatment "to a specific enterprise or industry" as required to be *de jure* specific. Hyundai Br. at 47-53 (citing *Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393  (Ct. Int'l Trade 2021) ("*ASEMESA*"). As such, Commerce's *de jure*

24

specificity determination is not supported by substantial evidence and is otherwise not in accordance with law.

Defendant responds with a deep dive into the facts of the *ASEMESA* case in an effort to distinguish it from Commerce's *de jure* specificity analysis here.  *See* Def. Br. at 40-44; *see* Def.-Intervenor Br. at 30-31.  This response is misplaced.  Hyundai Steel's reliance on *ASEMESA* is limited to the court's holding as to the statutory interpretation of 19 U.S.C. § 1677(5A)(D), and not factual similarities.  In particular, Hyundai Steel relies on that case for the court's holding that the lack of uniform treatment to a sector is "not equivalent to its *explicit restriction* of those benefits to a specific enterprise or industry," and the court's holding that what is required by the plain meaning of the statute is that "the authority providing the current subsidy, or its operating legislation, directly and explicitly prescribes limitations on the distribution of subsidies to an enterprise or industry."  *ASEMESA*, 523 F. Supp. 3d at 1403-04.  The facts of the *ASEMESA* case are unique and involve a complicated and layered factual situation involving the agricultural sector and for this reason Hyundai Steel drew no parallels between the facts of that case and the facts related to the KETS

25

program.  Defendant's argument that Hyundai Steel's reliance on

*ASEMESA* is misplaced because "Commerce is not interpreting

previous iterations or the historical evolution of the AAGEP; rather, the

AAGEP still operates in the same fashion as when it was established on

January 1, 2015" is thus non-responsive to Hyundai Steel's argument.

Def. Br. at 42-43.

Defendant also argues that "Article 12(4) of the AAGEP and

Article 14 of the Enforcement Decree establish criteria that *expressly*

*limits* which entities may qualify for the additional allocation by setting

thresholds that they must meet to qualify."  Def. Br. at 43.   Defendant

then recounts the eligibility criteria for trade intensive or high

production cost businesses who qualify for the 100 percent allocation,

and makes the point that businesses "with low international trade

intensity or low production costs {are} *explicitly* ineligible."  Def. Br. at

44.  But the mere fact that businesses with low international trade

intensity or low production costs do not qualify to retain their 100

percent allocation does not amount to an "explicit limit" of the 100

percent allocation "to a specific enterprise or industry" as required to be

*de jure* specific.

26

NON-CONFIDENTIAL

The AAGEP and Article 14 of the Enforcement Decree do not "express" that a certain "enterprise" or "industry" is ineligible to retain the 100 percent allocation.  Appx11586-87; Appx11638.  *Any* subsector may meet the trade intensity or production cost thresholds regardless of enterprise or industry.  As more entities become subject to the KETS over time, more subsectors will either qualify or not qualify based on the criteria in the AAGEP.  Appx10168 (showing that [

]). As Commerce itself admits, the program does "not name specific industries."  Appx01052.

Moreover, application of the trade intensity and production cost criteria demonstrate that the KETS lacks an express limitation.  The criteria set standards that required collection and analysis of data from 2013 to 2016 regarding each subsector's imports, exports, sales, production, and emissions.  Appx10139-10140; Appx15500; Appx15504. Those factors were chosen to determine (a) whether subsectors were exposed to competition from markets that were not subject to similar emissions caps and (b) the impact that the KETS emission cap may have on each potentially affected subsector.  Appx10139-10140;

Appx10142; Appx10156.  Notably, the GOK set the criteria with the

Enforcement Decree on December 29, 2017, Appx11615; Appx11638,

*and then* determined which subsectors received the 100 percent

allocation using the criteria, which were not proposed until July 9,

2018.  Appx15496; Appx15504.  In order to implement Phase Two of the

KETS, the GOK had to further divide the 26 subsectors from Phase one

into 63 subsectors for Phase Two such that it could determine which

subsectors met the criteria of the AAGEP.  Appx10140; Appx15500;

Appx15506.  The GOK could not have "expressly limited" the KETS

allocations to an enterprise or industry because it did not yet know

which subsectors met the criteria.

Defendant counters that "the statute does not require Commerce

to consider the *intent* behind the subsidy, but the *result*."  Def. Br. at

44-45.  This is a red herring.  Hyundai Steel's argument does not

require consideration of the intent of the alleged subsidy.  Rather,

Hyundai Steel's argument is simple–for this subsidy to be specific as a

matter of law, the AAGEP must expressly limit the 100 percent

allocations to specific enterprises or industries.  That is, by its terms.

The fact that the GOK did not know what enterprises or industries

28

would be included in the trade intensive or high production cost sectors at the time the law was drafted means it could not have expressly limited it to any particular enterprise or industry. This has nothing to do with intent.

Finally, Defendant argues that the AAGEP sets criteria for deciding which sectors and subsectors qualify to retain the 100 percent allotment and thus the AAGEP identify and provide "conditions that limit eligibility to select industries that can meet the criteria, with one of the criteria being volume of international trade." Def. Br. at 45. Once again, the criteria and conditions were set before the actual sectors and subsectors that qualified was known and so the AAGEP could not have expressly limited access to specific enterprises or industries. Trade intensity and production cost criteria do not favor any particular industry or enterprises, and so the fact that the AAGEP made these part of the eligibility criteria does not show that the law expressly limited access to any particular industry or enterprise.

Defendant-Intervenor tries to buttress Commerce's *de jure* specificity determination using the *BGH* decision. Def.-Intervenor Br. at 29-30. That case is easily distinguishable. In that case, additional

carbon credit allocations were expressly limited to companies on the carbon leakage list. A law that limits eligibility to specific companies (enterprises) meets the *de jure* criteria under the plain language. In contrast, as discussed, the AAGEP does not explicitly limit the 100 percent allocations to specific enterprises or industries. Instead, the trade intensive and production cost criteria do not explicitly identify or favor any particular enterprise or industry. Instead, the sectors and subsectors that qualify are set based on application of the trade intensity and production cost criteria and thus the law does not by its terms limit access to specific enterprises or industries.

### 2. *The Safe Harbor Criteria Have Been Met*

In the *Final Results*, Commerce found that the AAGEP and the implementing rules "are not objective criteria or conditions, as defined by section 771(5A)(D)(ii)." Appx01052. Commerce thus found that the KETS did not meet the requirements of the specificity safe harbor in Section 771(5A)(D)(ii). Hyundai Steel argued that the safe harbor has been met and that the determination of who is eligible to retain the 3 percent allocation is based on objective criteria.

In response, Defendant argues that "the AAGEP and its implementing rules are not objective because they establish criteria that favor industries that can meet the high prerequisites." Def. Br. at 47. However, merely establishing eligibility criteria that require a certain level of trade intensity or production costs does not favor any enterprise or industry. To the contrary, any enterprise or industry that meet these criteria will not have 3 percent deducted from its permit allocation. Under Defendant's logic, any eligibility criteria could be said to favor an enterprise or industry because not everyone will meet the eligibility criteria, *i.e.*, what would be the point of having eligibility criteria if everyone could qualify.[8] There is nothing in the trade intensity or production cost criteria that, when first established, favored

---

[8] Defendant relies on *Silicon Metal from Australia* as support for its argument that the AAGEP criteria are not objective. Def. Br. at 47 (citing *Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (March 8, 2018)), and accompanying IDM at 20. The discussion of this issue in Commerce's decision is abbreviated and while it may have some relevance to the *de jure* specificity finding here, Hyundai Steel notes that this decision was not appealed. Thus, even to the extent it involved similar facts Hyundai Steel disagrees with this decision and thinks it too is not in accordance with law because the law in that case did not limit eligibility to certain enterprises or industries.

any industry or enterprises and thus no basis to say they are not objective criteria.

For its part, Defendant Intervenor relies again on the *BGH* decision to support Commerce's determination that the criteria for ineligibility for the 3 percent deductions are not objective criteria or conditions. Def. Br. at 32-33. But the *de jure* determination in that case is inapposite. The eligibility criteria in *BGH* were to companies on the carbon leakage list and thus the court found these criteria were not objective because they favored the specific companies on the carbon leakage list. *BGH*, 2022 WL 11544421 at *39. In contrast, eligibility under the AAGEP for the 100 percent allocations was not limited to certain companies but instead is available to any enterprise in the sectors or subsectors that met the trade intensity or production cost criteria. As discussed above, the trade intensity and production cost criteria do not "favor one enterprise or industry over another." *Any* subsector may meet the trade intensity or production cost thresholds regardless of enterprise or industry. Appx11586-11587; Appx11638. The criteria are thus neutral and do not favor one enterprise or industry over another.

To the extent the *BGH* case is relevant, it actually supports the conclusion that the eligibility criteria under the AAGEP are objective. The statutory language provides that objective criteria are those that "are neutral and that do not favor one enterprise or industry over another." 19 U.S.C. § 1677(5A)(D). In seeking to understand this language, the court references the SAA that states that: "neutral in this context means economic in nature and horizontal in application, such as the number of employees or the size of the enterprise." *BGH*, 2022 WL 11544421 at *6 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4243 ("SAA")). Using this example, the AAGEP criteria are neutral. Deciding eligibility based on the number of employees or size of an enterprise would result in some enterprises being favored over others (*i.e.*, if eligibility required a large number of employees or large enterprise then enterprises with small number of employees or small size would be excluded) just as the trade intensity and production costs criteria would exclude companies with lower trade intensity or production costs. If this example is representative of neutral criteria then the AAGEP criteria are neutral.

33

Furthermore, the *BGH* court found that Commerce's determination that the safe harbor was not met for another subsidy program was not supported by substantial evidence. The KAV program at issue in that case limited the alleged subsidy to "special contract customers whose average price per kWh in the calendar year is lower than the average revenue per kWh from the supply of electricity to all special contract customers." *BGH*, 2022 WL 11544421 at \*16. In turn, special contract customers are those "whose measured power exceeds 30 kilowatts in at least two months of the billing year and whose annual consumption is more than 30,000 kilowatt hours." *Id.* The court faulted Commerce for not explaining how this program favors certain industries over others or explicitly limits who could apply, nor did Commerce address "whether criteria based on energy usage is economic in nature and horizontal in application," such that the program may be considered to be specific as a matter of law pursuant to 19 U.S.C. §1677(5A)(D)(ii)." *Id.* Here, as in *BGH*, Commerce has not explained how the AAGEP criteria favors certain companies over others or limits who can apply.

## II.    Conclusion

For the foregoing reasons, Hyundai Steel respectfully requests that the Court (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 6,834 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  December 13, 2022