Slip Op. 23-182

## UNITED STATES
## COURT OF INTERNATIONAL TRADE

| Court No. 22-00029 | Court No. 22-00032 |
|---|---|
| HYUNDAI STEEL COMPANY, | DONGKUK STEEL MILL CO., LTD., |
| *Plaintiff,* | *Plaintiff,* |
| v. | v. |
| UNITED STATES, | UNITED STATES, |
| *Defendant,* | *Defendant,* |
| and | and |
| SSAB ENTERPRISES LLC and NUCOR CORPORATION, | NUCOR CORPORATION, |
| *Defendant-Intervenors.* | *Defendant-Intervenor.* |

Before: M. Miller Baker, Judge

## OPINION

[The court grants Plaintiffs' motions for judgment on the agency record in part and remands to the Department of Commerce.]

Dated: December 18, 2023

*Brady W. Mills* and *Nicholas C. Duffey*, Morris, Manning & Martin, LLP, of Washington, DC, argued for Hyundai Steel Company, Plaintiff in Case 22-29. With them on the briefs were *Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Mary S. Hodgins*, *Eugene*

*Degnan*, *Edward J. Thomas III*, and *Jordan L. Fleischer*.

*Ruby Rodriguez*, Winton & Chapman PLLC of Washington, DC, argued for Dongkuk Steel Mill Co., Ltd., Plaintiff in Case 22-32. On the briefs for Dongkuk were *Jeffrey M. Winton* and *Vi N. Mai*.

*Elizabeth A. Speck*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, argued for Defendant in both cases. On the brief for Defendant were *Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *L. Misha Preheim*, Assistant Director; and *Kelly A. Krystyniak*, Trial Attorney. Of counsel for Defendant was *Jared M. Cynamon*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*Derick G. Holt*, Wiley Rein LLP of Washington, DC, argued for Nucor Corporation, Defendant-Intervenor in both cases. With him on the brief were *Alan H. Price*, *Christopher B. Weld*, and *Paul A. Devamithran*.

*Christopher T. Cloutier*, Schagrin Associates of Washington, DC, argued for SSAB Enterprises LLC, Defendant-Intervenor in Case 22-29 only.

   *Baker*, Judge: This case involves a South Korean steel producer's challenge to a countervailing duty order focused on that country's cap-and-trade system for limiting carbon emissions. The Department of Commerce found that because the scheme provides some indigenous manufacturers with 100 percent of their

allotted units under the system while giving other such producers only 97 percent, the system provides a countervailable subsidy to the former. For the reasons outlined below, the court remands for reconsideration.

I

The Tariff Act of 1930, as amended, provides that when Commerce determines that a foreign government is providing a "countervailable subsidy" as to goods imported into the United States, and the International Trade Commission further determines that such imports injure U.S. domestic industry, the Department will impose a "countervailing duty" on the relevant merchandise "equal to the amount of the net countervailable subsidy." 19 U.S.C. § 1671(a).

To conclude that a foreign producer received a subsidy, Commerce must determine that "(1) a foreign government provide[d] a financial contribution (2) to a specific industry and (3) a recipient within the industry receive[d] a benefit as a result of that contribution." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B)); *see also* 19 U.S.C. § 1677(5)(A). "Analyzing all three factors is therefore necessary for Commerce to determine whether a [countervailing duty] must be imposed." *Fine Furniture*, 748 F.3d at 1369.

As relevant here, the Tariff Act defines "financial contribution" as meaning "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." 19 U.S.C. § 1677(5)(D)(ii). The statute further (and unhelpfully)

provides that "[a] benefit shall normally be treated as conferred where there is a benefit to the recipient," *id.* § 1677(5)(E), and (more helpfully) outlines four non-exclusive examples. *See id.* § 1677(5)(E)(i)–(iv).

## II

## A

The South Korean government has imposed a cap-and-trade system on that country's industry to reduce carbon emissions. In general, companies—including steel producers—that emit more than a certain volume of carbon must "pay" to do so by surrendering "Korean Allowance Units." Appx14329–14330. The South Korean government allocates the units. Appx14330. Before a given compliance year, the government calculates the number of units to be assigned to each regulated company. *Id.* Certain business sectors that meet "high international trade intensity" or "high production cost" criteria receive 100 percent of their assigned units. Appx14330–14331. Other sectors that fail to meet the "trade intensity" or "production cost" criteria instead receive 97 percent of their assigned units. Appx14330.

Every year, the South Korean government determines each regulated company's actual carbon emissions for the preceding year. Appx14331. Such an entity must then surrender the necessary number of units to cover—to "pay" for, as it were—its emissions. A company that does not have enough units available has various options. It can borrow from its anticipated future units; it can buy additional units through an auction at which the government sells the held-back

three percent portion of other companies' units; it can buy units from other companies that have more than they need; or it can pay a monetary penalty. *Id.* A company that has more units than it needs can, in turn, sell its excess units to other companies either via a centralized exchange or directly, or it may carry over a certain percentage of units to the following compliance year. Appx14331–14332.

## B

### 1

Hyundai Steel Company, a South Korean steel manufacturer, qualified for 100 percent of its allocated units because of its high international trade intensity and/or high production costs. Appx14332. During an administrative review for 2019 of a countervailing duty order on certain steel imported from South Korea, Nucor Corporation, an American steel producer, filed a "new subsidy allegation" with Commerce contending that Hyundai's receipt of 100 percent of its allocated units is a countervailable subsidy. Appx09230–09238.

Following an investigation, the Department found in a post-preliminary determination that by providing the additional three percent of units (i.e., the amount beyond the 97 percent awarded to most participants) to companies such as Hyundai at no cost, the South Korean government relieved them of the financial burden of purchasing those units from either the government-run auction or from private actors. Appx14332. Commerce found that because the South Korean government sells the additional units via a government-

run auction, it "is able to collect revenue on any additional units that these entities may need to purchase," and it was therefore "providing something of value on which it could otherwise potentially collect revenue." *Id.* Based on that finding, the Department concluded that South Korea's provision of the "additional, free" three percent of the units was "a financial contribution in the form of revenue forgone" under 19 U.S.C. § 1677(5)(D)(ii). *Id.*

Commerce then found that the South Korean statute and implementing regulations "have delineated the criteria for determining which sectors and sub-sectors qualify for the additional [unit] allotment" and that the South Korean government applies those criteria to determine who qualifies:

> As such, companies falling within the sectors and sub-sectors that the GOK determined as trade intensive and/or high production cost sectors automatically qualify for the additional free three percent [unit] allocation from the GOK. Accordingly, we . . . preliminarily find the provision of additional free [units] to certain sectors, including Hyundai Steel, to be *de jure* specific under [19 U.S.C. § 1677(5A)(D)(i)].

*Id.*

Finally, the Department determined that because a company receiving 100 percent of its units "is relieved of the obligation to purchase additional allowances," such companies receive a benefit under 19 C.F.R. § 351.503(b)(2). Appx14333. Commerce therefore

preliminarily assigned Hyundai a countervailable subsidy rate of 0.10 percent, *id.*, bringing the company's total margin to 0.56 percent. Appx01074–01075. The Department thereafter issued its final decision—which, as relevant here, remained unchanged—over the objections of both Hyundai and the South Korean government.

### 2

During the same administrative review, a second South Korean steel producer, Dongkuk Steel Mill Co., requested that Commerce examine it individually as a voluntary respondent. The Department declined to do so. Appx01070–01071. Commerce instead assigned Dongkuk the same 0.56 percent rate Hyundai received, citing the statutory requirement that because Hyundai's rate was neither zero nor *de minimis*, that rate also applied to non-examined respondents. Appx01074–01075.

### C

Hyundai brought this suit under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii) to challenge its countervailing subsidy margin. *See generally* Case 22-29, ECF 8 (complaint). Shortly thereafter, Dongkuk also sued under the same provisions to challenge that same margin. *See* Case 22-32, ECF 15 (complaint).

Nucor and SSAB Enterprises moved to intervene as of right in both cases. In Case 22-29, Hyundai consented and the court granted both motions. ECF 22 (SSAB) and 23 (Nucor). In Case 22-32, Dongkuk

consented to Nucor's intervention and the court
granted the latter's motion, ECF 29. Dongkuk, how-
ever, opposed SSAB's motion, and the court denied it
because the latter did not actively participate in the
Commerce proceedings and therefore was not a "party
to the proceeding" with a right to intervene under 28
U.S.C. § 2631(j)(1)(B). *Dongkuk Steel Mill Co. v.
United States*, 567 F. Supp. 3d 1359, 1364 (CIT 2022).

The court then consolidated the cases for the lim-
ited purpose of briefing and argument. Hyundai filed
a motion for judgment on the agency record. Case
22-29, ECF 38. Dongkuk filed a joinder to Hyundai's
arguments and argued that if the court granted the
latter's motion, it should also order Commerce to re-
calculate Dongkuk's rate. Case 22-32, ECF 43-1, at 4.[1]

The government, Case 22-29, ECF 47; Case 22-32,
ECF 50, and Nucor, Case 22-29, ECF 51; Case 22-32,
ECF 54, opposed.[2] Hyundai, Case 22-29, ECF 51, and
Dongkuk, Case 22-32, ECF 55, replied. The court then
heard argument.

---

[1] The point of Dongkuk's case is to protect the company's
interest in having its rate recalculated if Hyundai prevails.
Because Dongkuk merely rides Hyundai's coattails, the
court does not address the former's filings. All docket cita-
tions that follow therefore refer to Case 22-29 absent any
indication otherwise.

[2] SSAB filed no response to the motion for judgment on the
agency record in Case 22-29, the case where it was permit-
ted to intervene.

### III

The court has subject-matter jurisdiction over these actions under 28 U.S.C. § 1581(c).

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

### IV

Although Commerce assigned Hyundai a 0.56 percent countervailing duty margin, the company only challenges the 0.10 percent portion of that margin based on the company's receipt of 100 percent of its cap-and-trade units. More is at stake, however, than just one-tenth of one percent. Commerce's regulations

preclude the imposition of any countervailable subsidy rate of less than 0.50 percent. *See* 19 C.F.R. § 351.106(c)(1). Thus, if Hyundai were to prevail on any remand and the challenged 0.10 percent portion is subtracted from its 0.56 percent margin, it will have no liability and will receive a refund of all countervailing duty cash deposits it paid under the order.[3]

In its challenge to that 0.10 percent portion, Hyundai raises three different issues. It contends that it received no subsidy because the South Korean government did not forego any revenue that was otherwise due, ECF 38-2, at 15–33, that its 100 percent unit allocation does not provide a benefit, *id.* at 34–47, and that the cap-and-trade system is not specific, *id.* at 47–57. The court addresses these issues in turn.

## A

Hyundai argues that in awarding the company 100 percent of its cap-and-trade units, the South Korean government did not forego, or fail to collect, revenue that was "otherwise due," ECF 38-2, at 15–16 (citing 19 U.S.C. § 1677(5)(D)(ii)), and thus did not make a financial contribution. The company contends that there is no expected revenue otherwise due because there is no way to know, when the South Korean government issues units, whether the recipient will need all the units received, a smaller number (in which case the recipient might then sell the unused portion), or a larger number. ECF 38-2, at 19. The company further

---

[3] The same is true of Dongkuk. Its rate rises and falls with Hyundai's.

argues that when a recipient needs a larger number of units, there is no way to know whether that recipient will purchase them at the government-run auction or through private channels from another company that has surplus units. *Id.*

Commerce correctly rejected these arguments, explaining, "[T]he key consideration is that, in lieu of giving these entities the additional [units] for free, the [South Korean government] would have received revenue from said entities." Appx01051. As the government says: "By simply receiving an additional allocation of permits for free, the [South Korean government] has overlooked initial revenue it could have been received *but for* the three percent additional allocation." ECF 47, at 25–26 (emphasis in original). Because most other entities were required to pay for additional units that were simply given away to Hyundai and a few other similarly situated companies, the South Korean government failed to collect revenue that it otherwise would have received. Thus, Commerce's reading of 19 U.S.C. § 1677(5)(D)(ii) was exactly right, and its determination on the financial contribution issue is supported by substantial evidence.

## B

Hyundai also challenges the Department's finding that the South Korean government's provision of the free units provided a "benefit." As noted above, the statute unhelpfully provides that "[a] benefit shall normally be treated as conferred where there is a benefit to the recipient." 19 U.S.C. § 1677(5)(E). Despite that definition's circularity, it's manifest that the

additional three percent confers a benefit even if one accepts Hyundai's theory that the cap-and-trade system imposes an overall burden on companies subject to its requirements.

The company contends that "Commerce ignores the immense burden this program places on companies like Hyundai Steel and the fact that Hyundai Steel is subject to the program whereas other companies are not." ECF 38-2, at 34. There is no doubt that the cap-and-trade system imposes a burden. But the company's argument ignores that the free provision of additional units *reduces* the compliance burden that recipients would otherwise have to bear. As the government explains, "Hyundai and Dongkuk receive a benefit *compared to other Korean industries* with a lower volume of international trade or production costs," ECF 47, at 32 (emphasis in original), and if they instead received only the "standard" 97 percent allocation of units, "they would be required to incur a cost for acquiring these [units] from either the [South Korean government] or private markets," *id.*

The court agrees with the government. A company that receives 100 percent of its allocated units is relieved of the financial burden of purchasing the additional three percent that other companies must obtain. This is true even if the company needs to purchase extra units because its emissions exceed the allowable cap such that a 100 percent allocation is not enough— the company receiving 100 percent would still need

fewer units than it would if it fell within the "97 percent" group.[4]

That is what Commerce found: "The fact that certain industries are . . . granted an additional three percent allocation . . . means that they are, on a proportional basis, given a benefit under K-ETS not available to those industries receiving the standard 97 percent allocation." Appx01049. The reduction of Hyundai's cost of compliance constitutes a benefit because "Commerce determines benefit by the reduction or elimination of the obligation, without regard to the source of that obligation." *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1264 (CIT 2022). "Due to receiving the additional free allowances, [Hyundai] received something for free—allowances [it] would have been required to pay to acquire at auction or on the private market." *Id.* The Department's "benefit" determination is supported by substantial evidence.

## C

The third and final issue Hyundai raises is whether the benefit it received is "specific." The statute provides that, subject to certain exceptions not relevant here, "a countervailable subsidy is a subsidy described in this paragraph which is specific as described in

---

[4] Conversely, even if entities—such as Hyundai—receiving the free extra units ultimately have no need for them because their carbon emissions are lower than anticipated, such entities can sell those units to companies that *do* need them. That's found money for the fortunate beneficiaries of the free units.

paragraph (5A)." 19 U.S.C. § 1677(5)(A). A specific subsidy may be *de jure* specific—that is, specific as a matter of law—under § 1677(5A)(D)(i),[5] or it may be *de facto* specific—"specific as a matter of fact," to use the statute's words—under § 1677(5A)(D)(iii).

Here, Commerce determined the subsidy to be *de jure* specific.[6] The Department's post-preliminary determination found that the South Korean statute and implementing regulations "have delineated the criteria for determining which sectors and sub-sectors qualify for the additional KAU allotment" and that companies within those sectors and sub-sectors "automatically qualify" for the subsidy, so it is therefore *de jure* specific. Appx14332. In its final determination, Commerce concluded that "the [statute] and implementing rules not only establish explicit limitations but also are not objective criteria or conditions, as defined by [19 U.S.C. § 1677(5A)(D)(ii)]. Accordingly, consistent with Commerce's decision in other similar cases, we continue to find that the additional three percent KAU allocation is *de jure* specific." Appx01052.

As it did before the agency, Hyundai relies primarily on this court's *ASEMESA* decision, *Asociación de*

---

[5] There is an exception to *de jure* specificity for subsidies that are governed by "objective criteria or conditions" and that satisfy three enumerated criteria. *See* 19 U.S.C. § 1677(5A)(D)(ii).

[6] The statute provides that "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law." *Id.* § 1677(5A)(D)(i).

*Exportadores e Industriales de Aceitunas de Mesa v.
United States*, 523 F. Supp. 3d 1393 (CIT 2021). *ASE-
MESA* examined the meaning of the statutory phrase
"expressly limits access to the subsidy to an enterprise
or industry." Relying on dictionary definitions of "ex-
press" and "limit," the court concluded that

> the plain meaning of the statute is that a sub-
> sidy is de jure specific when the authority
> providing the subsidy, or its operating legisla-
> tion, directly, firmly, or explicitly assigns limits
> to or restricts the bounds of a particular subsidy
> to a given enterprise or industry.

*Id.* at 1403. The court explained that Commerce must
determine "that the subsidy in question [is] explicitly
limited to a *specific* enterprise or industry by the ad-
ministering authority or its implementing legislation."
*Id.* (emphasis added). "Under the plain meaning of
Section 1677(5A), subsidies are only de jure specific
where the authority providing the current subsidy, or
its operating legislation, *directly* and *explicitly* pre-
scribes limitations on the distribution of subsidies to
an enterprise or industry." *Id.* at 1404 (emphasis
added).

Hyundai argues that the cap-and-trade system
does not fit within *ASEMESA*'s teaching because noth-
ing in the South Korean statute prescribes an express
limitation whereby only specific industries or enter-
prises can be eligible for the additional three percent
unit allotment: "[T]he [System's] alleged failure to
treat all enterprises or industries uniformly does not
equate to an 'explicit restriction' to specific enterprises

or industries," ECF 38-2, at 52 (citing *ASEMESA*, 523 F. Supp. 3d at 1403), because nothing in the South Korean statute or regulations "directly, firmly, or explicitly assign[s] limits to or restricts the bounds of a particular subsidy to a given enterprise or industry," *id.* (emphasis removed) (quoting *ASEMESA*, 523 F. Supp. 3d at 1403).

The government responds that the South Korean statute and regulations do "establish criteria that *expressly limit*[ ] which entities qualify for the additional allocation by setting thresholds that they must meet to qualify." ECF 47, at 42 (emphasis in original) (citing Appx01052). The government quotes a South Korean statutory provision whereby a business will be eligible for a 100 percent allocation if its "international trade intensity" exceeds a baseline "or if it engages in a type of business for which the production cost increased by reducing greenhouse gases is not less than the standard prescribed by" the implementing regulation. *Id.* (quoting Appx11585–11587). The government then notes that the regulation, in turn, provides that "any of the following *types of businesses*," *id.* (emphasis added) (quoting Appx01052), are eligible for the 100 percent allocation:

> (1) a business with an international trade intensity of at least 30 percent, (2) a type of business with production costs of at least 30 percent[,] or (3) a type of business with an international trade intensity of at least 10 percent and production costs of at least 5 percent.

*Id.* at 42–43 (quoting Appx01052 and citing Appx11638). "Thus, a participant who does not meet th[ose] criteria because they are a business with low international trade intensity or low production costs is *explicitly* ineligible." *Id.* at 43 (emphasis in original). The government contends that all that matters is that the statute "inherently limits the subsidy to large businesses with high international trade intensity or high production costs" and that the South Korean Ministry of Environment determined that "Manufacturing of Basic Steel" qualified. *Id.* (citing Appx14332).

For its part, Nucor contends that *ASEMESA*'s teaching is "inapplicable" here because that case involved an agricultural product and a Commerce regulation provides that agricultural subsidies are not specific under § 1677(5A)(D). ECF 49, at 30 (citing 19 C.F.R. § 351.502(e)). The court disagrees because *ASEMESA*'s analysis turns on the statutory language, not the regulation. *See* 523 F. Supp. 3d at 1403.

Nucor then argues that "businesses with low international trade intensity or low production costs, which are identified in the implementing legislation, are expressly ineligible for the 'gratuitous allocation of all emission permits,'" ECF 49, at 31 (citing Appx11638), and argues that "this subsidy is limited to large polluters with significant international trade exposure and/or production costs as defined by the" South Korean statute, *id.*

The regulation Nucor cites contains the same language Commerce and the government quoted regarding the three "types of businesses," Appx11638, and it

refers to an attached Table 1. The full provision reads as follows:

> Types of business eligible for gratuitous allocation of all emission permits pursuant to Article 12(4) of the Act shall be any of the following types of businesses and determined in the allocation plan through evaluation in each commitment period:
>
> (1) A type of business, the international trade intensity of which, *referred to in attached Table 1* is at least 30/100;
>
> (2) A type of business, the production costs incurrence rates of which, *referred to in attached Table 1* is at least 30/100;
>
> (3) A type of business, the international trade intensity and production costs incurrence rate of which, *referred to in attached Table 1* are at least 10/100 and at least 5/100, respectively.

Appx11638 (emphasis added). The table, in turn, simply gives two formulas—one for calculating international trade intensity and the other for calculating the "production costs incurrence rate," Appx11896—and then provides two definitions of terms used in those formulas and instructions for how to ascertain certain figures to be included in the formulas' calculations, Appx11896–11897.

The court sees an inherent disconnect between a reference to "*types* of businesses" (or "*a type* of business") as referred to in the South Korean statute and

implementing regulation and "a *specific* enterprise or industry," or "a *given* enterprise or industry," as referred to in the Tariff Act as interpreted by *ASE-MESA*, 523 F. Supp. 3d at 1403 (emphasis added). Commerce's final determination here acknowledged that "the rules do not name specific industries" but found the program *de jure* specific anyway without responding in any meaningful way to Hyundai's arguments about *ASEMESA*. Appx01052. The Department also found that the statute imposes a "limitation on *which industries qualify* for the additional allocation by setting thresholds that *industries* must meet *in order to qualify*." *Id.* (emphasis added).

Absent from this discussion is any indication of how the criteria, or the limitation and the thresholds, operate to "restrict the bounds of [the] particular subsidy to *a given* enterprise or industry," "*a specific* enterprise or industry," or even a "specific" small universe of enterprises or industries. *See ASEMESA*, 523 F. Supp. 3d at 1403 (emphasis added).

Two questions thus present themselves here. First, did the Department consider whether, as Hyundai argues, any large business could qualify for the additional three percent allocation regardless of the industry to which it belongs? Second, did Commerce consider that the South Korean government's determination that "Manufacturing of Basic Steel" qualified for the additional allocation appears to have no significance for whether any other enterprise or industry does or does not qualify? The Department failed to address either of these questions.

In other words, nothing in the record demonstrates that the South Korean statute or regulations expressly restrict access to a particular (specific, as it were) and limited number of enterprises or industries. There is also nothing to demonstrate why any particular enterprise or industry would not qualify as long as it met the statutory numbers. Hyundai correctly argues that Commerce failed to address this issue and simply found specificity—to which the government has no response.

In sum, the Department's finding of "*de jure* specificity" is conclusory and is not supported by substantial evidence. But there is one other loose end to tie up. The Tariff Act contains an exception whereby a subsidy is not specific, even if it would otherwise be considered *de jure* specific, when it satisfies three conditions:

> Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if—
>
> (I) eligibility is automatic,
>
> (II) the criteria or conditions for eligibility are strictly followed, and
>
> (III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.

For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.

19 U.S.C. § 1677(5A)(D)(ii).

Hyundai argued before Commerce, and argues again here, that the cap-and-trade system's three percent allocation subsidy satisfies all three conditions and thus falls within this exception even if it is otherwise *de jure* specific. ECF 38-2, at 54–58; ECF 51, at 30–34. The Department's decision did not address the issue in any meaningful way: Commerce simply found, without explanation, that the South Korean statute and its implementing rules do not establish "objective criteria or conditions." Appx01052 (quoting the regulation's three categories of eligible types of business and then stating, "As such, the [statute] and implementing rules not only establish explicit limitations but also are not objective criteria or conditions, as defined by" 19 U.S.C. § 1677(5A)(D)(ii)).

Absent analysis and explanation, the court cannot properly perform its judicial review function. *See Innovation Techs., Inc. v. SplashA Med. Devices, LLC*, 528 F.3d 1348, 1350–51 (Fed. Cir. 2008) (remanding fee award because district court failed to support "exceptional case" finding with particular factual findings and reasoning); *ASEMESA*, 523 F. Supp. 3d at 1403 n.1 ("Conclusory statements without more are not reviewable even where the statute applied by Commerce is unambiguous."). The court therefore remands this issue for reasoned analysis.

**Ct. Nos. 22-00029, 22-00032**                    **Page 22**

*      *      *

For the foregoing reasons, the court grants judgment on the agency record in part to Hyundai Steel and Dongkuk. A separate remand order will issue.

Dated: December 18, 2023          /s/ *M. Miller Baker*
       New York, NY               M. Miller Baker, Judge