C-580-837
Remand
Slip Op. 23-182
POR:  1/1/2019 – 12/31/2019
**Public Document**
E&C/OIII:  EB

*Hyundai Steel Company v. United States*,
**Court No. 22-00029 and 22-00032, Slip Op. 23-182 (CIT December 18, 2023)**
**Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (CIT) issued on December 18, 2023.[1]  These final results of redetermination concern Commerce's final results of the administrative review of the countervailing duty (CVD) order on certain cut-to-length carbon-quality steel plate (CTL plate) from the Republic of Korea (Korea)[2] covering the period of review (POR) January 1, 2019, through December 31, 2019.[3]  The CIT remanded Commerce's determination to countervail the Government of Korea's (GOK) provision of additional emission allowances (KAU) to certain participants in the Korean Emissions Trading System (K-ETS).  Specifically, the CIT remanded for Commerce to:  (1) reconsider whether the benefit conferred upon Hyundai Steel Company (Hyundai Steel) under the K-ETS program is *de jure* specific within the meaning of section 771(5A)(D)(i) of the Tariff

---

[1] *See Hyundai Steel Company v. United States*, Court No. 22-00029, Slip Op. 23-182 (CIT December 18, 2023) (*Remand Order*).
[2] *See Notice of Amended Final Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from India and the Republic of Korea; and Notice of Countervailing Duty Orders:  Certain Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000) (*Order*).
[3] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 79 (January 3, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

Act of 1930, as amended (the Act); (2) reconsider whether the criteria of section 771(5A)(D)(ii) of the Act apply; and (3) recalculate the subsidy rate applied to Dongkuk Steel Mill Co. Ltd. (DSM), a non-selected respondent in the underlying review, if the rate for Hyundai Steel changes as a result of this redetermination.

## II.    BACKGROUND

On April 8, 2020, Commerce initiated an administrative review of the *Order* for the POR January 1, 2019, through December 31, 2019.[4]  On May 6, 2020, we selected Hyundai Steel as the mandatory respondent in the administrative review.[5]  On May 28, 2020, DSM requested that Commerce examine it as a voluntary respondent and provided a response to Commerce's initial questionnaire.[6]  On June 10, 2020, Commerce denied DSM's request to be selected as a voluntary respondent because it would be unduly burdensome and inhibit the timely completion of the review.[7]

In the Post-Preliminary Analysis Memorandum, Commerce determined that Hyundai Steel received countervailable subsidies from the GOK through its receipt of an additional allocation of KAUs as a participant in the K-ETS program.[8]  In the *Final Results*, Commerce continued to countervail the program.[9]  With respect to specificity, we stated that, "{a}s discussed in the Post-Preliminary Analysis Memorandum, we concluded that the additional three percent KAU allocation was *de jure* specific because of the language in the {Act on the

---

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 19730 (April 8, 2020).
[5] *See* Memorandum, "Selection of Respondents for Individual Examination," dated May 6, 2020.
[6] *See* DSM's Letter, "Voluntary Response of Dongkuk Steel Mill Co., Ltd., to Questions Concerning Affiliated Companies Required to Respond to the Questionnaire in the Administrative Review of the Countervailing Duty Order on Cut-to-Length Plate from Korea for the 2019 Review Period," dated May 28, 2020.
[7] *See* Memorandum, "Selection of a Voluntary Respondent," dated June 10, 2020.
[8] *See* Memorandum, "Post-Preliminary Analysis Memorandum," dated October 19, 2021 (Post-Preliminary Analysis Memorandum).
[9] *See Final Results* IDM at 5 and Comment 1.

Allocation and Trading of Greenhouse Gas Emissions Permits (AAGEP)} and implementing rules that present criteria for determining which industries qualify."[10]  We explained:

> … the criteria included in the AAGEP and implementing rules establish that some industries may benefit from the additional assistance in the form of the allocation of additional KAUs, while others do not.  More specifically, article 14 of the enforcement decree for the AAGEP states that the "types of business eligible for gratuitous allocation of all emissions permits … shall be any of the following types of businesses …" (1) a business with an international trade intensity of at least 30 percent, (2) a type of business with production costs of at least 30 percent or (3) a type of business with an international trade intensity of at least 10 percent and production costs of at least 5 percent.  As such, the AAGEP and implementing rules not only establish explicit limitations but also are not objective criteria or conditions, as defined by section 771(5A)(D)(ii) of the Act.[11]

Accordingly, consistent with Commerce's decision in other similar cases, we continued to find that the additional three percent KAU allocation is *de jure* specific within the meaning of section 771(5A)(D)(i) of the Act.[12]  We calculated a subsidy rate of 0.10 percent *ad valorem* for the program.[13]

Hyundai Steel challenged Commerce's findings regarding the countervailability of the K-ETS program at the CIT.  On December 18, 2023, the CIT remanded the *Final Results* for Commerce to reconsider whether the K-ETS program is specific within the meaning of section 771(5A)(D)(i) of the Act, and to reconsider whether section 771(5A)(D)(ii) of the Act applies.  The CIT explained that it "sees an inherent disconnect between a reference to '*types* of businesses' (or '*a type* of business') as referred to in the South Korean statute and implementing regulation and 'a *specific* enterprise or industry,' or 'a *given* enterprise or industry, as referred to in the Tariff Act as interpreted by *ASEMESA*, 523 F. Supp. 3d at 1403" (emphasis added).[14]

---

[10] *Id.* at Comment 1 (citing Post-Preliminary Analysis Memorandum at 5).
[11] *Id.* (citing GOK's Letter, "Response to the New Subsidy Allegation Questionnaire," dated May 17, 2021 (GOK NSAQR), at Exhibits CEP-1 and CEP-9).
[12] *Id.* (citing *Silicon Metal from Australia:  Final Affirmative Countervailing Duty Determination*, 83 FR 9834 (March 8, 2018) (*Silicon Metal from Australia*), and accompanying IDM at Comment 3).
[13] *Id.* at 5.
[14] *See Remand Order* at 18-19.

Further, the CIT found that Commerce "failed to address"[15] the following questions: (1) "did {Commerce} consider whether, as Hyundai argues, any large business could qualify for the additional three percent allocation regardless of the industry to which it belongs?"[16] and (2) "did Commerce consider that the {GOK's} determination that "Manufacturing of Basic Steel" qualified for the additional allocation appears to have no significance for whether any other enterprise or industry does or does not qualify?"[17] The CIT determined that Commerce's finding of *de jure* specificity was "conclusory and not supported by substantial evidence."[18] Additionally, the CIT found that Commerce failed to explain whether the three conditions contained in section 771(5A)(D)(ii) of the Act are met with respect to the K-ETS program, such that the program is not *de jure* specific.[19] Below, we provide additional analysis required by the CIT's *Remand Order* and based on further consideration of the record evidence before us, we continue to find that the K-ETS program is *de jure* specific.

## III.    ANALYSIS

Consistent with the *Remand Order*, we reexamined the specificity issue and we continue to find the GOK's provision of an additional three percent KAU allocation to K-ETS participants in designated subsectors to be specific as a matter of law, *i.e.*, *de jure* specific, pursuant to section 771(5A)(D)(i) of the Act.

Section 771(5A)(D)(i) of the Act provides that, when "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law." Section 771(5A)

---

[15] *Id.* at 19.
[16] *Id.*
[17] *Id.*
[18] *Id.* at 20.
[19] *Id.* at 20-21.

of the Act also states that, for the purposes of this provision, "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries."[20]

Section 771(5A)(D)(ii) of the Act, the corollary of the *de jure* test, provides that a subsidy is not specific as a matter of law when three different enumerated conditions are satisfied. Pursuant to this section, a subsidy is not *de jure* specific if the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, where: (I) eligibility is automatic; (II) the criteria or conditions for eligibility are strictly followed; and (III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.[21] The term "objective criteria or conditions" in this section of the Act denotes the criteria or conditions that are neutral and that do not favor one enterprise or industry over another.[22] Indeed, the SAA elaborates that such criteria, in this context, signify criteria that are economic in nature and horizontal in application, such as the number of employees or the size of the enterprise.[23]

Under the Act, the limiting criterion in the governing legislation is not required to contain a list of sector names to be considered *de jure* specific: under the Act, if "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law."[24] Here, as

---

[20] *See, e.g., Non-Oriented Electrical Steel from the Republic of Korea: Final Negative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 79 FR 61605 (October 14, 2014), and accompanying IDM at Comment 9.

[21] *See* section 771(5A)(D)(ii) of the Act.

[22] *Id.*

[23] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 930.

[24] *See* section 771(5A)(D)(i) of the Act.

explained further below, the Ministry of the Environment (MOE) imposes the "international trade intensity" and "production cost" qualifying criteria in an explicit manner to certain industries or "subsectors" as defined by the MOE.  Such an express, legal limitation on eligibility for the additional three percent KAU allocation constitutes *de jure* specificity within the meaning of section 771(5A)(D)(i) of the Act.

In its *Remand Order*, the CIT posed the following questions:  (1) "did {Commerce} consider whether, as Hyundai argues, any large business could qualify for the additional three percent allocation regardless of the industry to which it belongs?"[25] and (2) "did Commerce consider that the {GOK's} determination that "Manufacturing of Basic Steel" qualified for the additional allocation appears to have no significance for whether any other enterprise or industry does or does not qualify?"[26]  We have considered the questions posed by the CIT.  Based on the record evidence, as discussed further below, we find that not any large business could qualify for the additional three percent allocation regardless of the industry to which it belongs, and we find that the GOK's provision of the additional three percent allocation to the steel industry does not have any significance for whether any other enterprise or industry does or does not qualify.

First, not every industry is mandated to participate in the K-ETS program.  The program as a whole, thus, does not apply to every industry within Korea.[27]  Rather, the K-ETS program is limited to a subset of industries within Korea.  According to Article 8(1) of the Act on the AAGEP, the K-ETS program applies to the following:

- entities from which the average total amount of greenhouse gas (GHG) emissions produced per annum during the preceding three-year period is not less than 125,000 tons of carbon dioxide ($CO_2$) equivalents; or

---

[25] *See Remand Order* at 19.
[26] *Id.*
[27] *See Final Results* IDM at 13-17.

- entities with a place of business that has produced 25,000 tons of $CO_2$ equivalents during the preceding three-year period.[28]

In each phase of the program the GOK calculates the carbon emissions permits to be allocated to each subject industry.  In phase 2 of the program, covering the POR, pursuant to Article 12 (4) of the AAGEP and Article 14 of its Enforcement Decree, the GOK provided additional permits to certain "subsectors" that fulfilled the same trade intensity and production cost criteria used by the European Union (EU) and the state of California in implementing their emissions trading system.[29]  Those criteria are:  "(1) a business with an international trade intensity of at least 30 percent; (2) a type of business with production costs of at least 30 percent; or (3) a type of business with an international trade intensity of at least 10 percent and production costs of at least 5 percent."[30]  Thus, in phase 2 of the program, which had 63 industries or "subsectors," the GOK provided the full allocation of KAUs to 37 industries or "subsectors" and provided 97 percent of the full allocation of KAUs to 26 industries or subsectors.[31]

Although the AAGEP and the Enforcement Decree use the term "business entity," to which the trade intensity and production cost criteria apply, the GOK explained that it applied the trade intensity and production cost criteria to industries or "subsectors," and that any business within an industry that qualified for the additional allocation of permits would receive the 100 percent allocation.[32]  Specifically, the GOK stated:

> Trade Intensity for each *sub-sector* is calculated as follows:  Annual Average of (exports + imports) / (sales + imports) during the base period, which is from year 2013 through 2015.  The trade intensity criteria shows whether the product or service provided by a *specific industry* is disclosed to competition in markets where

---

[28] *See* GOK NSAQR at 46 and Exhibit CEP-1.
[29] *Id.* at 24; *see also* GOK's Letter, "Submission of Translation," dated May 20, 2021 (GOK May 20, 2021 SQR), at Exhibit CEP-8.
[30] *See Final Results* IDM at Comment 5 (citing Post-Preliminary Analysis Memorandum at 5).
[31] *See* GOK May 20, 2021 SQR at Exhibit CEP-8.
[32] *Id.* at Exhibit CEP-8.

competitors exist that are not subject to the same or similar carbon reduction programs.[33]

Further, in discussing how the additional free KAUs are allocated in phase 2, the GOK stated that, "{i}n principle, for participants that do not fulfill the trade intensive or production costs criteria explained in the GOK's response to Question 3.d, 3% of the permits shall be deducted and set aside for the reserve.  However, *participants that are associated with the sectors or subsectors that meet the trade intensive or production costs criteria, no deduction is made*."[34] Additionally, the GOK stated, "{f}or entities within the *industry* that meet the criteria explained in the GOK's response to Question 3.d above, 100 percent of the emission permits calculated for the *industry* shall be allocated unconditionally."[35]  The GOK further elaborated on how and why it allocated the additional free KAUs to certain industries, stating the following:

> In order to rehabilitate and provide equal market opportunity to the participants in foreign markets in which competitors are not subject to restrictions similar to those that are imposed under this program, the GOK allocates not 97% but 100% of the carbon emissions permits calculated on the basis of the carbon equivalent GHG emitted from 2014 through 2016 to participants in the *industrial sectors* that meet the (i) trade intensity and (ii) production costs criteria … the trade intensity criteria shows whether the product or service provided by a *specific industry* is disclosed to competition in foreign markets and the production costs criteria shows the impact of this program in manufacturing goods or providing services of a specific industry.[36]

Thus, not all industries qualified, but rather, those that qualified for the 100 percent free allocation were those subsectors (or specific industries) with a certain level of international trade intensity and production cost.  Specifically, as noted above, of the 63 subsectors subject to the K-ETS program, 37 subsectors qualified for the 100 percent free allocation, based on either the international trade intensity criteria or the production cost criteria, while 26 subsectors received

---

[33] *See* GOK NSAQR at 24-25 (emphasis added).
[34] *Id.* at 27 (emphasis added).
[35] *Id.* at 28 (emphasis added).
[36] *Id.* at 41 (emphasis added).

the 97 percent free allocation.[37]  The "iron and steel" industry was one of 37 subsectors out of 63

subsectors that qualified for the 100 percent free allocation,[38] and the GOK in its Press Release

announcing Phase 2 of the program specifically highlighted the steel industry as one of the

subsectors to receive the 100 percent free allocation of KAUs, "{t}he steel, semiconductor,

display, electricity & electronics, motor vehicles, shipbuilding, and cement industries, *etc.* will be

granted with emission permits free of charge as before."[39]  Therefore, on remand, we continue to

find that the K-ETS program is *de jure* specific because the GOK expressly limited the 100

percent free allocation of the additional KAUs to a specific enterprise or industry, in accordance

with section 771(5A)(D)(i) of the Act.

Additionally, in the *Remand Order*, the CIT found that "Commerce simply found,

without explanation, that the South Korean statute and its implementing rules do not establish

'objective criteria or conditions,'" and found that "{a}bsent analysis and explanation, the court

cannot properly perform its judicial review function."[40]  As discussed further below, we find

that, because the criteria establishing eligibility for the program are not neutral and objective,

section 771(5A)(D)(ii) of the Act does not apply and, to address the CIT's concerns we have

provided additional explanation.  Consequently, on remand, we continue to find this program to

be *de jure* specific.

The "international trade intensity" criterion under the AAGEP is calculated based on the

sum of exports and imports as a percentage of the sum of sales and imports, and the "production

cost" criterion is calculated based on the industry's GHG emissions volume multiplied by the

market price of KAUs, as a percentage of the amount of value added for that industry during a

---

[37] *See* GOK May 20, 2021 SQR at Exhibit CEP-8.
[38] *Id.* at Attachment 2.
[39] *Id*. at 2.
[40] *See Remand Order* at 21.

defined base period.[41]  These two factors, *i.e.*, "international trade intensity" and "production costs," are not horizontal in application and, thus, are not neutral as described in the SAA.[42] Unlike the examples of neutral criteria in the SAA (*i.e.*, the number of employees or size of the enterprise), the criteria for the additional KAU allocation, here, inherently favor certain industrial subsectors, including those covering primary steel producers like Hyundai Steel, over other subsectors.[43]  The favored subsectors, by their nature, have more GHG-intensive (*i.e.*, heavy polluting) production processes (the production cost factor) and/or are more dependent on international markets for sales and/or sourcing (the international trade intensity factor) than other subsectors that are subject to the K-ETS but do not qualify for the additional KAU allocation.[44] In contrast, *objective* criteria of the kind described in the SAA—criteria with a neutral horizontal application—would be those that apply to subsectors across an economy, rather than criteria that are characteristic of certain types of subsectors, as is the case, here.  As Commerce has found, a subsidy can be *de jure* specific pursuant to section 771(5A)(D)(i) of the Act where an authority[45] expressly limits access to a "group" of enterprises or industries which the authority, itself, defines, but which does not necessarily comprise "specifically named" enterprises or industries (*e.g.*, Companies A, B, and C or the steel and automotive industries).[46]

---

[41] *See* GOK NSAQR at 24-25; *see also* GOK May 20, 2021 SQR at Exhibit CEP-8.

[42] *See* SAA at 930 ("…the objective criteria or conditions must be neutral, must not favor certain enterprises over others, and must be economic in nature and horizontal in application, such as the number of employees or the size of the enterprise.").

[43] *See* GOK NSAQR at 24-25; *see also* GOK May 20, 2021 SQR at Exhibit CEP-8.

[44] *See* GOK May 20, 2021 SQR at Exhibit CEP-8.

[45] Consistent with section 771(5A)(D)(i) of the Act, references to "authority" and "authorities" in this section also refer to legislation pursuant to which the authorities operate.

[46] *See, e.g.*, *Certain Softwood Lumber Products from Canada:  Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review, 2020*, 87 FR 48455 (August 9, 2022), and accompanying IDM at Comment 103.

We examined the list of subsectors that, based on the GOK's response, satisfy the "international trade intensity" and/or "production costs" criteria.[47]  This list shows that 37 subsectors (of the 63 subsectors that are subject to the K-ETS) receive the 100 percent free allocation of KAUs.[48]  Of these 37 subsectors, the vast majority are included because they satisfy the trade intensity criteria.[49]  Such subsectors, for instance, are related to "iron and steel," "manufacture of semiconductors," "manufacture of basic chemicals," "manufacture of aircraft," and a variety of other internationally-oriented manufacturing subsectors.[50]  A small number qualify based on the production cost criteria, including "group energy" and "waste treatment."[51]  Thus, the subset of subsectors that qualify for the additional allocation are manufacturing sectors of a certain type, *i.e.*, trade and/or emission intensive subsectors.[52]

In contrast, the range of subsectors that receive the 97 percent allocation covers a broader spectrum of manufacturing groupings in addition to a broad set of service industries, such as "electricity," "telecommunications," "computer programming," "insurance," and "hospital activities."[53]  Comparing the subsectors that receive the 97 percent allocation with those that receive the 100 percent allocation under the AAGEP and its Enforcement Decree demonstrates that the criteria are not horizontal in application and limit eligibility to a select group of

---

[47] *Id.*

[48] *Id.*

[49] *Id.*  We have not examined whether the additional three percent allocation, insofar as it relates specifically to the allocation of KAUs to companies within subsectors qualifying on the basis of "international trade intensity," is export contingent, as we are finding the provision of the additional three percent allocation to be *de jure* specific as a domestic subsidy to companies within subsectors that qualified for the allocation based on "international trade intensity" and/or "production costs" criteria.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

subsectors.  Such a finding would be consistent with numerous prior *de jure* specificity determinations.[54]

That the program criteria result in the allocation of additional KAUs to a select group of subsectors of similar types (*i.e.*, trade intensive and/or high production cost subsectors)—as compared with the substantive breadth of subsectors that received the 97 percent allocation under the K-ETS program—is consistent with the GOK's intent in establishing the program.  The GOK summarized the motivation underlying its provision of the additional three percent allocation to a targeted groups of subsectors as follows:

> companies that are subject to this or similar carbon emission programs are disadvantaged from market competition perspective, and equal opportunity to compete in the market becomes broken.  *In order to rehabilitate and provide equal market opportunity to the participants in markets in which there are other competitors who are not subject to restrictions similar to those imposed under this program, the GOK does not deduct permits in case of sectors or sub-sectors that meet the (i) trade intensity and (ii) production costs criteria*.[55]

---

[54] *See, e.g.*, *Silicon Metal from Australia* IDM at Comment 3 ("With respect to the RET program, the criteria used by the {Government of Australia} are not neutral because the criteria favor enterprises or industries that conduct 'emission-intensive' activities and are 'trade-exposed' over industries or enterprises that do not conduct such activities and are not trade exposed which thus constitutes an explicit limitation on access to the subsidy.  Therefore, we continue to find that the issuance of RET exemption certificates is *de jure* specific under section 771(5A)(D)(i) of the Act."); *see also Aluminum Extrusions from the People's Republic of China:  Final Results, and Partial Rescission of Countervailing Duty Administrative Review; 2013*, 80 FR 77325 (December 14, 2015), and accompanying IDM at Comment 5 ("Record evidence shows that this program is limited to eight industries:  (1) Electronics and Information Technology; (2) Biology and New Medicine Technology; (3) Aerospace Industry; (4) New Materials Technology; (5) High-tech Service Industry; (6) New Energy and Energy-Saving Technology; (7) Resources and Environmental Technology; and (8) High-tech Transformation of Traditional Industries. … By specifically identifying eight particular industries for subsidization, the criteria or conditions are not neutral and favor these eight industries."); *Certain Steel Nails from the Sultanate of Oman:  Final Negative Countervailing Duty Determination*, 80 FR 28958 (May 20, 2015), and accompanying IDM at Comment 1 ("The SIMR {Standard Industrial Management Regulations Law} expressly limits the tariff exemption to 'industrial establishments,' which are defined as enterprises that transform or convert raw materials into semi-finished goods or convert the latter into finished products, *i.e.*, manufacturing industries.  Because enterprises that only produce raw materials but do not convert them into semi-finished or finished products are denied access to the tariff exemption program, the SIMR favors industrial establishments that produce semi-finished or finished products."); and *Certain Uncoated Groundwood Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018), and accompanying IDM at Comment 56 ("Under this program, the eligibility criteria limit access to the subsidy to only those users purchasing fuel for a prescribed list of approved activities.  Therefore, the eligibility criteria do not meet the statutory definition of 'objective criteria,' because they favor certain enterprises, that is, those enterprises or industries that use coloured fuel for one of the limited, prescribed purposes.").

[55] *See* GOK NSAQR at 27 (emphasis added).

Elsewhere, specifically regarding the "international trade intensity" criteria, the GOK explained that "the trade intensity criteria shows whether the product or service provided by a specific industry is disclosed to competition in foreign markets."[56]  In other words, the explicit eligibility limitations included in the GOK's provision of the additional allocation under the K-ETS program favors trade-intensive and/or emission-intensive subsectors (or industries) and are not horizontal in nature.

Additionally, where Commerce has determined that a program is not *de jure* specific because the conditions under section 771(5A)(D)(ii) of the Act are met have been programs that do not favor one enterprise or industry over another.  For example, in *Wood Flooring from China*, Commerce determined that the "Tax Deduction under Article 96 of the Enterprise Income Tax Law" was not *de jure* specific because "the eligibility criteria indicate that it is generally available to any company that hired disabled persons, with no other criteria further limiting the availability and usage of the tax incentive."[57]  Commerce has similarly determined that certain programs were not specific where the program did not favor one enterprise or industry over another under section 771(5A)(D)(ii) of the Act.[58]  Because the K-ETS program applies only to certain subsectors, and there are eligibility criteria that expressly carve out subsectors to receive

---

[56] *Id*. at 24.

[57] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2012*, 80 FR 41007 (July 14, 2015) (*Wood Flooring from China*), and accompanying IDM at 20.

[58] *See, e.g.*, *Certain Welded Carbon Steel Standard Pipe from Turkey:  Preliminary Results of Countervailing Duty Administrative Review*, 75 FR 16439, 16442 (April 1, 2010), unchanged in *Certain Welded Carbon Steel Standard Pipe from Turkey:  Final Results of Countervailing Duty Administrative Review*, 75 FR 44766 (July 29, 2010), in which we found that a program exempting a company from paying its share of insurance premiums if it employed handicapped workers was not specific because the exemption was "available to all employers who employ handicapped workers in jobs appropriate for their professions and physical and psychological status"; *see also Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination:  Carbon and Certain Alloy Steel Wire Rod from Germany*, 67 FR 55808 (August 30, 2002), and accompanying IDM at Comment 19.

the full allocation of KAUs, we find that the criteria for the full allocation are not horizontal in application and limit eligibility to a select group of subsectors.

As noted above, the GOK reported that it applied the same criteria used by the EU and the state of California in implementing their emissions trading programs.  In *FEBs from Germany*, Commerce explained that, for an industry to be considered at significant risk of carbon leakage during the relevant period under the EU Emission Trading System (ETS) program, it must satisfy one of the following three criteria:

1. the sum of direct and indirect costs (*i.e.*, induced by the implementation of the EU ETS) would increase production cost, calculated as a proportion of the gross value added, by at least five percent; and at the same time the sector's trade intensity with non-EU countries is greater than 10 percent;
2. the sum of direct and indirect additional costs (*i.e.*, induced by the implementation of the EU ETS) would increase production cost, calculated as a proportion of the gross value added by at least 30 percent; or
3. the sector's trade intensity with non-EU countries is greater than 30 percent.[59]

Notably, these criteria are identical to those used in the K-ETS program to identify the entities and subsectors eligible for the additional three percent free allocation.[60]  Both programs are expressly limited to a select group of companies as recognized by the CIT in *BGH I*.[61]  To reach different conclusions regarding these two programs, which use virtually identical eligibility criteria, would be arbitrary and potentially create a loophole to avoid the application of the CVD

---

[59] *See Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 FR 31454 (May 26, 2020) (*FEBs from Germany*), and accompanying Preliminary Decision Memorandum (PDM) at 26, unchanged in *Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 FR 80011 (December 11, 2020), and accompanying IDM at Comment 5b.
[60] *See* GOK NSAQR at Exhibit CEP-1.
[61] *Id*. at 24 and Exhibit CEP-1; *see also* GOK May 20, 2021 SQR at Exhibit CEP-8; and *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1264 (CIT 2022) (*BGH I*) ("Commerce reasonably determined the ETS additional free allowances program is *de jure* specific because it is expressly limited to a group of companies" and "{i}t is reasonably discernible that Commerce determined the restrictions of the carbon leakage list to favor certain enterprises or industries or groups of certain industries or enterprises.").

remedy through simple rephrasing of the implementing legislation.[62]  Such a result would be antithetical to the purpose of the CVD law and withhold the relief to which an injured domestic industry is entitled.

Finally, in the *Remand Order*, the CIT requested that Commerce recalculate the subsidy rate applied to DSM if the rate for Hyundai Steel changes as a result of this redetermination. Because we have made no changes to Hyundai Steel's subsidy rate, we also have not made any changes to DSM's subsidy rate.

## IV.    INTERESTED PARTY COMMENTS

We released the Draft Results to interested parties on March 5, 2024.  We received comments from Hyundai Steel and Nucor Corporation (Nucor) (a petitioner in the underlying proceeding) relating to Commerce's specificity analysis for the GOK's provision of an additional three percent allocation to certain recipients under the K-ETS program.[63]  DSM did not submit any comments for Commerce to consider.  We summarize and address these arguments, in turn.

### Comment 1:  Whether the K-ETS Program is *De Jure* Specific Pursuant to Section 771(5A)(D)(i) of the Act

*Hyundai Steel's Comments*:[64]
- The GOK's application of the trade intensity and production cost criteria does not expressly limit the K-ETS allocations to an enterprise or industry pursuant to section 771(5A)(D)(i) of the Act because any industry or enterprise may meet the trade intensity or production cost criteria.
- The CIT rejected the evidence and reasoning underlying Commerce's determination that the criteria operate to expressly limit the subsidy to a given enterprise or industry.
- The observation that some subsectors are eligible pursuant to the trade intensity and production cost criteria while others are not merely reflects the truism that not all industries will qualify under the criteria.

---

[62] *See* SAA at 929 ("the specificity test was not intended to function as a loophole through which narrowly focused {sic} subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law.").

[63] *See* Hyundai Steel's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated March 12, 2024 (Hyundai Steel's Comments); *see also* Nucor's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated March 12, 2024 (Nucor's Comments).

[64] *See* Hyundai Steel's Comments at 5-10.

*Nucor's Comments*:[65]
- Because the MOE imposes the "international trade intensity" and "production cost" qualifying criteria in an explicit manner to certain industries or "subsectors" as defined by the MOE, Commerce correctly found that such an express, legal limitation on eligibility for the additional three percent KAU allocation is *de jure* specific.

**Commerce's Position:** We disagree with Hyundai Steel and continue to find for purposes of this final remand redetermination that the K-ETS program is *de jure* specific pursuant to section 771(5A)(D)(i) of the Act. Hyundai Steel argues that "the MOE simply applies the trade intensity and production cost criteria to determine what sectors qualify,"[66] and that "any industry or enterprise may meet the trade intensity or production cost criteria."[67] While it may be theoretically true that any enterprise *may* meet the trade intensity or production cost criteria, as a practical matter, many industries are unlikely to meet the sufficient trade intensity or production costs criteria, thus, not all industries *will* meet the criteria. The MOE specifically limited eligibility of the subsidy to a subset, or group, of industries that meet the trade intensity and production cost criteria. In Phase 2 of the program, the MOE divided 26 subsectors into 63 subsectors "in association with the selection of industries for 100% free allocation due to the implementation of the allocation with charges and to objectively reflect economic characteristics."[68] The GOK then applied the trade intensity or production cost criteria to expressly limit the industries within these 63 subsectors to determine which industries would receive the 100 percent free allocation.[69] In other words, the GOK determined that of those 63 subsectors, those industries with "30% or higher international trade intensity," "30% or higher production costs incurrence rate," or "10% or higher trade intensity & 5% or higher production

---

[65] *See* Nucor's Comments at 3-5.
[66] *See* Hyundai Steel's Comments at 6.
[67] *Id.* at 7.
[68] *See* GOK May 20, 2021 SQR at CEP-8.
[69] *Id.*

costs incurrence rate" would receive the additional three percent free allocation.[70]  The GOK's press release specifically states that "the steel, semiconductor, display, electricity & electronics, motor vehicles, shipbuilding and cement industries, etc. will be granted permits free of charge as before."[71]

Additionally, even though the GOK's press release expressly identified certain industries, including the steel industry, as industries to which permits will be granted free of charge as before, Hyundai Steel argues that the "MOE could not have 'expressly limited' the KETS allocations to an enterprise or industry because it did not yet know which subsectors met the criteria."[72]  We find that the MOE's process for limiting the industries that received the 100 percent free allocation does not undermine Commerce's finding that this program is *de jure* specific.  As noted above, in Phase 2 of the program, the MOE applied the trade intensity and production cost criteria to 63 subsectors to determine which industries qualified for the 100 percent free allocation of emissions permits.  Under Hyundai Steel's interpretation, a government could enact its law in phases to escape countervailability—so long as the initial underlying legislation did not outright name the recipient companies or subsectors, there could be no *de jure* specificity.  There is no basis to conclude that a law must enumerate specific subsectors by the formal name of the sectoral division to constitute a *de jure* specific law.  Indeed, Commerce has previously found subsidy programs to be *de jure* specific because the government in question identified qualifying recipients on the basis of characteristics of relevant industries, *e.g.*, targeting enterprise or industries that perform certain types of activities or use certain types of

---

[70] *Id.*
[71] *Id.*
[72] *See* Hyundai Steel's Comments at 7.

resources.[73]  Hyundai Steel did not address these numerous administrative precedents provided above in its comments.

Hyundai Steel also argues that Commerce did not directly answer the CIT's question, "whether any large business could qualify for the additional three percent allocation regardless of the industry to which it belongs," contending that Commerce's finding that not every industry in Korea is subject to the K-ETS program is "irrelevant."[74]  We do not find the fact that a subset of industries is subject to the K-ETS program overall to be "irrelevant."  At the most basic level, to answer the CIT's question, any large business could not qualify for the additional three percent allocation because not all large businesses are necessarily subject to the K-ETS program overall. With respect to the GOK's 100 percent free allocation of KAUs, the GOK then applies the trade intensity and production cost criteria to further limit those industries subject to the K-ETS program to receive the additional three percent free allocation of permits.  The GOK explained how and why it allocated the additional free KAUs to certain industries, stating the following:

> In order to rehabilitate and provide equal market opportunity to the participants in foreign markets in which competitors are not subject to restrictions similar to those that are imposed under this program, the GOK allocates not 97% but 100% of the carbon emissions permits calculated on the basis of the carbon equivalent GHG emitted from 2014 through 2016 to participants in the *industrial sectors* that meet the (i) trade intensity and (ii) production costs criteria … the trade intensity criteria shows whether the product or service provided by a *specific industry* is disclosed to competition in foreign markets and the production costs criteria shows the impact of this program in manufacturing goods or providing services of a specific industry.[75]

Thus, as explained above, any large business is not going to qualify for the 100 percent allocation regardless of the industry to which it belongs because not all large businesses or industries are subject to the K-ETS program and among those businesses and industries that are

---

[73] *See* n. 54, *supra*.
[74] *See* Hyundai Steel's Comments at 7-8.
[75] *See* GOK NSAQR at 41 (emphasis added).

subject to the K-ETS program, not all large business or industries will receive the 100 percent

allocation, but only "participants in the *industrial sectors* that meet the (i) trade intensity and (ii)

production costs criteria."[76]

Hyundai Steel similarly argues that Commerce did not answer the CIT's second question,

"did Commerce consider the {GOK's} determination that 'Manufacturing of Basic Steel'

qualified for the additional allocation appears to have no significance for whether any other

enterprise or industry does or does not qualify?"[77]  Again, it is not necessary for a law to

specifically enumerate an industry or list of industries for a program to be *de jure* specific, as

Hyundai Steel argues.  Commerce has frequently found programs to be *de jure* specific where the

program was provided based on the activities or characteristics of relevant industries.  For

example, in *Common Alloy Aluminum Sheet from Turkey*, Commerce found the provision of land

for less than adequate remuneration to be *de jure* specific because it was limited by law to

companies that satisfied certain investment and employment thresholds.[78]  Similarly, in

*Aluminum Foil from Oman*, Commerce found the provision of land for less than adequate

remuneration to be *de jure* specific because it was limited by law to companies having an

industrial license.[79]  Similarly, in *FEBs from Germany*,[80] Commerce found the EU ETS program

to be *de jure* specific because the eligible industries were limited by law to those to be at

---

[76] *Id.*

[77] *See* Hyundai Steel's Comments at 8.

[78] *See Common Alloy Aluminum Sheet from the Republic of Turkey:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Determination of Critical Circumstances in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 FR 49629 (August 14, 2020), and accompanying PDM at 24-25, unchanged in *Common Alloy Aluminum Sheet from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 86 FR 13315 (March 8, 2021) (*Common Alloy Aluminum Sheet from Turkey*).

[79] *See Certain Aluminum Foil from the Sultanate of Oman:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 86 FR 12913 (March 5, 2021), and accompanying PDM at 12-13, unchanged in *Certain Aluminum Foil from the Sultanate of Oman:  Final Affirmative Countervailing Duty Determination*, 86 FR 52888 (September 23, 2021) (*Aluminum Foil from Oman*).

[80] *See FEBs from Germany* PDM 26, unchanged in *FEBs from Germany* IDM at Comment 5b.

significant risk of carbon leakage. In *BGH I*,[81] the CIT explained that Commerce lawfully found the EU ETS program to be *de jure* specific because it provided additional free allowances to an expressly limited group of companies and "{i}t is reasonably discernible that Commerce determined the restrictions of the carbon leakage list to favor certain enterprises or industries or groups of certain industries or enterprises."[82] While Hyundai Steel argues that "any industry or enterprise that meet{s} the eligibility criteria could qualify independently,"[83] the SAA explains that "specificity exists where a government expressly limits eligibility for a subsidy to an enterprise, industry, or group thereof."[84] The GOK applied the trade intensity and production cost criteria to 63 subsectors (or industries) to determine which industries qualified for the 100 percent free allocation, thus limiting the eligibility for the subsidy to certain enterprises/industries.

Hyundai Steel's dismissal of the CIT's decision in *BGH I*, on the grounds that the CIT did not address the arguments at issue, also falls short.[85] While Hyundai Steel attempted to distinguish *BGH I*, it did not actually address the substance of Commerce's finding – that the criteria governing the relevant program in *BGH I* and the K-ETS program here are identical – and, thus, that Commerce has acted consistent with prior practice in rendering a specificity determination in this case.[86] Additionally, Hyundai Steel's assertion that "there is no evidence

---

[81] *See BGH I*, 600 F. Supp. 3d at 1264.

[82] *See also* section 771(5A)(D)(i) of the Act (Where *the authority providing the subsidy*, or the legislation pursuant to which the authority operates, *expressly limits access to the subsidy* to an enterprise or industry, the subsidy is specific as a matter of law.") (emphasis added).

[83] *See* Hyundai Steel's Comments at 8.

[84] *See* SAA at 930.

[85] *See* Hyundai Steel's Comments at 9.

[86] *See BGH I*, 600 F. Supp. 3d at 1264 ("Commerce reasonably determined the ETS additional free allowances program is *de jure* specific because it is expressly limited to a group of companies" and "{i}t is reasonably discernible that Commerce determined the restrictions of the carbon leakage list to favor certain enterprises or industries or groups of certain industries or enterprises.").

that the GOK has attempted to thwart or evade U.S. CVD law in this case,"[87] is similarly

unavailing.  Consistent with the SAA's guidance concerning the purpose of the specificity test,

we do not require affirmative evidence of a foreign government's intent to evade the U.S. CVD

legal regime before considering the implications of, and potential loopholes resulting from, an

interested party's proposed application of our laws.[88]

Hyundai Steel argues that "it is 'antithetical' to the purpose of the CVD law to treat this

program as providing a subsidy."[89]  Hyundai Steel also contends that Korean companies have to

incur unwanted costs to reduce their carbon emissions and that U.S. companies are not subject to

a cap and trade system.[90]  When analyzing whether a potential countervailable subsidy exists,

Commerce does not take into account the effects of the subsidy, or any related "burdens"

imposed on a firm that are related to the granting of the subsidy, such as those pertaining to

compliance with certain environmental obligations.  As explained in detail in the *CVD Preamble*,

Commerce looks at each subsidy independent of other parts of a law, regulation, *etc.*, to evaluate

whether a countervailable benefit has been conferred, and does not take into account any effects

related to the granting of the subsidy.[91]  Indeed, the *CVD Preamble* speaks directly to the

circumstances in this case, stating:  "{a} subsidy that reduces a firm's cost of compliance

remains a subsidy…even though the overall effect of the two government actions, taken together,

may leave the firm with higher costs."[92]  The fact that the subsidy program itself, or some related

---

[87] *Id.*

[88] *See* SAA at 930 ("although it has been long established that intent to target benefits is not a prerequisite for a countervailable subsidy, the *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, further inquiry into the actual use of the subsidy is unnecessary.").

[89] *Id.* (citing *Zenith Radio Corp v. United States*, 437 U.S. 443, 446-56, 98 S. Ct. 2441, 2448 (1978)) ("the countervailing duty {law} was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments.")).

[90] *See* Hyundai Steel's Comments at 9-10.

[91] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65361 (November 25, 1998) (*CVD Preamble*).

[92] *Id.*

law or regulation affects the recipient's behavior is not material to Commerce's determination as to whether a countervailable benefit is conferred under the program.

**Comment 2:  Whether the K-ETS Program is *De Jure* Specific Pursuant to Section 771(5A)(D)(ii) of the Act**

*Hyundai Steel's Comments*:[93]
- The trade intensity and production cost criteria apply horizontally to all subsectors to determine which qualify, and thus the "safe harbor" criteria are met.

*Nucor's Comments*:[94]
- Commerce provided additional explanation to support its determination that the implementing rules do not establish "objective criteria or conditions" and that the criteria establishing eligibility for the program are not "neutral and objective" and therefore do not meet the requirements of the safe harbor provision of section 771(5A)(D)(ii) of the Act.

**Commerce's Position:**  As explained above, section 771(5A)(D)(ii) of the Act, a corollary of the *de jure* test, provides that a subsidy is not specific as a matter of law when an authority "establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy," such that:  (1) eligibility is automatic; (2) the criteria or conditions for eligibility are strictly followed; and (3) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.  As the SAA elaborates, the objective criteria or conditions, defined in section 771(5A)(D)(ii) of the Act, "must be neutral, must not favor certain enterprises or industries over others, and must be economic in nature and horizontal in application, such as the number of employees or the size of the enterprise."[95]  Hyundai Steel argues that "whether subsectors meet the trade intensive and production cost criteria does not mean that the criteria favor one enterprise or industry or another for purposes of {section 771(5A)(D)(ii) of the Act}."[96]  We disagree.  The criteria result in an

---

[93] *See* Hyundai Steel's Comments at 10-13.
[94] *See* Nucor's Comments at 5-6.
[95] *See* SAA at 930.
[96] *See* Hyundai Steel's Comments at 11-12.

express statutory limitation on which industries or enterprises qualify for the additional allocation by setting thresholds that industries must meet to qualify. The criteria included in the AAGEP and implementing rules establish that some industries or enterprises may benefit from the additional assistance in the form of the allocation of additional KAUs, while others do not. Moreover, while these criteria are based on mathematical formulas and are therefore "objective" in that sense, they are not neutral as described in the SAA, because they favor certain enterprises or industries over others, and therefore are not objective within the meaning of section 771(5A)(D)(ii) of the Act.[97] As explained above, the production cost and international trade intensity factors, while economic in nature, are not horizontal in application and thus are not neutral as described in the SAA.[98] Unlike the examples of neutral criteria in the SAA (*i.e.*, the number of employees or size of the enterprise), these criteria are not horizontal in nature because they favor certain industries, such as primary steel, over others, such as electricity/power generation, and the manufacture of wood, plastic, and concrete products.[99]

Hyundai Steel also disagrees with Commerce's reliance on *Wood Flooring from China*, where we found that section 771(5A)(D)(ii) of the Act did apply, stating that, "following the Department's logic here, the tax deduction in *Wood Flooring from China* favors certain enterprises that hire disabled persons and thus could not be objective criteria because it would 'limit eligibility to a select group' of enterprises and 'expressly carve out' eligible enterprises."[100] Again, we disagree. Hiring disabled workers is an example of a "neutral" criterion because the eligibility criteria is generally available to any company that hired disabled persons, with no

---

[97] *See* SAA at 930 ("…the objective criteria or conditions must be neutral, must not favor certain enterprises over others, and must be economic in nature and horizontal in application, such as the number of employees or the size of the enterprise.").

[98] *Id.*

[99] *See* GOK May 20, 2021 SQR at Exhibit CEP-8.

[100] *See* Hyundai Steel's Comments at 12.

other criteria further limiting the availability and usage of the tax incentive.[101]  In comparison, the AAGEP and implementing rules carve out industries to receive the additional three percent free allocation based on certain characteristics of said industries, such as whether they are "trade intensive" or have high production costs, is not "neutral" in nature.  Thus, the K-ETS program is not neutral, and it favors particular industries, such as steel, over others.

## V.    FINAL RESULTS OF REDETERMINATION

Based on the analysis above, we continue to find the GOK's provision of additional KAU allocations to firms operating in select subsectors under the K-ETS program to be *de jure* specific.  As a result, Hyundai Steel's overall subsidy rate for the POR continues to be 0.56 percent, which is also the overall subsidy rate for DSM, as a non-selected respondent.

4/12/2024

X 

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[101] *See Wood Flooring from China* IDM at 20.