**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br>        Plaintiff,<br>    v.<br>UNITED STATES,<br>        Defendant,<br>    and<br>SSAB ENTERPRISES LLC and<br>NUCOR CORPORATION,<br>        Defendant-Intervenors. | Court No. 22-00029 |
| DONGKUK STEEL MILL CO., LTD.,<br>        Plaintiff,<br>    v.<br>UNITED STATES,<br>        Defendant,<br>    and<br>NUCOR CORPORATION,<br>        Defendant-Intervenor. | Court No. 22-00032 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S COMMENTS ON
COMMERCE'S FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116
*Counsel to Plaintiff Hyundai Steel Company*

June 13, 2024

## <u>TABLE OF CONTENTS</u>

I.   Argument.....................................................................................2

    A.   Commerce's Specificity Determination Continues To Be
       Unsupported By Evidence And Is Otherwise Not In
       Accordance With Law. ......................................................4

        1.   The KETS Is Not De jure Specific Pursuant To 19
            U.S.C. § 1677(5A)(D)(i). ..............................................6

        2.   The KETS Is Not Specific As A Matter Of Law
            Pursuant To 19 U.S.C. § 1677(5A)(D)(ii)....................21

II.   Conclusion .....................................................................31

III.   Certificate of Compliance.................................................32

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ........................................................ 5, 10, 12, 15

*BGH Edelstahl Siegen GmbH v. United States,* 600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022) .......................................................................... 16

*BGH Edelstahl Siegen GmbH v. United States,* 663 F. Supp. 3d 1378 (Ct. Int'l Trade 2023) ......................................................... 18, 26, 28

*Commissioner of Internal Revenue v. Brown,* 380 U.S. 563, 85 S.Ct. 1162 (1965) ..................................................... 19

*CS Wind Vietnam Co., Ltd. v. United States,* 832 F.3d 1367 (Fed. Cir. 2016) ............................................................ 19

*Gerald Metals Inc. v. United States,* 132 F.3d 716 (Fed. Cir. 1997) .............................................................. 19

*Hyundai Steel Co. v. United States,* 2023 WL 8715732 (Ct. Int'l Trade 2023).................................... *passim*

*Hyundai Steel Co. v. United States,* 2024 WL 1929018 (Ct. Int'l Trade 2024) ...................................................... 25, 26, 29, 30

*Hyundai Steel Co. v. United States*, 659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) .................................................................... 5, 15

*Timex V.I. v. United States,* 157 F.3d 879, (Fed. Cir. 1998) ............................................................ 19

*Zenith Radio Corp. v. United States,* 437 U.S. 443 98 S. Ct. 2441 (1978).................................................... 17

**Statutes**

19 U.S.C. §1516a(b)(1)(B)(i) ....................................................... 21

19 U.S.C. §1516a(b)(1)(2)(A) ..................................................... 21

19 U.S.C. §1677(5A)(D) ................................................... *passim*

**Other Authorities**

*Aluminum Extrusions from the People's Republic of China:*
*Final Results, and Partial Rescission of Countervailing*
*Duty Administrative Review; 2013,*
80 Fed. Reg. 77,325 (Dec. 14, 2015) .................................... 15

*Certain Aluminum Foil from the Sultanate of Oman: Final*
*Affirmative Countervailing Duty Determination*, 86 Fed.
Reg. 52,888 (Sept. 23, 2021) ............................................... 15

*Certain Aluminum Foil from the Sultanate of Oman:*
*Preliminary Affirmative Countervailing Duty*
*Determination and Alignment of Final Determination*
*With Final Antidumping Duty Determination*, 86 Fed.
Reg. 12,913 (Mar. 5, 2021) ................................................... 15

*Certain Cut-to-Length Carbon Quality Steel Plate From the*
*Republic of Korea: Final Results of Countervailing Duty*
*Administrative Review; 2019*, 87 Fed. Reg. 79 (Jan. 3,
2022) .................................................................................... 2

*Certain Hot-Rolled Steel Flat Products From the Republic of*
*Korea: Final Results of Countervailing Duty*
*Administrative Review; 2019*, 87 Fed. Reg. 22,570 (May 9,
2022) .................................................................................... 24

*Certain Steel Nails from the Sultanate of Oman: Final*
*Negative Countervailing Duty Determination,*
80 Fed. Reg. 28,958 (May 20, 2015) ................................... 15

*Certain Uncoated Groundwood Paper from Canada: Final*
*Affirmative Countervailing Duty Determination,*
83 Fed. Reg. 39,414 (Aug. 9, 2018) ..................................................... 15

*Common Alloy Aluminum Sheet from the Republic of Turkey:*
*Final Affirmative Countervailing Duty Determination and*
*Final Affirmative Determination of Critical*
*Circumstances, in Part,*
86 Fed. Reg. 13,315 (Mar. 8, 2021) .................................................... 15

*Common Alloy Aluminum Sheet from the Republic of Turkey:*
*Preliminary Affirmative Countervailing Duty*
*Determination, Preliminary Affirmative Determination of*
*Critical Circumstances in Part, and Alignment of Final*
*Determination With Final Antidumping Duty*
*Determination*, 85 Fed. Reg. 49,629 (Aug. 14, 2020) ........................ 15

*Multilayered Wood Flooring from the People's Republic of*
*China: Final Results and Partial Recission of*
*Countervailing Duty Administrative Review; 2012,* 80 Fed.
Reg. 41,007 (Jul. 14, 2015) ............................................................ 27

Uruguay Round Agreements Act, Statement of
Administrative Action,
H.R. Doc. No. 103-316 (1994) .................................................... *passim*

## <u>LIST OF ACRONYMS</u>

1.  Act on the Allocation of Trading of Greenhouse Gas Emissions Permits ("AAGEP")

2.  Forged Steel Fluid End Blcoks ("FEBs")

3.  Greenhouse Gas ("GHG")

4.  Government of Korea ("GOK")

5.  Ministry of Environment ("MOE")

6.  Korean Allowance Units ("KAU")

7.  Korean Emission Trading System ("KETS")

8.  Countervailing Duty ("CVD")

9.  Issues and Decision Memorandum ("IDM")

10. Asociacion de Exportadores e Industriales de Aceitunas de Mesa ("ASEMESA")

11. BGH Edelstahl Siegen GmbH ("BGH")

12. European Union Emissions Trading System ("EU-ETS")

13. Defendant's Response Brief ("Def's Resp. Br.")

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br>       Plaintiff,<br>    v.<br>UNITED STATES,<br>       Defendant,<br>   and<br>SSAB ENTERPRISES LLC and<br>NUCOR CORPORATION,<br>       Defendant-Intervenors. | Court No. 22-00029 |
| DONGKUK STEEL MILL CO., LTD.,<br>       Plaintiff,<br>    v.<br>UNITED STATES,<br>       Defendant,<br>   and<br>NUCOR CORPORATION,<br>       Defendant-Intervenor. | Court No. 22-00032 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S COMMENTS ON
COMMERCE'S FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

Plaintiff Hyundai Steel Company ("Hyundai Steel") hereby comments on the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Co. v. United States*, Ct. No. 22-00029 (Ct. Int'l Trade Apr. 16, 2024), ECF No. 70-1, PRR 4 ("*Final Remand*").[1]  The administrative

---

[1] Citations to the administrative record shall be to the public or confidential record document number ("PR" or "CR") followed by the

determination at issue is *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 79 (Jan. 3, 2022) ("*Final Results*"), PR 133, and accompanying Issues and Decision Memorandum ("*Final Results IDM*"), PR 132, *as amended*.

As discussed below, the *Final Remand* fails to comply with the Court's instructions and is otherwise unsupported by substantial evidence and not in accordance with law.

## I.    Argument

The Court held that "the Department's finding of '*de jure* specificity' is conclusory and is not supported by substantial evidence" because "nothing in the record demonstrates that the South Korean statute or regulations expressly restrict access to a particular (specific, as it were) and limited number of enterprises or industries." *Hyundai Steel Co. v. United States*, No. 22-00029, 2023 WL 8715732 at *7. (Ct. Int'l Trade. Dec. 18, 2023) ("*Hyundai Steel II*"). As part of its decision, the Court posed two questions to Commerce. The first question was

---

page or exhibit number. Citations to the remand administrative record shall be to the public or confidential remand record document number ("PRR" or "CRR") followed by the page or exhibit number.

whether "any large business could qualify for the additional three percent allocation regardless of the industry to which it belongs?" *Hyundai Steel II*, 2023 WL 8715732 at *7. The second question posed by the Court was "did Commerce consider that the {GOK's} determination that 'Manufacturing of Basic Steel' qualified for the additional allocation appears to have no significance for whether any other enterprise or industry does or does not qualify?" *Hyundai Steel II*, 2023 WL 8715732 at *7. The Court also necessarily discussed the safe harbor provision in section 771(5A)(D)(ii) of the Tariff Act of 1930 (the "Act") as this argument had been presented by Hyundai Steel in the event the court found that the *de jure* specificity determination as per section 771(5A)(D)(i) was lawful. The Court directed Commerce to "reconsider whether the benefit conferred upon Hyundai is 'specific' as required by the Tariff Act of 1930" and "insofar as that benefit is otherwise 'specific,' reconsider whether it falls within the safe harbor exception of 19 U.S.C. § 1677(5A)(D)(ii)." Order, *Hyundai Steel Co. v. United States*, Ct. No. 22-00029 (Ct. Int'l Trade Dec. 18, 2023), ECF No. 67.

In the *Final Remand*, Commerce continued to determine that the KETS program is *de jure* specific pursuant to 771(5A)(D)(i) of the Act and determined that the criteria for the full allocation are not horizontal in application and thus not "objective criteria" for purposes of the safe harbor provided pursuant to 771(5A)(D)(ii) of the Act.  For the following reasons, Commerce's determinations that the KETS program is *de jure* specific pursuant to 19 U.S.C. §1677(5A)(D)(i) and that the safe harbor of 19 U.S.C. § 1677(5A)(D)(ii) does not apply are unsupported by substantial evidence and contrary to law.

> A.    *Commerce's Specificity Determination Continues To Be Unsupported By Evidence And Is Otherwise Not In Accordance With Law.*

Pursuant to section 771(5A)(D)(i) of the Act, a subsidy is *de jure* specific "where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry {or a group of enterprises or industries}."  19 U.S.C. § 1677(5A)(D)(i).  This language has been interpreted to mean "that a subsidy is *de jure* specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a

particular subsidy to a given enterprise or industry." *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393, 1403 (Ct. Int'l Trade 2021) ("*ASEMESA*"). "Non-uniform treatment across the economy is not enough; instead, the authority or its implementation legislation must 'explicit{ly} restrict{}' the 'benefits to a specific enterprise or industry.'" *Hyundai Steel Company v. United States*, 659 F. Supp. 3d 1327, 1342 (Ct. Int'l Trade 2023) ("*Hyundai Steel I*") (citing *ASEMESA*, 523 F. Supp. 3d at 1403).

The "safe harbor" provision, section 771(5A)(D)(ii) of the Act, provides that a subsidy is not *de jure* specific when certain enumerated conditions are met. In particular, a subsidy is *not de jure* specific if the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing eligibility for, and the amount of, a subsidy, where: "(I) eligibility is automatic; (II) the criteria or conditions for eligibility are strictly followed; and (III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification." 19 U.S.C. § 1677(5A)(D)(ii). The Act defines "objective criteria or conditions" as "criteria or conditions that are

neutral and that do not favor one enterprise or industry over another."
19 U.S.C. § 1677(5A)(D)(ii). The Statement of Administrative Action
accompanying the Uruguay Round Agreements Act clarifies that
objective criteria or conditions means "criteria that are economic in
nature and horizontal in application, such as the number of employees
or the size of the enterprise." Uruguay Round Agreements Act,
Statement of Administrative Action, H.R. Doc. No. 103–316, vol.1, at
159 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4243 ("Statement of
Administrative Action"). Further, the Statement of Administrative
Action describes subsection (D)(ii) as "a corollary of the *de jure* test."
Statement of Administrative Action, 1994 U.S.C.C.A.N. at 4243.

      *1.   The KETS Is Not De jure Specific Pursuant To 19*
             *U.S.C. § 1677(5A)(D)(i).*

In the *Final Remand*, Commerce determined that the GOK
expressly limited the 100 percent permit allocation to a specific
enterprise or industry because "not all industries qualified, but rather
those that qualified for the 100 percent free allocation were those
subsectors (or specific industries) with a certain level of international
trade intensity or production cost." Appx16464. To support its
determination, Commerce notes that "any business within an industry

6

that qualified" pursuant to the trade intensity or production cost criteria "would receive the 100 percent allocation" and quotes statements from the GOK so stating. Appx16463-64. Commerce also notes that 37 subsectors out of 63 qualified for the 100 percent allocation. Appx16464. But these facts demonstrate only that the GOK applies the trade intensity and production cost criteria to determine which "types" of business qualify and, as the Court held, fail to provide substantial evidence that the GOK or the AAGEP expressly limit access to an enterprise or industry (or group thereof).

In particular, the Court held that Commerce's finding of *de jure* specificity, relying on the same facts and reasoning in the Commerce's *Final Remand* here, was not supported by substantial evidence. Before the Court, Commerce argued that the AAGEP "expressly limits which entities qualify for the additional allocation by setting thresholds they must meet to qualify" and quoted Article 12(4) of the Act on Allocation and Trading of Greenhouse-Gas Emission Permits ("AAGEP") and Article 14 of the AAGEP Enforcement Decree. Def.'s Resp. to Pls.' Mots. for J. on the Agency R. at 42, *Hyundai Steel Co. v. United States*, Consol. Ct. No. 22-00029 (Ct. Int'l Trade Nov. 9, 2022), ECF No. 47

("Def.'s Resp. Br.").  The Court noted that Commerce determined that the AAGEP "imposes a 'limitation on which industries qualify for the additional allocation by setting thresholds that industries must meet in order to qualify,'" and found that "{a}bsent from this discussion is any indication of how the criteria, or the limitation and the thresholds, operate to 'restrict the bounds of {the} particular subsidy to a given enterprise or industry.'" *Hyundai Steel II*, 2023 WL 8715732 at *7.  The Court reasoned that "{t}here is also nothing to demonstrate why any particular enterprise or industry would not qualify as long as it met the statutory numbers." *Hyundai Steel II*, 2023 WL 8715732 at *7.  The Court thus already rejected the logic of the *Final Remand* as to how the KETS allegedly expressly limits access to the subsidy to an enterprise or industry.

To Commerce, the Ministry of Environment ("MOE") "imposes the 'trade intensity' and 'production cost' qualifying criteria in an explicit manner," Appx16462, but this is not true as the MOE simply applies the trade intensity and production cost criteria to determine what

sectors qualify.[2]  The criteria set standards that required collection and analysis of data from 2013 to 2016 regarding each subsector's imports, exports, sales, production costs, emissions, and the market price of permits.  Appx16439-40.  Those factors determine (a) whether subsectors were exposed to competition from markets that were not subject to similar emissions caps and (b) the impact that the KETS emission cap may have on each potentially affected subsector.  Appx10139-40.  Any industry or enterprise may meet the trade intensity or production cost criteria.  Notably, the GOK set the criteria with the Enforcement Decree, and then later determined which subsectors received the 100 percent allocation using the criteria.  Appx11615; Appx11638; Appx15496; Appx15504.  In order to implement Phase Two of the KETS, the GOK had to further divide the 26 subsectors from Phase One into 63 subsectors for Phase Two such that it could determine which subsectors met the criteria of the AAGEP.  Appx15500.  The MOE thus could not have "expressly limited" the

---

[2] Trade intensity is equal to average annual exports plus average annual imports divided by average annual sales plus average annual imports, and production costs are equal to the annual average emission quantity multiplied by the market price for permits divided by the value-added during the base period.  Appx11896-97.

KETS allocations to an enterprise or industry because it did not yet know which subsectors met the criteria.

In the *Final Remand*, Commerce determined that "many industries are unlikely to meet the sufficient trade intensity or production costs criteria" and thus "thus, not all industries will meet the criteria." Appx16472. Commerce explains that the GOK applied the trade intensity and production cost criteria to expressly limit which industries would receive the 100 percent allocation, noting that the MOE's process for allegedly limiting industries the industries who receive the 100 percent allocation "does not undermine Commerce's finding that the program is *de jure* specific." Appx16472-73.

Contrary to Commerce's claims in the *Final Remand*, whether "all industries will meet the criteria" does not mean that the AAGEP or its Enforcement Decree "expressly limit access to the subsidy to an enterprise or industry" pursuant to 19 U.S.C. § 1677(5A)(D)(i). Indeed, there is an "inherent disconnect" between the "types of businesses" in the AAGEP and "'a *specific* enterprise or industry' or 'a *given* enterprise or industry' as referred to in the Tariff Act as interpreted by *ASEMESA*," as the Court pointed out. *Hyundai Steel II*, 2023 WL

8715732 at *7 (emphasis in original) (citing Appx11638).  The Court,

through its instructive questions to Commerce, noted that whether a

certain industry, such as the "'Manufacturing of Basic Steel,' qualifies

for the additional allocation appears to have no significance for whether

any other enterprise or industry does or does not qualify."  *Hyundai*

*Steel II*, 2023 WL 8715732 at *7.  Further, whether the "Manufacturing

of Basic Steel" subsector itself will qualify depends on whether it meets

the trade intensity and production cost criteria, and it may or may not

qualify in later phases of the KETS program.  Appx11896-97.

Depending on the relevant factors in the criteria, any large business

could qualify for the 100 percent allocation regardless of the industry to

which it belongs.  Commerce's determination that "not all industries

will meet the criteria," Appx16472, literally repeats "the truism that not

all industries will 'qualify under the criteria,'" which the Court found

insufficient to justify a finding of *de jure* specificity in *Hyundai Steel I*

and *Hyundai Steel II*. *Hyundai Steel I*, 659 F. Supp. 3d at 1342;

*Hyundai Steel II*, 2023 WL 8715732 at *7-8.  The *Final Remand* lacks

substantial evidence that demonstrates "how the criteria, or the

limitation and the thresholds, operate to 'restrict the bounds of the

11

particular subsidy to a given enterprise or industry,' 'a specific enterprise or industry,' or even a 'specific' small universe of enterprises or industries." *Hyundai Steel II*, 2023 WL 8715732 at \*7 (quoting *ASEMESA*, 523 F. Supp. 3d at 1403). The Court has already rejected the logic behind the *Final Remand* and should do so again here.

As to the Court's first question, Commerce claims in the *Final Remand* that "among those businesses and industries that are subject to the KETS program, not all large businesses will receive the 100 percent allocation," and selectively quotes text from the GOK's questionnaire response describing the industries that meet the trade intensive and production cost criteria. Appx 16474-75. Specifically, Commerce starts its response by asserting – "First, not every industry is mandated to participate in the KETS program. The program as a whole, thus, does not apply to every industry within Korea." Appx16462. This is a non-sequitur. The Court's question asks about whether any large business can qualify for the 100 percent allocation, regardless of the industry they belong. By definition, this question does not apply to companies or industries that are not even subject to the KETS program. After all, these companies have no carbon emissions

reduction obligations and so are not even part of the "program" that Commerce is examining, which is a program that deducts 3 percent of the permit allocation from subject companies that do not meet the trade intensive or high production cost eligibility criteria. Therefore, pointing out that not every industry in Korea is subject to this burdensome program is not responsive to the Court's question. Whether other entities are not subject to the carbon emission caps of the KETS program is irrelevant to whether the 100 percent allocation is specific to Hyundai Steel.

As to the Court's second question – whether Commerce considered "that the {GOK's} determination that 'Manufacturing of Basic Steel' qualified for the additional allocation appears to have no significance for whether any other enterprise or industry does or does not qualify" – Commerce concedes it has no relevance. *See Hyundai Steel II*, 2023 WL 8715732 at *7. More specifically, Commerce states that it does "not find that the GOK's provision of the additional three percent allocation to the steel industry has any significance for whether any other enterprise or industry does or does not qualify." Appx16462. This concession further undermines Commerce's *de jure* specificity determination.

13

In response to comments filed by Hyundai Steel before the agency regarding Commerce's response to the Court's second question, Commerce further responded by stating that "it is not necessary for a law to specifically enumerate an industry for a program to be *de jure* specific." Appx16475; *see also* Appx16466 (noting that Commerce has found that a subsidy can be *de jure* specific where it "expressly limits access to a 'group' of enterprises or industries which the authority itself defines, but which does not necessarily comprise 'specifically named' enterprises or industries"). Commerce claims that "under Hyundai Steel's interpretation," no program would be *de jure* specific "so long as the initial underlying legislation did not outright name the recipient companies or sectors" and asserts that "there is no basis to conclude that a law must enumerate specific subsectors by formal name" to constitute *de jure* specificity. Appx16473-74.

Yet Hyundai Steel does not argue that recipient companies or sectors must be "outright named" to be *de jure* specific. Hyundai Steel argues that, in order to be specific as a matter of law pursuant to 19 U.S.C. § 1677(5A)(D)(i), the authority or legislation must "expressly limit access to the subsidy to an enterprise or industry," and that the

KETS does not do so here.  The court has held that the plain meaning of § 1677(5A)(D)(i) "is that a subsidy is *de jure* specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry."  *Hyundai Steel II*, 2023 WL 8715732 at *5 (citing *ASEMESA*, 523 F. Supp. 3d 1393).  "Non-uniform treatment across the economy is not enough; instead, the authority or its implementation legislation must 'explicit{ly} restrict{}' the 'benefits to a specific enterprise or industry.'" *Hyundai Steel I*, 659 F. Supp. 3d 1327, 1342 (citing *ASEMESA*, 523 F. Supp. 3d at 1403).  None of the "administrative precedents" that Commerce cites contradict the Court's holding as to the meaning of § 1677(5A)(D)(i).[3]  Commerce has failed to

---

[3] Commerce cites several decisions to support its *Final Remand*. Appx16475-76 (citing *Common Alloy Aluminum Sheet from the Republic of Turkey*, 85 Fed. Reg. 49,629 (Aug. 14, 2020); *Aluminum Foil from the Sultanate of Oman*, 86 Fed. Reg. 12,913 (Mar. 5, 2021)); *see also* 16468 n.54 (citing *Silicon Metal from Australia,* 83 Fed. Reg. 9,834 (Mar. 8, 2018); *Aluminum Extrusions from the People's Republic of China*, 80 Fed. Reg. 77,325 (Dec. 14, 2015); *Certain Steel Nails from the Sultanate of Oman:*, 80 Fed. Reg. 28,958 (May 20, 2015); *Certain Uncoated Groundwood Paper from Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Aug. 9, 2018)).  None of the cited cases provide authoritative support for Commerce's statutory interpretation as to the KETS program at issue.  Like Hyundai Steel originally pointed out as to *Silicon Metal from Australia*, many of these

show that the KETS program expressly limits access to the 100 percent

allocation of permits as a matter of law pursuant to the statutory text.

Commerce also determined that the trade intensity and

production cost criteria are allegedly similar to those that the European

Union uses to identify companies on its "carbon leakage list," which the

court recognized as expressly limiting the EU-ETS program to a select

group of subsectors in *BGH Edelstahl Siegen GmbH v. United States.*

Appx16470 (citing *BGH Edelstahl Siegen GmbH v. United States*, 600

F. Supp. 3d 1241, 1264 (Ct. Int'l Trade 2022)).  Citing language from the

Statement of Administrative Action, Commerce claims that "to reach

different conclusions regarding these two programs… creates a

loophole" that could be exploited by foreign governments to "evade

capture by CVD law."  Appx16470-71; Appx16476-77 (citing Statement

of Administrative Action, 1994 U.S.C.C.A.N. at 4243).  *BGH*, although

discussing a similar program, did not address the precise arguments

_____

cases were not appealed and thus to the extent each may involve
similar facts, Hyundai Steel submits that the determination is not in
accordance with law because it did not limit eligibility to certain
enterprises or industries and involve distinct programs with a different
administrative record from the one before the Court here.  *See* Hyundai
Steel's Reply Br. at 31 n.8, *Hyundai Steel Co. v. United States*, No. 22-
00029 (Dec. 13, 2022).

16

that Hyundai Steel has raised in this case and involves a distinct

program with a different administrative record.  The determination in

*BGH* was limited to a program that, by law, limited the permit

allocation to companies on a carbon leakage list whereas the KETS

program, by law, allocates permits using the trade intensity and

production cost criteria and therefore does not expressly limit access to

an enterprise or industry.  *See* Hyundai Steel's Reply Brief in Support

of Its Motion for Judgment on the Agency Record at 29-30, *Hyundai

Steel Co. v. United States*, No. 22-00029 (Ct. Int'l Trade Dec. 13, 2022),

ECF No. 51.

In making its "loophole" argument, Commerce claims that

reaching different results in *BGH* and this case "would be antithetical

to the purpose of the CVD law and withhold the relief to which an

injured domestic industry is entitled."  Appx16471.  To the contrary, a

review of this program reveals that it is "antithetical" to the purpose of

the CVD law to treat this program as providing a subsidy.  "The

countervailing duty {law} was intended to offset the unfair competitive

advantage that foreign producers would otherwise enjoy from export

subsidies paid by their governments."  *Zenith Radio Corp. v. United*

17

*States*, 437 U.S. 443, 455-56, 98 S. Ct. 2441, 2448 (1978). "The preeminent purpose of the specificity test is 'to function as a rule of reason and avoid imposition of {CVDs} in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy.'" *BGH Edelstahl GmbH v United States*, 663 F. Supp. 3d 1378, 1384 (Ct. Int'l Trade 2023) ("*BGH III*"). Treating the differing KAU allocations as a countervailable subsidy in this case does not further the purpose of the CVD law or the specificity test.

Hyundai Steel, and all the Korean companies who are required to participate in the KETS program, have to incur unwanted costs to reduce their carbon emissions. On the other hand, U.S. companies are not subject to a cap and trade system and thus do not have to incur the same carbon reduction costs. To impose countervailing duties on Korean companies based on a 3 percent difference in permit allocations does not level the playing field for U.S. companies that the CVD law is designed to protect. Instead, it creates an uneven playing field whereby companies like Hyundai Steel have to incur carbon reduction costs that are not incurred by U.S. companies. This uneven playing field is

18

exaggerated by imposing countervailing duties on their exports to the

United States, which demonstrates the absurdity of countervailing the

KETS program. Commerce's treatment of the KETS as a

countervailable subsidy is inconsistent with the purpose of the CVD

law.

In response, Commerce claims that it does not "take into account

any effects related to the granting of the subsidy" when determining

whether a countervailable subsidy exists. Appx16477. However,

Commerce's analysis of the "substantiality of the evidence must take

into account whatever in the record fairly detracts from its weight." *CS

Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir.

2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720

(Fed. Cir. 1997). Additionally, when determining whether Commerce

has appropriately interpreted 19 U.S.C. § 1677(5A)(D), the court must

"carefully investigate the matter" including consideration of "Congress's

purpose and intent on the question at issue." *Timex V.I. v. United

States*, 157 F.3d 879, 881 (Fed. Cir. 1998); *see also Commissioner of

Internal Revenue v. Brown,* 380 U.S. 563, 572, 85 S.Ct. 1162, 1166

(1965) ("Unquestionably the courts, in interpreting a statute, have some

19

'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results… or would thwart the obvious purpose of the statute.'").  As explained, the record as a whole does not support that the purpose of the countervailing duty law would be thwarted if Commerce were to determine the KETS is not *de jure* specific and, while Commerce claims that it does not have to consider the effects of the subsidy, the Court may consider the purpose and intent behind the countervailing duty and specificity as to whether the program is specific pursuant to 19 U.S.C. § 1677(5A)(D).

There is no evidence that the GOK has attempted to thwart or evade U.S. CVD law in this case.  Commerce claims that it does not require evidence of a foreign government's intent to evade countervailing duty law before considering the implications of its decisions.  Appx16477.  Commerce's explanation is immaterial. Hyundai Steel does *not* argue that the KETS is not specific because the GOK did not "intend" to target benefits with the program.  The Court's holding in this case will not open a loophole to evade the countervailing duty law.  The issue in this case is whether the trade intensity and

20

production cost criteria "expressly limit access to the subsidy an enterprise or industry" pursuant to the plain language of 19 U.S.C. § 1677(5A)(D)(i).  Commerce's determination must be based on substantial evidence on the record and in accordance with law, not speculation.  19 U.S.C. § 1516a(b)(1)(B)(i), (2)(A).

Accordingly, the *Final Remand* fails to demonstrate that the trade intensity or production cost criteria expressly limit access to a subsidy. The *Final Remand* thus fails to comply with this Court's remand order and is unsupported by substantial evidence and is otherwise not in accordance with law.

### 2. The KETS Is Not Specific As A Matter Of Law Pursuant To 19 U.S.C. § 1677(5A)(D)(ii).

With regard to the safe harbor argument, the Court found that "{t}he Department's decision did not address the issue in any meaningful way: Commerce simply found, without explanation, that the South Korean statute and implementing rules do not establish 'objective criteria or conditions.'"  *Hyundai Steel II*, 2023 WL 8715732 at *8.  In the *Final Remand*, Commerce again failed to address in any meaningful way the Court's concerns or demonstrate that the safe harbor does not apply.

21

In the *Final Remand*, Commerce claims that the trade intensity and production cost criteria are "not horizontal in application and, thus, not neutral as described in the {Statement of Administrative Action}" because the criteria allegedly favor certain subsectors that "have more GHG-intensive (*i.e.* heavy polluting) production processes (the production cost factor) and/or are more dependent on international markets for sales and/or sourcing (the international trade intensity factor) than other subsectors."  Appx16466.  According to Commerce, "comparing the subsectors that receive the 97 percent allocation with those that receive the 100 percent allocation under the AAGEP and its Enforcement Decree demonstrates that the criteria are not horizontal in application and limit eligibility to a select group of subsectors."  Appx16467-68.  In the *Final Remand*, Commerce further determined that the trade intensity and production cost criteria result in an express statutory limitation on which industries or enterprises qualify for the 100 percent allocation allegedly because "some industries or enterprises may benefit" while "others do not."  Appx16478-79.  To Commerce, the criteria "are not horizontal in nature because they favor certain industries, such as primary steel, over others."  Appx14679.

22

The observations by Commerce that "the subset of subsectors that qualify for the additional allocation are manufacturing sectors of a certain type, *i.e.*, trade and/or emission intensive subsectors" and the alleged contrast against the "broader spectrum of manufacturing groupings" and "broad set of service industries," Appx16467, merely delineate the result of the GOK applying the KETS criteria.  In other words, the *Final Remand* determines that the trade intensity and production cost criteria are not "objective" because the criteria "favor{} trade intensive and/or emission intensive subsectors."  Appx16469. Commerce's explanation does not lead to the conclusion that the criteria favor one enterprise or industry over another for purposes of 19 U.S.C. § 1677(5A)(D)(ii).  Under Commerce's logic, any eligibility criteria could be said to favor an enterprise or industry because not every enterprise will meet the eligibility criteria, *i.e.*, what would be the point of having eligibility criteria if everyone could qualify.  As the court has noted, "Commerce's observation that 'some industries may benefit from the additional assistance in the form of the allocation of additional KAUs, while others do not,' merely reflects the truism that not all industries will 'qualify under the criteria.'" *Hyundai Steel*, 659 F. Supp. 3d at 1342

(quoting *Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 22,570 (Dep't Commerce May 9, 2022) and accompanying Issues and Decision Mem. at 23).  Whether subsectors meet the trade intensive and production cost criteria does not mean that the criteria favor one enterprise or industry over another for purposes of 19 U.S.C. § 1677(5A)(D)(ii).

The *Final Remand* disregards that the trade intensity and production cost criteria are applied to *all* subsectors to see which qualify.  The *Final Remand* claims that the criteria are "not horizontal" because the GOK explained that the trade intensity criteria shows whether the product or service provided by an industry "is disclosed to competition in markets where competitors exist that are not subject the same or similar carbon reduction programs."  Appx16469 (citing Appx10139-40).  Yet, the *Final Remand* fails to explain how the criteria are not economic in nature or horizontal in application and thus would be unlike the number of employees or size of the enterprise examples from the Statement of Administrative Action.  Statement of Administrative Action, 1994 U.S.C.C.A.N. at 4243.  The GOK applied

24

the trade intensity and production cost criteria evenly to all subsectors subject to the KETS to determine who qualified.  Appx15504-05.  The criteria thresholds do not vary by enterprise or industry.  Any type of business can qualify under the KETS program if they meet the trade intensity and production cost criteria.  Indeed, Commerce admits that "these criteria are based on mathematical formulas and are therefore 'objective' in that sense."  Appx16479.

The court rejected the logic underlying the *Final Remand* in *Hyundai Steel III*.  In the *Remand Results* of *Hot-Rolled Steel from the Republic of Korea*, Commerce determined that the trade intensity and production cost criteria "'are not horizontal in application' because the favored subsectors, by their nature, have more GHG-intensive (i.e., heavy polluting) production processes' and 'are more dependent on international markets for sales and/or sourcing.'" *Hyundai Steel v. United States*, 2024 WL 1929018 at *10 (Ct. Int'l Trade May 2, 2024) ("*Hyundai Steel III*").  The court remanded Commerce's *Remand Results*, explaining that "Commerce's rationale merely repackages the language of the criteria into a statement that certain subsectors are favored." *Hyundai Steel III*, 2024 WL 1929018 at *11.  The court

25

reasoned that "even criteria recognized as objective (such as the size or

number of employees) 'could exclude entire categories of enterprises and

industries, but such criteria would not render the subsidy *de jure*

specific because it is horizontal (operating throughout an economy)."

*Hyundai Steel III*, 2024 WL 1929018 at *11 (citing *BGH III*, 663 F.

Supp. 3d 1382).  The court acknowledged that "any subsidy bestowed

pursuant to eligibility criteria necessarily requires some identification

of the recipients that meet those criteria."  *Hyundai Steel III*, 2024 WL

1929018 at *12.  The court also reasoned that Commerce's explanation

considered evidence related to a *de facto* analysis pursuant to 19 U.S.C.

§ 1677(5A)(D)(iii), which the court noted was not grounded in the *de

jure* specificity prong of the statute.  *Hyundai Steel III*, 2024 WL

1929018 at *11.  The same reasoning applies equally here.  The *Final

Remand* merely reflects the fact that not all enterprises or industries

will qualify pursuant to the criteria and does not evidence that the

criteria are not "horizontal in application."

Commerce also attempts to contrast the trade intensity and

production cost criteria with *Wood Flooring from China* where

Commerce determined that a tax deduction "was not *de jure* specific

26

because 'the eligibility criteria indicate that it is generally available to any company that hired disabled persons.'" Appx16469 (citing *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2012*, 80 Fed. Reg. 41,007 (July 14, 2015) and accompanying Issues and Decision Mem. at 20). But following Commerce's logic here, the tax deduction in *Wood Flooring from China* favors certain enterprises that can hire disabled persons and thus could not be objective criteria because it would "limit eligibility to a select group" of enterprises and "expressly carve out" eligible enterprises. Appx16467-68; Appx16469-70.

Commerce claims that, in comparison to the tax deduction for enterprises that hire disabled persons, the AAGEP "carve{s} out industries" to receive the 100 percent allocations "based on certain characteristics of said industries." Appx16480. However, the alleged "characteristics" of the industries are the very trade intensity and production cost criteria at issue. Rebranding the term "criteria" as "characteristics" does not suggest that the criteria or "characteristics" favor any given enterprise or industry. Rather, it restates the obvious

27

conclusion that industries that do not meet those criteria or "have those characteristics" would not be eligible.  The statute permits the use of "characteristics" to identify eligible recipients so long as the "characteristics" are "objective criteria governing the eligibility for and amount of a subsidy."  19 U.S.C. § 1677(5A)(D)(ii); *see also BGH III*, 663 F. Supp. 3d 1378, 1384 (Ct. Int'l Trade 2023) ("The statute allows a subsidy to be limited to fewer than all enterprises or industries in an economy so long as that criteria creating that legislation is objective.").

In *BGH III*, Commerce similarly offered a generalized counterexample to the court's requests on remand: "Commerce's example of a permissible program which only requires firms to strive to improve energy efficiency for eligibility implies that all industries must be capable of taking advantage of a program for the program to be horizontal in application."  *BGH III*, 663 F. Supp. 3d at 1384.  The court found that such an "implication runs counter to the example provided in the {Statement of Administrative Action} indicating that a category based on the size or number of employees would be horizontal."  *BGH III*, 663 F. Supp. 3d at 1384.  Here too, Commerce suggests that only

those criteria which would be applicable to all industries could, under its theory, be objective.  The Court should reject this interpretation.

As the court in *Hyundai Steel III* explained, "the agency's consideration of the actual users of the subsidy" does not follow from the text of the *de jure* provision of the statute.  *Hyundai Steel III*, 2024 WL 1929018 at *11.  Indeed, such considerations are irrelevant to specificity as a matter of law and apply in a *de facto* analysis.  19 U.S.C. § 1677(5A)(D)(iii), not 19 U.S.C. § 1677(5A)(D)(ii), provides for consideration of whether an enterprise or industry is a "predominant user of the subsidy," whether an enterprise or industry "receives a disproportionately large amount of the subsidy," or whether the "actual recipients" of the subsidy "are limited in number."  19 U.S.C. § 1677(5A)(D)(iii).  As explained in the Statement of Administrative Action with regard to *de jure* specificity, "when the authority 'expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, *further inquiry into actual use of the subsidy is unnecessary.*'" *Hyundai Steel III*, 2024 WL 1929018 at *11 (citing Statement of Administrative Action at 930, 1994 U.S.C.C.A.N. at 4243) (emphasis in original).  The court should reject Commerce's

interpretation of 19 U.S.C. § 1677(5A)(D)(ii) because it "offers no interpretation of the *de jure* provision of the statute to support its consideration of the actual users of the subsidy in order to determine whether the subsidy is specific *as a matter of law*." *Hyundai Steel III*, 2024 WL 1929018 at *11 (emphasis in original).

Accordingly, the *Final Remand* fails to demonstrate that the trade intensity or production cost criteria are not objective for purposes of the safe harbor provided in 19 U.S.C. § 1677(5A)(D)(ii). The *Final Remand* thus fails to comply with this Court's remand order and is unsupported by substantial evidence and not in accordance with law.

## II.    Conclusion

For the foregoing reasons, Plaintiff respectfully requests that this Court again remand Commerce's decision with instructions to reconsider the *Final Remand*, and for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

## III.  **Certificate of Compliance**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 5,535 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills